SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
James C. Shah
475 White Horse Pike
Collingswood, NJ  08107                    **DOCUMENT ELECTRONICALLY**
Telephone: 856/858-1770                    **FILED**
856/858-7012 (fax)

Attorneys for Plaintiff

*Additional Counsel Listed on Signature Page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| M. J. Copeland, Individually and | : | |
| Derivatively on Behalf of | : | |
| Johnson & Johnson | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Charles O. Prince, III, Anne M. Mulcahy, | : | **COMPLAINT** |
| Mary Sue Coleman, James G. Cullen, | : | |
| Michael M.E. Johns, Arnold G. Langbo, | : | |
| Susan L. Lindquist, Leo F. Mullin, | : | |
| William D. Perez, Ted Torphy, | : | |
| David Satcher, William C. Weldon, | : | |
| Christine A. Poon, Steven S. Reinemund, | : | **DEMAND FOR JURY TRIAL** |
| Robert J. Darretta, Ann Dibble Jordan, | : | |
| Henry B. Schacht, James T. Lenehan, | : | |
| Robert N. Wilson, Joseph C. Scodari, | : | |
| Alex Gorsky, Nicholas Valeriani and | : | |
| Russell C. Deyo, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| Johnson & Johnson, | : | |
| | : | |
| Nominal Defendant. | : | |

## I.   NATURE OF THE ACTION AND SUMMARY OF THE CLAIMS

1.      This is a shareholder individual and derivative action brought on behalf of Nominal Defendant, Johnson & Johnson ("J&J" or the "Company").  No damage claims are asserted herein against J&J, which is a Nominal Defendant and an additional victim of the violations of the suffrage rights of Plaintiff, who was entitled to vote at the Company's Annual Meetings of Shareholders held on April 22, 2010 and April 28, 2011.

2.      This action charges the Individual Defendants identified below with using their control over J&J and its corporate suffrage process in effectuating and/or directly participating and/or aiding and abetting violations of §14 (a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder by the Securities and Exchange Commission ("SEC"), in order to perpetuate themselves in office as Directors of the Company, thereby permitting them to unjustly enrich themselves and/or otherwise damage the Company at its expense and the expense of its shareholders.

3.      Defendant, William C. Weldon, and the other Director Defendants named herein are charged by this Complaint with gross negligence in the management of J&J by, *inter alia*, engaging through their subordinates in an unlawful and deceitful course of conduct in which the Company was grossly mismanaged as well as incompetently governed by its Board of Directors (the "Board") over a multi-year period as described below.  The claims arise from systemic and pervasive failures of corporate governance by the Board at all levels of the Company.  Such conduct on the part of current and former senior officers and current and former directors of the Company including, *inter alia*, breaches of fiduciary duty throughout J&J,  spanning multiple drugs, products and medical devices and multiple operating subsidiaries in connection with, among other wrongdoing, payment of kickbacks,  payment of bribes in violation of the federal

Foreign Corrupt Practices Act ("FCPA") and similar foreign anti-bribery laws, violations of the federal False Claims Act ("FCA"), off-label drug promotion, failure to warn, and cGMP (current Good Manufacturing Practices) violations in connection with the recall of contaminated over-the-counter ("OTC") products.

4.      Additionally, the Director Defendants directly caused the waste of J&J's assets by causing the Company to settle claims brought by the Justice Department, the SEC and other regulatory agencies with J&J's assets rather than with the personal assets of the persons who were responsible for the wrongdoing that resulted in such claims being made.  To date, the Company has suffered substantial economic damages and injury to its reputation as a direct result of the wrongdoing alleged herein and, further, J&J's Directors were elected/re-elected to their positions in the wake of and due to the issuance and dissemination of false and misleading proxy statements issued in connection with the Company's 2010 and 2011 Annual Meetings of Shareholders.

5.      The allegations against the Individual Defendants are based upon personal knowledge as to Plaintiff and her ownership of shares of J&J, and on information and belief as to all other matters, such information and belief having been formed by the investigation conducted by and under the supervision of her counsel, which included, among other things: (a) review and analysis of the Company's public filings with the SEC; (b) review of other publicly available information, including articles in the news media and on blogs; (c) review and analysis of multiple qui tam complaints and complaints filed by the Department of Justice and/or state Attorneys General; (d) review of the Company's website and press releases; (e) consultation with persons knowledgeable regarding the facts and circumstances alleged herein including medical

professionals; and, (f) review of other shareholder derivative complaints in actions commenced against the Individual Defendants.

6.     Plaintiff believes that substantial additional evidentiary support will exist for her allegations after a reasonable opportunity for discovery.

## II.     JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9, as well as New Jersey common law.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Count I asserts claims for violations of § 14(a) of the Exchange Act and SEC Rule 14a-9; (b) pursuant to the Court's supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367(a); and (c) pursuant to the Court's diversity jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  Many of the acts charged herein, including the issuance and dissemination of the proxy statements at issue and the mismanagement of J&J, including the wrongdoing referred to below, occurred in substantial part in this District.  In addition, the Company maintains its corporate headquarters in this District.

10.     In connection with the acts alleged in this Complaint, the Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails and interstate wire facilities, to carry out the wrongdoing described herein.

11.     In additional to Plaintiff's individual claims asserted pursuant to federal law, this verified shareholder derivative action has been commenced pursuant to Rule 23.1 of the Federal

Rules of Civil Procedure. This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2) and (3) and 1401 because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred in this District.

### III.    PARTIES

#### A.    Plaintiff

12.    Plaintiff, M. J. Copeland ("Plaintiff"), owns and has continuously owned common stock in J&J throughout all or most of the period of the wrongdoing alleged herein.  Plaintiff is a citizen of California and, upon information and belief, each of the Defendants is a citizen of a state other than California.

#### B.    Nominal Defendant

13.    Nominal Defendant, J&J, is a corporation organized under the laws of New Jersey with its principal executive offices and corporate headquarters located in New Brunswick, New Jersey.  J&J manufactures and sells pharmaceutical products, medical devices and consumer packaged goods.

14.    The Company conducts its operations through multiple subsidiary companies. Contrary to its public representations and claims that "[e]ach of our operating companies functions as its own small business" (J&J website, April 18, 2010), in reality J&J, through its Board and senior management, exercises strict supervision, control, and dominion over its subsidiaries' activities, decisions, policies, and practices related to sales goals, sales tactics, compliance, regulatory affairs, medical affairs, research and development, human resources, legal issues, budget, accounting, employee compensation, employee benefits, employee expenses, manufacturing, and public relations.  J&J, through its Board and senior management,

sets the business objectives and sales goals of all its subsidiaries, and regularly reviews and approves their sales numbers and projections.

15.     As recognized in a recent academic study focusing on J&J's management behavior, and concluding that J&J routinely re-configures business units to suit its overall Board objectives, the claim of decentralized management is a myth:

> J&J suits the study particularly well.  Indeed, the study may help dispel some myths about the company that it consists of independent subsidiaries that rely on internal resource creation within the bounds of autonomous organizational business units.  By contrast with this view, we demonstrate the vital importance of unit reconfiguration to the company's innovativeness, along with the frequency of obtaining resources via business acquisitions and reconfiguring these resources. Johnson and Johnson continually moved resources within unit boundaries, and updated unit boundaries within the firm, as they pursued innovation.

Samina Karim and Will Mitchell, *Innovating through Acquisition and Internal Development: A Quarter-century of Boundary Evolution at Johnson & Johnson*, "Long Range Planning 37 (2004) 525-547.  Accordingly, each subsidiary is, in substance, the *alter ego* of the Company, managed through a centralized hierarchical structure, with a management level Executive Committee composed of business segment "Worldwide Chairmen," and corporate senior executive officers exercising plenary control over all Company operations and allocation of Company resources, and under the ultimate authority and oversight of the J&J Board.

## C.      Sitting Director Defendants

16.     Defendant, Anne M. Mulcahy ("Mulcahy"), has been a Director since 2009. Mulcahy has been a member of the Compensation & Benefits Committee and the Nominating & Corporate Governance Committee.  She presently is or has been a defendant in numerous securities fraud class actions and shareholder derivative suits. Despite her personal responsibility to J&J and its shareholders for the wrongdoing described herein since she became a Director, she currently is a member of the Board's so-called "Special Committee" appointed by the Board on

April 22, 2010, purportedly "to investigate, review, and analyze the facts and circumstances surrounding the allegations raised in," *inter alia*, Plaintiff's Demand Letter as described more fully below. During the period since she became a J&J Director Defendant Mulcahy was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of her stewardship responsibilities to J&J and its shareholders.

17.     Defendant, Mary Sue Coleman ("Coleman"), has been a Director since 2003. Coleman has been a member of the Audit Committee and the Science & Technology Advisory Committee since 2003.  During much of the Relevant Period, Defendant Coleman, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of her stewardship responsibilities to J&J and its shareholders.

18.     Defendant, James G. Cullen ("Cullen"), has been a Director since 1995, and is the Presiding Director of the Company's Board and Chairman of the Audit Committee.  Cullen has been a member of the Audit Committee since 1997 and a member of the Nominating & Corporate Governance Committee since 2004.  During much of the Relevant Period, Defendant Cullen, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

19.     Defendant, Michael M. E. Johns ("Johns"), has been a Director since 2005 and is a member of the Compensation & Benefits Committee and the Science & Technology Advisory Committee. Despite his personal responsibility to J&J and its shareholders for the wrongdoing described herein since he became a Director, he currently is a member of the Board's so-called

"Special Committee" appointed by the Board on April 22, 2010, purportedly "to investigate, review, and analyze the facts and circumstances surrounding the allegations raised in," *inter alia*, Plaintiff's Demand Letter as described more fully below. During most of the Relevant Period, Johns, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

20.     Defendant, Susan L. Lindquist ("Lindquist"), was elected to the Board in 2004 and is a member of the Science & Technology Advisory Committee and the Public Policy Advisory Committee.  Lindquist has been a member of the Public Policy Advisor Committee and the Science & Technology Advisory Committee since 2004.  During much of the Relevant Period, Defendant Lindquist, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

21.     Defendant, Leo F. Mullin ("Mullin"), has been a Director since 1999 and is a member of the Audit Committee and Chairman of the Public Policy Advisory Committee. Mullin has been a member of the Audit Committee since 2000, a member of the Public Policy Advisory Committee since 2006 and a member of the Nominating & Corporate Governance Committee from 2000 to 2005.  During much of the Relevant Period, Defendant Mullin, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

22.     Defendant, William D. Perez ("Perez"), was elected to the Board in 2007 and is a member of the Compensation & Benefits Committee and the Public Policy Advisory Committee.

Perez has been a member of the Public Policy Advisory Committee since 2008. Despite his personal responsibility to J&J and its shareholders for the wrongdoing described herein since he became a Director, he currently is a member of the Board's so-called "Special Committee" appointed by the Board on April 22, 2010, purportedly "to investigate, review, and analyze the facts and circumstances surrounding the allegations raised in," *inter alia*, Plaintiff's Demand Letter as described more fully below.  During much of the Relevant Period, Perez, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

23.     Defendant, Charles O. Prince III ("Prince"), was elected to the Board in 2006 and is a member of the Compensation & Benefits Committee and chairman of the Nominating & Corporate Governance Committee.  Prince has been a member of the Nominating & Corporate Governance Committee since 2007.  Prince is and has been a defendant in numerous securities fraud class actions and shareholder derivative actions, many of which are still pending.  Prince currently is a member and Chairman of the Board's so-called "Special Committee," appointed by the Board on April 22, 2010, purportedly "to investigate, review, and analyze the facts and circumstances surrounding the allegations raised in," *inter alia*, Plaintiff's Demand Letter as described more fully below.  During much of the Relevant Period, Defendant Prince, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.  Indeed, Prince abdicated his responsibilities to the Company while overseeing the virtual collapse of Citigroup, Inc., of which he was Chief Executive Officer ("CEO").

24.     Defendant, David Satcher ("Satcher"), was elected to the Board in 2002 and is Chairman of the Science & Technology Advisory Committee and a member of the Public Policy Advisory Committee.  Satcher has been a member of the Public Policy Advisory Committee and of the Science & Technology Advisory Committee since 2003.  During much of the Relevant Period, Defendant Satcher, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

25.     Defendant, William C. Weldon ("Weldon"), was elected to the Board and named Vice Chairman of the Board in 2001 and assumed his current responsibilities as Chairman of the Board and CEO in April 2002.   He was appointed to the Executive Committee and named Worldwide Chairman, Pharmaceuticals Group, in 1998, and became Chairman of the Executive Committee in 2002.  Weldon joined the Company in 1971 as a salesman at McNeil Pharmaceutical.  In 1989, he became Vice President, Sales and Marketing, for Janssen Pharmaceutical.  In 1992, he became President of Ethicon Endo-surgery, and in this position gained experience in medical devices, serving as Company Group Chairman and worldwide Franchise Chairman for Ethicon Endo-Surgery from 1995 through 1998.  He was named Worldwide Chairman, Pharmaceuticals Group, in 1998.  Throughout the Relevant Period, Defendant Weldon, as a J&J Director and as a senior officer of the Company, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

### D.     Former Director Defendants

26.     Defendant, Arnold G. Langbo ("Langbo"), was elected to the Board in 1991 and was a member of the Nominating & Corporate Governance Committee and Chairman of the

Compensation and Benefits Committee.  He left the Board on or about April 22, 2010.  In addition, Langbo served on the Audit Committee from 1997 through 2003 and was a member of the Nominating & Corporate Governance Committee from 2004 through 2010. During much of the Relevant Period, Defendant Langbo, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

27.     Defendant, Christine A. Poon ("Poon"), was elected to the Board and named a Vice Chairman of the Board in 2005.  She left the Board on March 1, 2009.  Her career with J&J began in November, 2000, as Company Group Chairman, Pharmaceuticals.  In August, 2001, she was promoted to the Executive Committee and named Worldwide Chairman, Pharmaceuticals. In October, 2003, she was appointed Worldwide Chairman, Medicines and Nutritionals.  In 2007, Poon assumed responsibility for the J&J Development Corporation, the Corporate Office of Science and Technology, the Corporate Office of Information Management, Worldwide Procurement and Worldwide Operations.  During much of the Relevant Period, Defendant Poon, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of her stewardship responsibilities to J&J and its shareholders.

28.     Defendant, Steven S. Reinemund ("Reinemund"), was elected to the Board in 2003 and left the Board on April 24, 2008.  While on the Board, he was a member of the Nominating & Corporate Governance Committee from 2004 to 2008.  During much of the Relevant Period, Defendant Reinemund, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

29.     Defendant, Robert J. Darretta ("Darretta") was elected to the Board in 2002 and served on the Board until 2006.  Darretta was named Vice President, Finance and Chief Financial Officer and appointed to the Executive Committee in 1997.  He was appointed Executive Vice President in 2002 and Vice Chairman of the Board in January 2004.  During much of the Relevant Period, Defendant Darretta, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

30.     Defendant, Ann Dibble Jordan ("Jordan"), served on the Board from 1981 to 2007.  She also served on the Compensation & Benefits Committee and the Audit Committee, and was Chairman of the Public Policy Advisory Committee.  During much of the Relevant Period, Defendant Jordan, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of her stewardship responsibilities to J&J and its shareholders.

31.     Defendant, Henry B. Schacht ("Schacht"), was a Director of J&J from 1997 to April 28, 2005 and served as a member of the Audit Committee and Chairman of the Nominating and Corporate Governance Committees.  During much of the Relevant Period, Defendant Schacht, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

32.     Defendant, James T. Lenehan ("Lenehan"), served on the Board from 2001 until February 1, 2004.  Lenehan started his career in 1976 at McNeil Consumer Products Company and became McNeil's President in 1990.  In 1993, Lenehan was named Company Group Chairman and worldwide Franchise Chairman for Consumer Pharmaceuticals and a member of

the Consumer Group Operating Committee.  In 1994, he was promoted to Executive Committee member and Worldwide Chairman, Consumer Pharmaceuticals & Medical Devices Group.  He was Worldwide Chairman of J&J's Medical Devices and Diagnostics Group from 1999 to 2001, when he became Vice Chairman of the Board, a position in which he also had responsibility for the consumer business.  He was named to the additional position of President of J&J in 2002, a position he held until February, 2004.  During much of the Relevant Period, Defendant Lenehan, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

33.     Defendant, Robert N. Wilson ("Wilson") was elected to the Board in 1986 and resigned in April, 2003.  He served as Vice Chairman of the Board from 1989 until 2002.  He joined the Company in 1964, served in several sales and marketing management positions and was appointed Company Group Chairman in 1981.  Wilson was appointed to the Executive Committee in 1983.  He was appointed Chairman of a Sector Operating Committee in 1985, was appointed Vice Chairman of the Board in 1989.  He was named Senior Vice Chairman of the Board in 2001.  He assumed expanded responsibilities as Vice Chairman of the Executive Committee in 1994.  Wilson also served on the Science and Technology Advisory Committee. During much of the Relevant Period, Defendant Wilson, as a J&J Director, was personally culpable and well-informed about the wrongdoing alleged herein and did nothing to remedy such conduct in furtherance of his stewardship responsibilities to J&J and its shareholders.

E.     **Officer Defendants**

34.     In addition to being named as Current or Former Director Defendants above, Weldon, Poon, Lenehan, Daretta and Wilson are also named as "Officer Defendants."

35.     Defendant, Joseph C. Scodari ("Scodari"), joined J&J in 1999 as President and Chief Operating Officer of Centocor, Inc., when J&J acquired the company and, in 2001, he was named Company Group Chairman for J&J's North American Pharmaceuticals business, and became a member of the Pharmaceuticals Group Operating Committee.  From 2003 to 2005, Scodari was Company Group Chairman of J&J's Biopharmaceutical Business and was Worldwide Chairman, Pharmaceuticals Group, and a member of the Executive Committee from March 2005 until March, 2008.

36.     Defendant, Alex Gorsky ("Gorsky"), is Worldwide Chairman, Medical Devices and Diagnostics Group, a position he has held since September 2009, and has been a member of J&J's Executive Committee since January 2009. He joined J&J in 2008 as Company Group Chairman and Worldwide Franchise Chairman for Ethicon, Inc.  Previously, he was head of the North American pharmaceuticals business at Novartis Pharmaceuticals Corporation from 2004 to 2008.  Prior to 2004, Gorsky served in various management positions at J&J, beginning as a sales representative with Janssen Pharmaceutica Inc. in 1988.  Over the next 15 years, he advanced through positions of increasing responsibility in sales, marketing and management, and was named President of Janssen Pharmaceutica Inc. in the U.S. in 2001. His responsibilities included the commercial development of Risperdal (risperidone), Duragesic/ Durogesic (fentanyl transdermal system), Aciphex/Pariet (rabeprazole sodium) and Reminyl/ Razdyne (galantamine HBr).  In 2003, Gorsky was promoted to Company Group Chairman for the J&J Family of Companies pharmaceutical business in Europe, the Middle East and Africa.

37.     Defendant, Nicholas Valeriani ("Valeriani"), is Vice President, Strategy & Growth, a position he has held since February, 2007.  Valeriani has been with the J&J family of companies since 1978.  In 1996, he was named General Manager of Indigo Medical, Inc. and he

became President of Ethicon Endo-Surgery, Inc. in 1997.  In January, 2001, he was named

Company Group Chairman with responsibility for Ethicon Endo-Surgery, Inc., and the J&J

Medical Products Canadian Medical Device & Diagnostic business. The following year he

became Worldwide Franchise Chairman for the DePuy franchise.  He was promoted to Corporate

Vice President, Human Resources, at J&J, and became a member of the Executive Committee in

September 2003, with responsibility for worldwide management succession and organization

development, compensation and benefits, education and training, recruiting, equal opportunity,

affirmative action, human resources policies, and employee and labor relations.  Valeriani also

chaired the Corporate Contributions Committee and was a member of the Management

Compensation Committee and the Pension Committee.  Additionally, in the first quarter of 2004,

he assumed responsibility for the Company's diagnostics businesses and was named Worldwide

Chairman, Diagnostics.  In 2004, Valeriani was named Worldwide Chairman, Cardiovascular

Devices and Diagnostics.  In 2006, he assumed responsibility for a newly-created Cardiovascular

Devices & Diagnostics Group Operating Committee, which included LifeScan, Inc., Cordis

Corporation and Ortho-Clinical Diagnostics, Inc.

      38.     Defendant, Russell C. Deyo ("Deyo"), joined the Company in 1985 and became

Associate General Counsel in 1991.  He became a member of the Executive Committee and Vice

President, Administration, in 1996 and Vice President, General Counsel and Chief Compliance

Officer in April, 2004.  Deyo was given the additional responsibility for Human Resources in

November, 2009.  Deyo has responsibility for the legal affairs and legal compliance activities of

J&J and its operating subsidiaries, and also has responsibility for the Office of Corporate

Secretary, Government Affairs and Policy, and the Corporate Health Care Compliance, Privacy,

Security and Aviation Departments.  He is on the Public Policy Advisory Committee of the Board.

39.     Defendant, Ted Torphy ("Torphy"), was Corporate Vice President, Office of Science and Technology at J&J until 2006.  Torphy joined J&J's corporate staff in 2003 as Corporate Vice President for Science and Technology, after three years at J&J's Centacor subsidiary, where he was Senior Vice President for Discovery and Preclinical Development. Prior to joining Centacor, Torphy spent 17 years with SmithKline Beecham, most recently as Vice President of Research for Cardiovascular, Pulmonary and Metabolic Diseases therapeutic areas.  As reported in the Company's Annual Reports, Torphy acted as the officer representative on the Board's Science & Technology Advisory Committee from 2003 through 2006.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The 2010 and 2011 Proxy Statements and Annual Meetings

40.     On March 17, 2010, the Company issued and disseminated its Notice of Annual Meeting and Proxy Statement (the "2010 Proxy Statement") announcing and soliciting shareholder votes in connection with J&J's Annual Meeting of shareholders to be held April 22, 2010.  On March 16, 2011, the Company issued and disseminated its Notice of Annual Meeting and Proxy Statement (the "2011 Proxy Statement") announcing and soliciting shareholder votes in connection with J&J's Annual Meeting of shareholders to be held April 28, 2011.

41.     Among the items of business for J&J shareholders at the Annual Meetings was to elect the Directors named in the respective Proxy Statements, each of whom was put forward by the Company's Board. Indeed, the Proxy Statements each proclaimed that "The accompanying proxy is solicited by the Board of Directors of the Company." Upon information and belief, each of the J&J Directors serving as of March 17, 2010 approved the content of the 2010 Proxy

Statement and/or indirectly controlled its content, all the while omitting material facts bearing upon how the shareholders of the Company would vote upon the Board's nominees for directorships. Upon information and belief, each of the J&J Directors serving as of March 16, 2011 (including newly-appointed Director Ian E. L. Davis) approved the content of the 2011 Proxy Statement and/or indirectly controlled its content, all the while omitting material facts bearing upon how the shareholders of the Company would vote upon the Board's nominees for directorships.

42. With respect to the purported "independence" of defendants Coleman, Cullen, Johns, Langbo, Prince, Mulcahy, Mullin, Perez, Satcher and Lindquist and current Board member Ian E.L. Davis, each Proxy Statement stated that such "Non-Employee Directors" are each "highly accomplished individuals in their respective industries, fields and communities." Contrary to such a fact-based statement, given their respective performance as CEOs and directors of Citigroup, Inc. and Xerox, Inc. as described in part below, J&J shareholders should have been advised and been given the opportunity to consider additional information and truthful facts (including the non-pejorative facts referred to herein) in determining whether to vote for Defendants Prince and Mulcahy, respectively. Similarly, the shareholders of J&J had the right to be informed, in non-pejorative terms, of the facts set forth herein with respect to the governance of the Company by the remaining Board members, including the multiple regulatory debacles that have confronted the Company.

> "**The Nominating and Corporate Governance Committee** is responsible for overseeing matters of corporate governance, including the evaluation of the performance and practices of the Board of Directors. The Committee also oversees the process for performance evaluations of the Committees of the Board." (Emphasis added.)

43. Despite the foregoing representations, upon information and belief, the Board has never performed any objective self-evaluation or considered any of its oversight failures or

directorial competence in making nominations to the J&J Board, particularly those nominated for election at the 2010 and 2011 Annual Meetings.

44.      The 2010 and 2011 Proxy Statements discussed the responsibilities and purported functions of other Committees of the J&J Board, including, in particular, the Compensation Committee. After describing the Compensation Committee's processes for determining executive compensation at the Company, the 2010 Proxy Statement said the following with respect to defendant Weldon's performance as Chairman and Chief Executive of the Company: "The Board believes that Mr. Weldon generally exceeded expectations despite substantial economic, political, regulatory and competitive challenges as well as significant patent expirations."  It then went on to describe certain of the events that transpired and Weldon's role or responsibility therein.  The 2011 Proxy Statement said the following with respect to defendant Weldon's performance as Chairman and Chief Executive of the Company: "The Board believes that Mr. Weldon generally met expectations during 2010, a year with many successes and very visible challenges…Mr. Weldon guided the Company through the last year while the Company's long-standing reputation was challenged and revenue was impacted by a series of operational, quality and compliance issues, most notably at McNeil Consumer Healthcare.  Mr. Weldon was instrumental in the Company's response to these issues, including the implementation of a comprehensive remediation plan at McNeil and a new operating model for supply chain, quality, and compliance spanning the enterprise."

45.      At no place in the 2010 or 2011 Proxy Statements was there any discussion of the neutral, non-pejorative facts regarding any of the matters referred to below (including, *inter alia*, the fact of multiple shareholder demands upon the J&J Board as well as the pendency of shareholder derivative litigation commenced following the 2010 Annual Meeting) and Defendant

Weldon's role in encouraging, concealing and otherwise having ultimate responsibility for the years-long history of wrongdoing perpetrated by J&J and its subsidiaries under his leadership. Similarly, nowhere in the 2010 or 2011 Proxy Statements, despite the principal purpose of the Proxy Statements being the solicitation of proxies in favor of the sitting Board members, was there even the slightest discussion with respect to the long-term failure of the Board, in neutral, non-pejorative terms, to seriously address the wrongdoing referred to below and, in particular, the repeated instances of well-documented violations of law. Those facts, which could have been presented to J&J shareholders in neutral, non-pejorative terms, were and are of the utmost materiality in a shareholder's determination of the qualifications of each such nominee to serve or continue to serve as a director of the Company. This is particularly so where the backgrounds of Defendants Weldon, Mulcahy and Prince are described while failing to disclose the facts set out below with respect to them.

### B.   The Omnicare Kickback Scheme

46.   In its November 7, 2005 Form 10-Q, J&J first disclosed that on September 26, 2005, the Company had received a subpoena from the United States Attorney's Office, District of Massachusetts, seeking documents related to sales and marketing of eight drugs to Omnicare, Inc., a manager of pharmaceutical benefits for long-term care facilities.

47.   On January 15, 2010, the United States Department of Justice ("DOJ") intervened in two civil  lawsuits brought in the United States District Court for the District of Massachusetts, naming J&J and two of its subsidiaries, Ortho-McNeil-Janssen Pharmaceuticals Inc. and Johnson & Johnson Health Care Systems Inc., for violations of the False Claims Act, 31 U.S.C. § 3729 et seq., the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), and the

Medicaid Drug Rebate Statute, 42 U.S.C. § 1396r-8 (the "Federal Kickback Complaint").  The Federal Kickback Complaint and all exhibits thereto are incorporated by reference herein.

48.     The Federal Kickback Complaint alleges that the Company and its subsidiaries, in violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), paid millions of dollars in kickbacks in the form of market share rebates, grants and cash payments to Omnicare, Inc. ("Omnicare"), thereby causing Omnicare, the nation's largest long-term care pharmacy, to submit false claims to Medicaid during the period from 1999 through 2004 (the "Omnicare Kickback Scheme").   The District Court of Massachusetts already had ruled that the failure to disclose the terms and conditions for achieving rebates may constitute a violation of the anti-kickback statute, and such violation could have resulted in the submission of false claims to Medicaid.

49.     The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.

50.     First enacted in 1972, Congress strengthened the statute in 1977 and again in 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and ©; 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93. 12.  The anti-kickback statute prohibits any person or entity from knowingly and willfully offering, making,

soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or

reward any person for purchasing, ordering, or recommending or arranging for the purchasing or

ordering of federally-reimbursable medical goods or services:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any
> kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to
> any person to induce such person -
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of
> any item or service for which payment may be made in whole or in part under a Federal
> health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or
> ordering any good, facility, service, or item for which payment may be made in whole or
> in part under a Federal health care program, shall be guilty of a felony and upon
> conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than
> five years, or both.

42 U.S.C. § 1320a-7b(b)(2).  Violation of the statute also can subject the perpetrator to exclusion

from participation in federal healthcare programs and, effective August 6, 1997, civil monetary

penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. §

1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

51.     During the period 1999 through 2004, Omnicare was one of J&J's largest

customers, especially for Risperdal, a J&J antipsychotic drug that, at J&J's behest, Omnicare

pharmacists recommended for nursing home patients who exhibited behavioral symptoms

associated with Alzheimer's Disease and dementia.  Over the period 1999 through 2004, under

the Omnicare Kickback Scheme, J&J paid Omnicare tens of millions of dollars in kickbacks

pursuant to two separate, consecutive drug supply agreements, one entered into in 1997 and the

second entered into in 2000.

52.     Pursuant to the scheme, as set forth in the Federal Kickback Complaint, during

the five-year period of 1999 through 2004, J&J, including through the named subsidiaries, paid

Omnicare tens of millions of dollars in the form of illegal kickbacks in return for Omnicare's engagement in "active intervention programs" by which Omnicare purchased and recommended Risperdal and other J&J drugs to Omnicare's elderly nursing home patients.  According to the DOJ, Omnicare launched a "Risperdal Initiative" whereby Omnicare pharmacists persuaded physicians to prescribe Risperdal, even where there were clinical risks in switching a stabilized elderly patient from one antipsychotic drug to another.  These kickbacks caused Omnicare to submit false reimbursement claims to Medicaid.

53.     J&J targeted Omnicare in this scheme because, through contracts with nursing homes, it dispenses drugs to approximately 1.4 million long-term care residents in 47 states.  Omnicare also provides consultant pharmacist services to nursing homes.  As known to J&J, Omnicare's pharmacists and consultant pharmacists have significant influence over the drugs that nursing home residents receive.

54.     J&J paid the kickbacks involved under the Omnicare Kickback Scheme in numerous ways.  For example, J&J entered into agreements with Omnicare, by which Omnicare was entitled to receive increasing levels of rebates from the Company so long as Omnicare implemented specific programs to increase the sales of J&J drugs.

55.     J&J and its employees understood that it was a violation of the anti-kickback statute to offer or to pay remuneration, by whatever means, to induce a customer like Omnicare to purchase or to recommend J&J drugs.  For example, J&J understood from its outside counsel that the Company could violate the law through market share rebate agreements, *i.e.*, agreements where J&J agreed to pay customers rebates for switching patients from competitors' drugs to J&J drugs.  J&J employees also understood that it would be a kickback to pay a customer like

Omnicare for the sake of fostering a relationship or for good will, where J&J's goal was always to convince Omnicare to purchase and recommend J&J drugs.

56.     As the Federal Kickback Complaint alleges, notwithstanding J&J's understanding of the anti-kickback statute, J&J repeatedly violated the statute in its relationship with Omnicare by paying Omnicare rebates to switch patients to J&J drugs, and paying Omnicare various grants and sponsorship fees whose purpose was to induce Omnicare to purchase and to recommend J&J drugs.  Notably, J&J recognized the problematic nature of its relationship with Omnicare.  As one J&J employee described in a September 2002 internal meeting, J&J's Omnicare sales team "got hammered re Healthcare Compliance."  Nevertheless, J&J continued to pay the Omnicare kickbacks until 2004.  As of 2007, J&J supply agreements stopped incorporating provisions engaging Omnicare in "active intervention programs."

57.     In addition, J&J also paid Omnicare millions of dollars for "data," much of which J&J never required to be submitted, and Omnicare never provided, or that Omnicare had already historically been providing free of charge.  J&J first discussed this "data purchase" scheme in 1999 and then implemented it beginning in 2000 as a method to avoid triggering Medicaid Best Price reporting requirements for Risperdal by replacing direct pricing rebates with ostensibly unrelated payments to Omnicare.  This subterfuge was implemented through a Consulting and Services Agreement entered into in October 2000 (the "Consulting and Services Agreement" or "Agreement").  The Agreement had a term of July 1, 2000 to April 1, 2004, and called for J&J to pay Omnicare $450,000 for the first three-month period of the term, and then $300,000 per quarter thereafter, for a total of $4,650,000.  At exactly the same time J&J and Omnicare signed the Consulting and Services Agreement, they eliminated certain Risperdal pricing rebates from their overall agreement.

58.     The Consulting and Services Agreement was designed and implemented despite J&J's knowledge and explicit recognition that it constituted illegal fraud and abuse under federal law.  In connection with a dispute over rebates Omnicare claimed it was owed for an earlier period (from the second quarter of 1997 to the first quarter of 1998), J&J had concluded in June 1999 that paying for data in lieu of the rebate claimed by Omnicare would "put us at risk for fraud and abuse."

59.     The data payments under the Consulting and Services Agreement were made in the face of J&J's standing policy against paying for data.  For example, a J&J Director of National Accounts publicly stated: "J&J Pharma, has previously gone on record, from corporate, that . . . [w]e will not pay customers for data."  (Emphasis in Federal Kickback Complaint, 34.)

60.     Even though Omnicare did not provide the data it was contractually obligated to provide in the Consulting and Services Agreement, J&J paid Omnicare as specified under the Agreement.  In cover letters enclosing J&J's payments to Omnicare pursuant to the Consulting and Services Agreement, J&J referred to each payment as a "marketing fee."  The letters also cautioned Omnicare that "some or all of this amount may be considered a Discount which Omnicare may have an obligation to reflect in any cost report or claim for reimbursement with Medicare/Medicaid," even though, as alleged in the Federal Kickback Complaint, J&J itself did not treat the payments as discounts and did not disclose them to Medicaid.

61.     J&J also made various other substantial kickback payments to Omnicare, attempting to disguise such kickback payments by describing them as "grants" and "educational funding," even though their true purpose was to provide improper and illegal financial incentives in order to induce Omnicare to recommend J&J's products.  The Federal Kickback Complaint states that, in January 1999, J&J noted that it had paid Omnicare "in excess of $1,000,000 since

1997 for educational, pull-through, and social activities."  J&J continued to make such payments in subsequent years as well.

62.     The DOJ press release announcing the filing of the Federal Kickback Complaint characterized the Omnicare kickbacks as an illegal scheme to "take advantage of the elderly and the poor."  The DOJ charges in the Federal Kickback Complaint that J&J viewed Omnicare's pharmacists as "an extension of [J&J's] sales force."

63.     J&J tracked and monitored its financial return from rebates it provided to Omnicare.  For example, in 2003, J&J determined that, "for a $3MM investment in rebates with Omnicare, [J&J] gains $9MM in sales, less costs and investments, returns $4.8 MM to OMP."  Another J&J manager calculated that J&J could generate the same return with just $1.44 million in rebates.  J&J further understood that "Rebates represent approximately 60%+ of [Omnicare's] net income model."

64.     Pursuant to the illegal Omnicare Kickback Scheme, J&J was able to increase sales of Risperdal and other J&J drugs to geriatric patients in long-term care facilities.  In return for the kickbacks J&J paid, during the 1999 through 2004 period, Omnicare undertook and engaged in intensive efforts to convince physicians to prescribe J&J drugs.  In addition, Omnicare's own annual purchases of J&J drugs increased from approximately $100 million to over $280 million, with annual purchases of Risperdal, alone, increasing to more than $100 million.

65.     As demonstrated by dozens of internal J&J documents attached as exhibits to the Federal Kickback Complaint, and incorporated herein by reference, the scheme was a deliberate, coordinated, long-term effort to increase J&J drug sales to these patients through illegal means.

66.     The DOJ is seeking to recover unspecified treble damages, restitution and civil penalties against J&J and its named subsidiaries based on the false claims submitted to Medicaid

by Omnicare as a result of the kickback scheme.  Reflecting the potential magnitude of the civil liability J&J faces on these claims, separately, in November 2009, the United States, numerous states, and Omnicare entered into a $98 million settlement agreement that, among other things, resolved Omnicare's civil liability under the False Claims Act for taking kickbacks from J&J.

67.     Based on the magnitude of the Omnicare settlement, and the size and profitability to J&J from its increased annual sales of its drugs to Omnicare over the period of 1999 through 2004 resulting from its illegal conduct, and J&J's deliberate structuring of discounted pricing for Risperdal as a phony "data purchase" contract in order to avoid Medicaid Best Price reporting requirements, J&J faces potential liability in the hundreds of millions of dollars.

68.     J&J's Board, through the Company's subsidiary, then known as Janssen Research Foundation, received an FDA Warning Letter dated January 5, 1999 in connection with the Company's off-label promotion of Risperdal to geriatric patients.  Internal J&J documents demonstrate that the Omnicare Kickback Scheme represented a deliberate effort to promote Risperdal for off-label treatment of dementia in geriatric patients residing in long-term care facilities.  For example, according to an internal J&J memorandum from the summer of 2000, Omnicare's ongoing Risperdal Initiative "has generated an all time market share high of 55.5% throughout the 1st quarter of 2000.  This market share represents Omnicare's ability to persuade physicians to write Risperdal in the areas of Behavioral Disturbances associated with Dementia."

69.     The Omnicare Kickback Scheme itself represents one aspect of J&J's multi-billion dollar exposure to liability for unlawful off-label promotion of Risperdal, Natrecor, and Topamax, which are each the subject of separate federal investigations, described below.

70.     The Omnicare Kickback Scheme addressed by the Federal Kickback Complaint has caused, and will continue to cause, financial and reputational harm to the Company,

including, inter alia, the costs of responding to governmental investigations and defending related legal proceedings, fines, penalties or settlement payments in connection with the federal action and related enforcement actions.

### C.    Illegal Off-Label Promotion of Risperdal, Natrecor and Topamax

71.    J&J reported in its March 2007 Annual Report that the Company has received separate subpoenas from the U.S. Attorney's Office in Philadelphia, the U.S. Attorney's Office in Boston and the U.S. Attorney's Office in San Francisco.  These subpoenas relate to investigations by these three offices regarding, respectively, sales and marketing of Risperdal, Topamax, and Natrecor by J&J through certain named subsidiaries.  According to the Annual Report, the subpoenas request information regarding the Company's corporate supervision and oversight of three Company subsidiaries, including their sales and marketing of these identified drugs.

72.    To put the critical importance of these drugs into perspective at J&J, for example, in 2004, the Pharmaceuticals Segment at the Company was responsible for generating 46.7% of total Company revenues ($22.128 billion of a total of $47.348 billion).  Of that amount, the blockbuster drugs Risperdal and Topamax, together, were responsible for approximately 20% of the segment's revenues; in 2005, they were responsible for approximately 23.4% of the segment's total revenues of $22.322 billion; in 2006, they were responsible for approximately 26.7% of the segment's total revenues of $23.267 billion; in 2007, they were responsible for approximately 28.7% of the segment's total revenues of $24.866 billion; and in 2008, in light of Risperdal's patent expiration in June 2008, these drugs were responsible for approximately 20.1% of the segment's total revenues of $24.567 billion.

73.     The U.S. Attorney's Office in Boston has also separately issued subpoenas to employees of J&J, requiring their testimony before a grand jury.  The March 2007 subpoenas reflect an apparent coordinated investigation by the DOJ of the off-label promotion of J&J drugs. In light of recent federal and state investigations, enforcement actions, and settlements involving off-label promotion of prescription drugs, the Company faces likely liability exposure in the amount of multiple billions of dollars as the result of deliberate and knowingly unlawful off-label promotion of Risperdal, Topamax, and Natrecor.  For example, sales of Risperdal alone between 1994 and 2008 were approximately $29 billion, with approximately 60% of that amount attributable to off-label sales.  Based on recent settlements involving other atypical antipsychotics such as Zyprexa, Abilify and Gedeon, J&J's liability exposure with respect to Risperdal alone exceeds $1 billion.

74.     To understand what off-label promotion and marketing entails, the Federal Food, Drug, and Cosmetic Act ("FDCA") requires that the manufacturer or sponsor of a new drug submit a New Drug Application ("NDA") to the Food and Drug Administration ("FDA"), which identifies all of the proposed uses of the drug intended by the manufacturer, together with the proposed label for those uses, as well as data generated in randomized, adequate and well-controlled clinical trials.  Approval requires that the data demonstrate to the FDA's satisfaction that the drug will be safe and effective for its intended uses.  See 21 U.S.C. §331(d) and §355(b).

75.     In order for the FDA to approve a drug, the manufacturer must demonstrate that the drug is "safe for use" for all "conditions prescribed, recommended, or suggested" in the drug's label.  21 U.S.C. §355(b).  Until the FDA approves the NDA, including the proposed labeling, and makes a determination regarding safety and efficacy for the uses proposed, the

FDCA prohibits the manufacturer from introducing the drug into interstate commerce.  21 U.S.C. §355(a).

76.     After the FDA approves the NDA, the sponsor is permitted to promote and market the drug, but only for the medical conditions or uses specified in the approved labeling.  The term "off-label promotion" or "off-label uses" refers to any promotion of the drug for uses not approved by the FDA and included in the drug's approved label.  While physicians are free to prescribe the drug for whatever conditions they see fit, the FDA prohibits drug companies from promoting off-label uses to doctors.  A manufacturer may not legally label or promote the drug for any new use without prior FDA approval.

### 1.     The Risperdal Off-Label Promotion Scheme

77.     In its March 11, 2004 Annual Report for the year ended December 31, 2003, issued on March 11, 2004 and signed by Defendants Weldon, Darretta, Cullen, Coleman, Jordan, Langbo, Lindquist, Mullin, Reinemund, Satcher, and Schacht, J&J first reported that:

> In January 2004, Janssen (now OMJPI) received a subpoena from the Office of the Inspector General of the U.S. Office of Personnel Management seeking documents concerning sales and marketing of, any and all payments to physicians in connection with sales and marketing of, and clinical trials for, RISPERDAL® (risperidone) from 1997 to 2002.

78.     J&J continued to receive subpoenas or requests for information relating to the sales and marketing of Risperdal after the 2004 subpoena, all of which were known to the Board. The Annual Report for the fiscal year ended January 2, 2005, filed March 15, 2005, and signed by  Weldon, Darretta, Coleman, Cullen, Jordan, Langbo, Lindquist, Mullin, Reinemund, Satcher, and Schacht, reported on a request from the New York State Attorney General's Office for documents pertaining to marketing, off-label sales and clinical trials for Risperdal (as well as

Topomax, Procrit (Epoetin alfa), Reminyl (galantamine HBr), Remicade (infliximab) and Aciphex (rabeprazole sodium).

79.     The Annual Report for fiscal year ended January 1, 2006, filed March 14, 2006 and signed by Defendants Weldon, Darretta, Poon, Coleman, Cullen, Johns, Jordan, Langbo, Lindquist, Mullin, Prince, Reinemund, and Satcher, reported on, *inter alia*: (i) the investigation by the U.S. Attorney's Office for the Eastern District of Pennsylvania regarding the marketing of and adverse reactions to Risperdal; (ii) subpoenas of Company employees to appear before a grand jury; and (iii) a civil investigative demand from the Texas Attorney General seeking broad categories of documents related to sales and marketing of Risperdal.

80.     The Annual Report for the fiscal year ended December 31, 2006, filed on February 21, 2007 and signed by Defendants Weldon, Darretta, Poon, Coleman, Cullen, Johns, Jordan, Langbo, Lindquist, Mullin, Prince, Reinemund and Satcher, reported on the subpoena from the California Attorney General seeking documents regarding sales and marketing and side-effects of Risperdal, as well as interactions with State officials regarding the State's formulary for Medicaid-reimbursed drugs.

81.     The Annual Report for the fiscal year ended December 30, 2007, filed on February 26, 2008 and signed by Defendants Weldon, Poon, Coleman, Cullen, Johns, Langbo, Lindquist, Mullin, Perez, Prince, Reinemund and Satcher, reported on, *inter alia*: (i) the subpoena from the U.S. Attorney's Office in Philadelphia concerning both Janssen's sales and marketing of Risperdal and J&J's supervision and oversight of Janssen; and (ii) the request from Senator Grassley on behalf of the Committee on Finance of the U.S. Senate for documents and information concerning the marketing and promotion of Risperdal for use by nursing home

patients; (iii) the filing of the State Risperdal Complaints; and (iv) the filing of six cases filed by union health plans seeking damages for alleged overpayments for Risperdal.

82.    As referenced above, beginning in with its Annual Report for the fiscal year ending December 31, 2007, the Company disclosed that several states have commenced actions (the "State Risperdal Complaints") seeking to recover damages and other relief for harm caused by the off-label promotion of Risperdal (the "Risperdal Off-Label Promotion Scheme").  Copies of State Risperdal Complaints filed on behalf of the States of Arkansas, Louisiana, South Carolina and Texas, and the Commonwealth of Pennsylvania are incorporated by reference herein.

83.    The Company provided a more detailed history of governmental investigations of alleged Risperdal off-label promotion in its most current Annual Report filed with the SEC on March 1, 2010 for the year ended December 31, 2010:

> In January 2004, Janssen (now OMJPI) received a subpoena from the Office of the Inspector General of the U.S. Office of Personnel Management seeking documents concerning sales and marketing of, any and all payments to physicians in connection with sales and marketing of, and clinical trials for, RISPERDAL® (risperidone) from 1997 to 2002. Documents subsequent to 2002 have also been requested. An additional subpoena seeking information about marketing of and adverse reactions to RISPERDAL® was received from the U.S. Attorney's Office for the Eastern District of Pennsylvania in November 2005. Subpoenas seeking testimony from various witnesses before a grand jury have also been received. Janssen is cooperating in responding to ongoing requests for documents and witnesses. The government is continuing to actively investigate this matter. In February 2010, the government served Civil Investigative Demands seeking additional information relating to sales and marketing of RISPERDAL® and sales and marketing of INVEGA®.

84.    The Annual Report goes on to state:

> With respect to RISPERDAL ®, the Attorneys General of eight states and the Office of General Counsel of the Commonwealth of Pennsylvania have filed actions seeking reimbursement of Medicaid or other public funds for RISPERDAL® prescriptions written for off-label use, compensation for treating their citizens for alleged adverse reactions to RISPERDAL®, civil fines or penalties, punitive damages, or other relief. The Attorney General of Texas has joined a qui tam action in that state seeking similar

relief. Certain of these actions also seek injunctive relief relating to the promotion of RISPERDAL®. The Attorneys General of more than 40 other states have indicated a potential interest in pursuing similar litigation against the Company's subsidiary, Janssen Pharmaceutica Inc. (Janssen) (now Ortho-McNeil-Janssen Pharmaceuticals Inc. (OMJPI)), and have obtained a tolling agreement staying the running of the statute of limitations while they inquire into the issues. In addition, there are six cases filed by union health plans seeking damages for alleged overpayments for RISPERDAL®, several of which seek certification as class actions. In the case brought by the Attorney General of West Virginia, based on claims for alleged consumer fraud as to DURAGESIC® as well as RISPERDAL®, Janssen (now OMJPI) was found liable and damages were assessed at $4.5 million.

85.    In late 1993, Risperdal became the second atypical antipsychotic to receive FDA approval.  Before 1993, the only atypical antipsychotic in the United States market was clozapine; however, the potential of clozapine to cause toxic side effects, including agranulocytosis, limited its prescription to a small percentage of the patient market.  According to the State Risperdal Complaints, J&J, through its Janssen subsidiary, obtained the first United States marketing approval of Risperdal from the FDA in late 1993, and commenced aggressive marketing of the drug in 1994.  From the outset, J&J actively promoted Risperdal not only for its approved indication, but also for numerous off-label uses, including ADHD, depression, anxiety, mood disorder, bipolar disorder, and aggression associated with late-onset dementia.  By late 1996, Defendants had significant market share for United States antipsychotic drug use, and had demonstrated to the pharmaceutical manufacturing industry the tremendous sales potential of marketing atypical antipsychotic drugs for off-label use.

86.    J&J had recognized the commercial potential of promoting Risperdal for off-label uses from the outset.  According to a March 10, 2010 article published by Bloomberg.com, Ivo Caers, a Janssen executive, wrote in a 1994 report that "Schizophrenia represents only 35 percent" of antipsychotic prescriptions, .... [and] [a]ggressive expansion of Risperdal use in other indications is therefore mandatory."

87.     Pursuant to the Risperdal Off-Label Promotion Scheme, J&J commenced a deliberate and multi-faceted off-label promotion campaign for the drug, which included, *inter alia:* (i) inducements to "key opinion leaders" to publicly disseminate information concerning off-label uses of Risperdal; (ii) control over the content of Continuing Medical Education ("CME") programs in which presenters would disseminate information concerning off-label uses of Risperdal; (iii) initiating, controlling, and producing scientifically-insignificant studies (small-scale clinical trials, investigator-initiated research, and pilot studies) not for the purpose of legitimate scientific research, but instead to spread information concerning off-label uses of Risperdal; (iv) causing the publication of "ghost written" articles - written by J&J-paid personnel but signed by ostensibly independent doctors and researchers - promoting off-label uses of Risperdal; (v) promoting the development of Medication Algorithms utilized by states to prioritize medications to be used for specific conditions, which algorithms specifically included the use of Risperdal in unapproved indications.  During the period 1998-2005, Janssen employed an Elder Care Sales Force to market Risperdal to physicians practicing in nursing homes.

88.     As a result of the Risperdal Off-Label Promotion Scheme, annual sales of the drug skyrocketed from zero on January 1, 1994 to over $3.4 billion in 2005, with Risperdal becoming the most widely used atypical antipsychotic in the world.

89.      On November 24, 2008, The New York Times reported on one example of off-label promotion and marketing tactics applied by J&J to drive Risperdal sales - the Company's funding, beginning in 2002, of a research center for child psychopathology at Massachusetts General Hospital, run by Dr. Joseph Biederman, "to move forward the commercial goals of J&J."  According to the article, "Dr. Biederman's work helped to fuel a fortyfold increase from

1994 to 2003 in the diagnosis of pediatric bipolar disorder and a rapid rise in the use of powerful, risky and expensive antipsychotic medicines in children."

90.    Internal J&J emails from 2002 indicate that the Company's sales and marketing organization was intimately involved in the discussions that led to J&J's funding of the center. For example, a February 2002 e-mail message from Georges Gharabawi, a J&J executive, stated that Dr. Biederman approached the Company "multiple times to propose the creation" of the center.  "The rationale of this center," the message stated, "is to generate and disseminate data supporting the use of [Risperdal] in" children and adolescents.  At that time, Risperdal was not approved by the FDA for use in children and adolescents.

91.    J&J's support for Dr. Biederman's work was not limited to funding.  The New York Times further reported that internal J&J "documents also show that the company prepared a draft summary of a study that Dr. Biederman, of Harvard, was said to have written." According to the article:

> A June 2002 e-mail message to Dr. Biederman from Dr. Gahan Pandina, a Johnson & Johnson executive, included a brief abstract of a study of Risperdal in children with disruptive behavior disorder. The message said the study was intended to be presented at the 2002 annual meeting of the American Academy of Child and Adolescent Psychiatry.
>
> "We have generated a review abstract," Dr. Pandina wrote, "but I must review this longer abstract before passing this along."
>
> One problem with the study, Dr. Pandina wrote, is that the children given placebos and those given Risperdal both improved significantly. "So, if you could," Dr. Pandina added, "please give some thought to how to handle this issue if it occurs."
>
> The draft abstract that Dr. Pandina put in the e-mail message, however, stated that only the children given Risperdal improved, while those given placebos did not. Dr. Pandina asked Dr. Biederman to sign a form listing himself as the author so the company could present the study to the conference, according to the message.

92.   As reported in the article, not only did J&J deliberately act to stimulate demand for off-label uses of Risperdal in children by funding and ghost writing for Dr. Biederman, it also paid him to make misleading presentations concerning the results of clinical studies.

93.   The March 10, 2010 *Bloomberg.com* article further reports that J&J, through its Janssen subsidiary:

> sought to sell Risperdal for bipolar disorder, dementia, mood and anxiety disorders and other unapproved uses, the documents show. Sales exceeded Janssen's expectations, according to the plans. Though Janssen predicted in 1993 it would take seven years to reach $295 million, U.S. sales hit $343 million in 1995.

> Hundreds of Janssen salespeople sold to doctors, nursing homes, Veteran's Administration facilities and jails, the records show. Marketers gave doctors materials about studies of unapproved uses for Risperdal. Janssen sponsored clinical trials of the drug's effect on other illnesses.

> In 1994, 1999 and 2004, the FDA ordered Janssen to stop making false and misleading marketing claims about Risperdal's superiority.

> Janssen set sales goals for 2000 of $302 million for geriatric sales, or 57 percent of the market, and $175 million in bipolar sales, or 32 percent, according to the business plan. That same year, Janssen planned to expand its geriatric sales force by 50 to 136 people, according to the business plan.

> It wasn't until 2003 that the FDA approved Risperdal for bipolar disorder. In 2006, the regulator approved it for symptoms related to autism in children and teens. The FDA approved it to treat bipolar children and teens the next year.

> The drug was never approved for dementia.

94.   As discussed above, the Omnicare Kickback Scheme also reflected J&J's efforts to promote Risperdal for off-label uses. Specifically, under the Omnicare Kickback Scheme, J&J rewarded Omnicare for its ability to promote the use of Risperdal for elderly patients suffering from dementia - an off-label use of the drug not approved by the FDA. J&J's Executive Committee, including Defendants Weldon, Poon, Valeriani, Scodari and Deyo, personally approved this scheme which J&J aggressively pursued in the face of the January 5,

1999 FDA Warning Letter concerning the off-label promotion of Risperdal to geriatric patients.

The *Bloomberg.com* article goes on to report:

> Johnson & Johnson made plans to reach $302 million in geriatric sales for its antipsychotic Risperdal just months after federal regulators said the company falsely claimed the drug was safe and effective with the elderly, according to internal documents.
>
> The U.S. Food and Drug Administration told J&J in 1999 that its marketing materials for geriatric patients overstated Risperdal's benefits and minimized risks. A J&J business plan for the next year called for increasing the drug's market share for elderly dementia sales, an unapproved use, according to newly unsealed documents in a lawsuit by the state of Louisiana.
>
> "The geriatric market represents Risperdal's second wave of growth," J&J officials wrote in the business plan. "The aging population will continue to drive market growth well into the next century."
>
> Louisiana officials cited the document and dozens of other internal J&J files in its lawsuit claiming the company marketed Risperdal to the elderly and children for unapproved uses. Professor Jerry Avorn of Harvard Medical School, who isn't involved in the case, called the papers "one of the more egregious examples" of marketing drugs to vulnerable patients.

95.     The State Risperdal Complaints also allege that while deliberately promoting Risperdal for off-label uses in children and the elderly, J&J acted to downplay the known health risks of Risperdal to patients, and made scientifically unsubstantiated claims regarding the safety of Risperdal, as compared to competing atypical antipsychotic drugs.  As a result, the Company faces substantial liability for the failure to warn patients treated with Risperdal of known health risks associated with its use, including, but not limited to risks of tardive dyskinesia; increased risk of stroke and transient ischemic attacks; hyperglycemia; diabetes mellitus; metabolic syndrome; hyperlipidemia (elevations in cholesterol, triglycerides); excessive weight gain; hyperprolactinemia; and increased risk of pituitary tumors.  Such potential liability includes liability in actions by numerous states' attorneys general, discussed above, to recover, inter alia, "compensation for treating their citizens for alleged adverse reactions to RISPERDAL®."  Two

of these suits already have resulted in jury verdicts adverse to J&J based on the failure to warn, and misleading the public about the health risks of Risperdal; the Louisiana verdict awarded $257.7 million to that state's Attorney General against Janssen and J&J, and the South Carolina Court of Common Pleas entered a penalty order, assessing penalties against Janssen of $327.1 million.

96.     J&J's own pre-clinical studies of Risperdal, as well as long-standing medical literature, had demonstrated that the drug, like older antipsychotic medications, had the potential to cause diabetes, diabetes-related injuries (*e.g.*, weight gain and hyperglycemia), cardiovascular and cerebrovascular complications, and other severe adverse effects.  Despite these known risks, J&J determined to conduct only the bare minimum of clinical trials, specifically designed to be of such limited duration that no side effects were likely to be revealed.

97.     In addition, despite actual knowledge that Risperdal causes weight gain, which increases the risk of developing diabetes, for years, J&J knowingly failed to include a warning of the potential for weight gain and the possible development of diabetes as a result of the use of Risperdal in its U.S. labeling.

98.     In October 2002, J&J, through its Janssen subsidiary, sent a letter to doctors and pharmacists in Canada describing the increased cardiovascular risk associated with the use of Risperdal, particularly in the elderly.  Despite informing the Canadian medical community, J&J did not provide any notification to healthcare providers in the United States of this recognized material adverse risk until 14 months later, in November 2003.

99.     Separately, in September 2003 the FDA mandated that manufacturers of all atypical antipsychotics include a warning concerning hyperglycemia and diabetes in labeling for

the drugs, and to specifically call prescribers' attention to such warnings through a "Dear Doctor" letter.

100.     As reflected in a Warning Letter from the FDA, dated April 19, 2004 and sent to both the CEO of Janssen Pharmaceutica and the CEO of J&J - defendant Weldon - on November 6, 2003, J&J had submitted supplemental New Drug Approvals ("NDAs") to the FDA covering the addition of risk information to the Warnings section of the Product Insert ("PI") for Risperdal regarding hyperglycemia and diabetes.  The FDA approved these supplements, and requested that J&J issue a DHCP (Dear Health Care Provider) letter "communicating the important new risk information."

101.     Consistent with its policy to avoid, delay, or minimize taking patient safety actions that could adversely affect pharmaceutical sales, J&J instead issued a DHCP letter that was worded in such a false, misleading, and commercially self-serving manner that it was rejected by the FDA in the April 19 Warning Letter.

102.     According to this Warning Letter, J&J's DHCP letter misled healthcare providers by, inter alia: (a) failing to communicate the fact that information regarding the potential consequences of hyperglycemia and the recommendation of regular glucose control monitoring was added to the PI for Risperdal; (b) minimizing the risks associated with the drug; and (c) claiming that Risperdal was safer than other atypical antipsychotics, when this had not been demonstrated by substantial evidence or substantial clinical experience.

103.     The April 19 Warning Letter quoted a portion of the DHCP letter, finding that:

This statement suggests that Risperdal does not increase the risks of diabetes, contradicting the Warning in the revised PI and minimizing the risks associated with the drug, including hyperglycemia-related adverse events such as ketoacidosis, hyperosmolar coma and death, and minimizing the importance of blood glucose control monitoring.

104.    The FDA demanded that J&J immediately cease the dissemination of promotional materials for Risperdol containing claims similar to those previously touted, and provide a plan of action to correct the effects of its false and misleading DHCP letter.

105.    The FDA further admonished J&J that the violations detailed above did not constitute an exhaustive list, and that it was continuing to "evaluate other aspects" of J&J's promotional campaign of Risperdal, and reserved the right to determine that "additional measures" would be necessary to "fully correct the false or misleading messages resulting from your violative conduct."  It wasn't until July 2004 that the Company finally sent a "Dear Doctor" letter that was acceptable to the FDA.

106.    The FDA's April 19, 2004 Warning Letter was not the first time J&J had been called to task for failure to provide adequate risk information about Risperdal.  In the FDA's January 5, 1999  Warning Letter concerning off-label promotion of Risperdal for use in geriatric patients, the FDA also charged J&J with failing to warn that the use of Risperdal by healthy elderly patients created a greater potential for hepatic and renal dysfunction and cardiovascular sensitivity, as well as making unsubstantiated claims of efficacy and comparative safety.  Such conduct further evidences the Company's overall policy to avoid, delay, or minimize taking patient safety actions that could adversely affect pharmaceutical sales.

107.    Consistent with this overall policy and with the Company's deliberate strategy to drive Risperdal sales through off-label promotion, despite data that emerged in 2005 regarding the increased risk of death and stroke in elderly patients treated with Risperdal and other atypical antipsychotics, according to the South Carolina complaint (filed May 2007), J&J continued to promote illegally the use of Risperdal for unapproved uses in such patients.  J&J determined to press on with its off-label promotional campaign despite the risks of serious injury and death to

this vulnerable patient population. According to the Louisiana complaint, this course of conduct continued at least through the filing of that complaint in late August 2008.

108.    As the result of J&J's knowing failure fully and properly to warn doctors and consumers of Risperdal's risks, many patients suffered Risperdal-related injuries and death, exposing J&J to substantial product liability.  Such liability for failure to provide adequate warnings to patients is the direct result of the policy implemented by J&J's senior pharmaceutical division management, and its Executive Committee and senior corporate management, and knowingly permitted to continue by the Board, of avoiding, delaying, or minimizing patient safety actions that could adversely affect pharmaceutical sales.

109.    Recent federal settlements of investigations of off-label promotion of atypical antipsychotic medications have yielded liabilities running into the billions of dollars, including the $1.42 billion January 2009 Eli Lilly & Co. settlement relating to the off-label promotion of Zyprexa, and the September 2009 $2.3 billion Pfizer, Inc. combined settlement relating to off-label promotion of Bextra, Geodon, Zyvox, and Lyrica.  As evidenced by these settlements for comparable alleged misconduct, J&J faces the potential of multi-billion dollar liabilities in connection with its knowing Risperdal Off-Label Promotion Scheme.

### 2.    Natrecor

110.    As noted above, one of the three federal subpoenas issued to J&J in March 2007 sought information regarding the sales and marketing of Natrecor by the Company and its Scios subsidiary, including information regarding the Company's corporate supervision and oversight of Scios' sales and marketing of Natrecor.  This was not, however, the first time Defendants were aware of issues surrounding the sale and marketing of Natrecor.

111.    In July 2005, Scios Inc. ("Scios"), a J&J subsidiary, received a subpoena from the United States Attorney's Office, District of Massachusetts, seeking documents related to the sales and marketing of Natrecor.  The fact of this investigation was disclosed in the Company's Form 10-K for the fiscal year ended January 1, 2006, filed March 14, 2006 and signed by Weldon, Darretta, Poon, Coleman, Cullen, Johns, Jordan, Langbo, Lindquist, Mullin, Prince, Reinemund and Satcher.

112.    In March 2007, almost a full two years after the first subpoena was received, the Company received yet another subpoena related to Natrecor, this time from the U.S. Attorney's Office in San Francisco.  This subpoena also requested information about the sale and marketing of Natrecor, and also sought documents and information regarding the Company's corporate supervision and oversight of Scios.  The fact of this investigation was disclosed in the Company's Form 10-K for fiscal year ended December 30, 2007, filed February 26, 2008 and signed by Weldon, Poon, Coleman, Cullen, Johns, Langbo, Lindquist, Mullin, Perez, Prince, Reinemund and Satcher.

113.    Natrecor was discovered and developed by Scios, Inc. ("Scios"), a company J&J acquired in April 2003 for $2.5 billion.  Scios' initial application for FDA approval of Natrecor was rejected in 1998 due to safety concerns, particularly relating to the drug's propensity to cause symptomatic hypotension (unusually low blood pressure).

114.    In August 2001, the FDA approved Natrecor for a limited indication - the in-patient treatment of acutely decompensated congestive heart failure patients who have dyspnea at rest or with minimal activity.  Recognizing that the limitation of use only to in-patient treatment would severely limit the commercial prospects for the drug, Scios developed an entire marketing plan around promoting Natrecor for regularly scheduled outpatient infusions, in part by

encouraging healthcare providers to open and operate their own outpatient Natrecor infusion

clinics.  Scios implemented this practice despite the known risks to patients and the absence of

any scientific evidence that regularly scheduled outpatient infusions would offer any patient

benefits.

      115.    At the time J&J acquired Scios, it was fully aware of this aggressive, illegal off-

label promotion scheme, and, in fact, planned to continue and expand it upon acquiring the

company (the "Natrecor Off-Label Promotion Scheme").  Reflecting this, in a February 10, 2003

joint press release announcing the acquisition agreement, Poon, J&J's then-Executive Committee

member and Worldwide Chairman, Pharmaceuticals Group, who would later become the Vice

Chairman of the J&J Board in January 2005, stated "NATRECOR is a truly unique product for a

largely underserved and growing market," and Richard B. Brewer, President and Chief

Executive Officer of Scios, stated "Johnson & Johnson's financial and management resources

will enable us to realize the full potential of NATRECOR."  Later that day, Reuters reported that

"[o]fficials from Johnson & Johnson and Scios said on a conference call with investors that they

expect the partnership to help boost sales of Natrecor beyond current expectations."

      116.    The Company first disclosed that the federal government was investigating its

sales and marketing of Natrecor in its Quarterly Report on Form 10-Q filed August 10, 2005.  In

its Annual Report on Form 10-K filed February 20, 2009, and signed by Defendants Weldon,

Poon Coleman, Cullen Johns, Langbo, Lindquist, Mullin, Perez, Prince and Satcher, the

Company first disclosed that the federal Natrecor investigation included a criminal investigation,

with several former and current Scios employees called to testify before a grand jury in San

Francisco.  The February 2009 10-K failed to disclose, however, that one day prior to its filing,

three *qui tam* complaints against the Company concerning off-label promotion of Natrecor were unsealed.

117.    In its Annual Report on Form 10-K filed March 1, 2010 and signed by Defendants Weldon, Coleman, Cullen, Johns, Langbo, Lindquist, Mullin, Perez, Prince and Satcher, the Company disclosed that: (a) the U.S. government has intervened in one of the *qui tam* actions, and filed a complaint against Scios and J&J in June 2009 (the "Federal Natrecor Complaint," incorporated by reference herein); and (b) Scios and J&J filed a motion to dismiss the Federal Natrecor Complaint, which motion was subsequently denied.  The Form 10-K went on to report that the criminal investigation is continuing, and settlement discussions are underway.

118.    The Federal Natrecor Complaint establishes that the scheme to illegally promote Natrecor for off-label use was approved and encouraged at the highest levels of J&J, including by J&J Chairman of the Board and CEO Weldon.  The Company acquired Scios following "comprehensive due diligence." (Scios Schedule 14a filed March 14, 2003.)  According to the Federal Natrecor Complaint:

> J&J was directly involved in Scios' marketing of Natrecor for serial, outpatient use. J&J knew and approved of Scios' marketing goals and strategies that included marketing Natrecor for serial, outpatient use. For example, even before the acquisition, J&J officers learned during the due diligence process that:
>
> a.    The FDA had only approved Natrecor for treatment of acute congestive heart failure, not treatment of chronic congestive heart failure;
>
> b.    Despite Natrecor's approved use, Scios was marketing Natrecor for serial outpatient use;
>
> c.    There would be significant upside potential if Scios were able to achieve an indication for chronic outpatient use - *i.e.,* the sales forecast would increase by $330 million (from $600 million to $930 million);
>
> d.    Scios' Business Plan included continuing to market Natrecor for outpatient use;

e.    Success in the outpatient setting would depend on Medicare continuing to reimburse for "treatment on a chronic basis," and that until Medicare's view was clear, "it is a risk that is difficult to assess;" and

f.    Scios was facilitating Medicare reimbursement for outpatient use through its Natrecor Reimbursement Quick Reference guide, its reimbursement support hotline, and its website, which also indicated that there was a financial incentive for physicians to use Natrecor in the outpatient setting.

119.    Just after the acquisition, J&J and Scios jointly presented their plan to grow the outpatient congestive heart failure market to $100 million in 2004, $200 million in 2005, over $300 million in 2006, and over $400 million in 2007.  This plan was a key component of J&J's plan to grow Scios' total revenue to over $1 billion by 2007.  The Federal Natrecor Complaint alleges that J&J controls the business and daily operations of Scios.

120.    Further evidencing J&J's direct involvement in Scios' illegal marketing of Natrecor for serial outpatient use, on June 27, 2003, Weldon, the Chairman of J&J's Board, visited Scios and reviewed the 2003/2004 Natrecor Business Plan, which set out the plan to continue marketing Natrecor for outpatient use, and set separate sales goals for "Outpatient" sales.

121.    Likewise, as detailed in the Federal Natrecor Complaint, in March 2004, J&J Company Group Chairman Scodari reviewed and approved the 2004 Business Plan and Strategic Plan. The 2004 Business Plan, *inter alia*: (a) discussed the plan to continue marketing Natrecor for outpatient use by "[e]stablish[ing] a growing prescriber and advocate base that will drive Natrecor as the preferred management strategy in the outpatient setting (increase monthly infusion revenue from $3M to $9.5M);" (b) provides separate sales goals for "Acute CHF" sales and "Outpatient" sales, thereby differentiating outpatient infusions from the approved indication; and (c) estimates that there are 129,000 eligible outpatient patients who may use 17 vials of Natrecor each, as opposed to 2.6 vials for each eligible "Acute CHF" patient.

122.     The 2004 Strategic plan likewise discussed, *inter alia*: (a) Scios' "Development Strategy for Natrecor for the Chronic Intermittent Outpatient Market;" (b) "Leveraging the Natrecor Platform" for Outpatient Chronic CHF; (c) "Improv[ing] infusion procedure payment rate in hospital outpatient department;" and (d) "Increas[ing] business acumen of treating physicians."

123.     Not only were members of J&J's senior executive management, including Defendants Weldon, Scodari and Poon, fully aware of the Natrecor Off-Label Promotion Scheme at the time of the Scios acquisition, but so was J&J's Board, which approved the $2.5 billion cash offer to acquire Scios on the afternoon of February 9, 2003.

124.     As disclosed in Scios' FY 2002 Annual Report on Form 10-K: "[s]ales of Natrecor represented approximately 96% of [Scios's] revenues for the year ended December 31, 2002," and "Natrecor [was] the only product that [Scios was] currently marketing."  Given, *inter alia:* (a) the comprehensive due diligence J&J's Board performed prior to the acquisition; (b) the fact that Natrecor was Scios' only marketed product and virtually its only source of its revenues; (c) the public comments of Poon and Brewer as quoted above; and (d) the fact that the J&J Board approved the Company's final $45/share, $2.5 billion acquisition offer for the Company, the J&J Board at that time was comprehensively briefed on Natrecor and J&J's post-merger plans for expanding its sale through continued pursuit and intensification of the Natrecor Off-Label Promotion Scheme.

125.     According to the Federal Natrecor Complaint, since the April 2003 acquisition of Scios, J&J exercises strict supervision, control, and dominion over Scios' activities, decisions, policies, and practices related to sales goals, sales tactics, compliance, regulatory affairs, medical

affairs, research and development, human resources, legal issues, budget, accounting, employee

compensation, employee benefits, employee expenses, manufacturing, and public relations.

126.     In addition, J&J sets Scios' business objectives and sales goals and regularly

reviews and approves Scios' sales numbers and projections.  For example, in February 2004, J&J

replaced Scios' President and CEO, Richard Brewer, with a J&J executive, Jim Mitchell

("Mitchell"), who confirmed to J&J that Scios' strategies included achieving the 2004 Business

Plan, growing Natrecor's revenue to $1 billion by 2007.

127.     Mitchell reports to a J&J Group Chairman, who, in turn, reports to J&J's

Executive Committee and Board. Other members of Scios' Corporate Management Committee

report directly to either to J&J or to Scios' President and CEO, who, in turn, reports directly to

J&J and its Board.

128.      The Natrecor Off-Label Promotion Scheme continued and intensified following

J&J's acquisition of Scios.  As detailed above, on June 27, 2003, the Chairman of J&J's Board,

defendant Weldon, visited Scios and reviewed the 2003/2004 Natrecor Business Plan.  The 2004

Business Plan for Natrecor detailed strategies for achieving the goal of doubling the number of

outpatient clinics providing Natrecor infusions.

129.     One of these strategies was the "Centers for Excellence" program, under which

J&J sent healthcare practitioners, who were potentially interested in starting outpatient infusion

clinics, to existing outpatient clinics that used Natrecor, in order to observe and learn.  As alleged

in the Federal Natrecor Complaint, the 2004 Business Plan for Natrecor, reviewed and approved

by Weldon, relied on the Centers of Excellence program as the primary tactic for achieving the

goal of "doubling the number of outpatient clinics delivering more than 20 infusions of Natrecor

per month."

130.    The same 2004 Natrecor Business Plan listed the ADHERE LM program, a registry of heart failure treatment and outcomes data created by Scios and continued by J&J as a vehicle to attract prescribers and promote the outpatient use of Natrecor, under the description: "Outpatient Management Market - Business Driver - Number of Treaters."

131.    J&J pursued the Natrecor Off-Label Promotion Scheme through various tactics in addition to the Centers for Excellence and the ADHERE LM registry.  For example, J&J and Scios maintained an Outpatient Infusion Center database from March 2003 to July 2004 to, *inter alia*, evaluate the market opportunity represented by outpatient infusion centers, measure the amount of Natrecor revenue being generated by outpatient infusion centers, and accelerate adoption of Natrecor in the outpatient infusion market.

132.    In late 2003, Kim Hillis, Scios' Director of Sales, directed sales management to utilize Scientific Affairs Managers at the Company to help develop new Natrecor outpatient infusion clinics.  During a sales representative training session in February 2004, J&J and Scios discussed separate sales goals for "Acute CHF" sales, and "Outpatient" sales, and their plan to continue marketing Natrecor for outpatient use by "establish[ing] a growing prescriber and advocate base that will drive Natrecor as the preferred management strategy in the outpatient setting."

133.    J&J and Scios further instructed their sales force that the "Outpatient Market Development Strategy" was to maximize exposure to outpatient infusion data such as the FUSION I trial, to increase the number of individuals treated through Centers of Excellence (discussed above), the ADHERE LM registry (discussed above), and the ongoing FUSION II clinical trial.

134.    According to the Federal Natrecor Complaint, one of these "Centers of Excellence" was the South Bay Cardiovascular Associates ("South Bay"), located in West Islip, New York.  From 2003 to 2005, J&J paid more than $100,000 to a nurse at South Bay.  This nurse made promotional speeches relating to the outpatient use of Natrecor; she trained other healthcare providers on the outpatient use of Natrecor; and her name appears as author on various publications relating to the outpatient use of Natrecor, including, *inter alia*, "Nesiritide in an Outpatient Infusion Clinic Setting - Case Studies of 17 patients," which was published in the *Journal of Cardiac Failure* in August 2002.

135.    J&J paid numerous other healthcare professionals who authored articles, made promotional speeches, and/or taught continuing medical education courses that promoted the outpatient use of Natrecor.  For example, from 2003 to 2005, J&J paid a cardiologist at Hackensack University Medical Center over $250,000.  This doctor made speeches promoting the outpatient use of Natrecor, and was listed as author of articles on Natrecor, including at least two that were ghost-written at J&J's expense, including, among other articles, "Safety and Feasibility of Using Serial Infusions of Nesiritide for Heart Failure in an Outpatient Setting (From the FUSION I Trial)."

136.    On or about May 2004, J&J paid a $500,000 grant to the University of Texas Southwestern Medical Center for a cardiology fellowship.  A cardiologist at this center was a key proponent of Natrecor outpatient infusions, authoring articles and giving speeches that promoted the outpatient use of Natrecor.  Likewise, from 2003 to 2005, a cardiologist and former Medical Director at the Midwest Heart Specialists received over $160,000 from Scios and J&J for speaking in favor of Natrecor.  In addition, the Midwest Heart Foundation, which is affiliated with Midwest Heart Specialists, also received over $250,000 in grant funds from Scios.  Such

grants, speaking fees, and other payments of funds by J&J and/or its subsidiaries were, in reality, frequently disguised marketing payments, a practice long-blessed by J&J's senior management and Board. Indeed, defendant Johns has been frequently criticized in professional journals and otherwise for effectively being an apologist for such payments.

137.    These off-label promotion strategies succeeded in driving growth in Natrecor sales. For example, in January 2005, J&J estimated that Natrecor outpatient sales had increased by 173% for 2004 and would continue to increase by another 81% for 2005. The Company also estimated that its outpatient infusion business would grow at a higher rate than its base hospital business.

138.    In February 2005, Forbes.com reported that "in 2004, sales of [Natrecor] more than doubled to $300 million according to Raymond James, an investment bank." The New York Times, on July 21, 2005, reported an even higher number - $400 million in Natrecor sales for 2004. J&J's aggressive and improper promotion tactics continued to drive accelerating growth in 2005 as well. For example, *Newsinferno.com* reported in August 2005 that: "Natrecor has been aggressively marketed with sales of the drug now reaching almost $700 million this year."

139.    Even as it pursued these aggressive and highly successful off-label promotion strategies, according to the Federal Natrecor Complaint, J&J and Scios told the FDA in an April 11, 2005 letter that "Scios does not currently market Natrecor in a manner that suggests that it should or should not be used specifically in the outpatient setting," and that "Scios's written policies and training materials emphasize the company's unambiguous policy that the promotion of serial or scheduled administration of Natrecor is not permitted."

140.     As also alleged in the Federal Natrecor Complaint, during the same year that J&J budgeted $750,000 for the Centers of Excellence program in an effort to double the number of outpatient clinics delivering more than 20 infusions of Natrecor per month, that J&J provided the FDA with slides from an October 12, 2004 training presentation indicating that the sales force was being trained not to market Natrecor for scheduled infusions.

141.     This presentation, given by Scios' Senior Director, Health Care Compliance Naoko Fuji, stated that "we must not promote Natrecor for conditions requiring chronic, long-term or prophylactic therapy given that such promotion would not fall within the label indication currently approved for our drug."

142.     These false claims of compliance with the law were directly at odds with J&J's actual long-term conduct, and underscore its knowledge of the law and the deliberate nature of its violations.

143.     Of particular concern with respect to the Natrecor Off-Label Promotion Scheme is the fact it was pursued despite clear, known risks to patients, and without any scientific evidence that serial outpatient treatment provided any health benefits.  As noted above, Scios' initial application for FDA approval of Natrecor was denied due to safety concerns, and when the FDA finally approved Natrecor, it did so for a narrow indication - the in-patient treatment of acutely decompensated congestive heart failure patients who have dyspnea at rest or with minimal activity.

144.     The FDA required that the initial product labeling for Natrecor include a precaution that the drug should only be used in settings permitting the close monitoring of blood pressure.

145.    Immediately after the launch of Natrecor in August 2001, Scios had started the FUSION I trial (derived from the study's full name - Management of Heart Failure after Hospitalization with Follow Up Serial Infusions of Nesiritide in an Outpatient Setting). FUSION I was a pilot study designed only to assess the ability of a patient with chronic congestive heart failure ("CHF") to tolerate these serial infusions (*i.e.*, to study the safety of serial infusions) and thus was not a study that could be used to determine the efficacy of the serial infusions.  Scios described the study as a multi-center (46 sites), randomized, three-treatment arm, open-label (thus the doctors and patients knew who were receiving Natrecor) pilot study of 210 CHF patients at high risk for re-hospitalization.  The patients generally had weekly outpatient visits for 12 weeks and the patients receiving Natrecor got a four- to six-hour infusion at each weekly visit.

146.    In September 2003, six months after J&J had acquired Scios, the Company caused Scios to announce the results of FUSION I, stating that the study suggested that weekly outpatient infusions of Natrecor could be safely administered to treat high-risk patients with advanced CHF.  While the study was not designed to support any conclusion about the efficacy of Natrecor for serial infusions, J&J caused Scios to issue a press release stating that "[d]ata from the FUSION I study suggests that the Natrecor-treated patients show improvements in clinical status with longer life expectancy and a lower frequency of hospitalizations compared to the group of patients receiving standard care."  J&J, through Scios, disseminated the results of FUSION I widely, claiming that it supported not only the safety but the efficacy of Natrecor for serial infusions.

147.    Thereafter, in 2004, J&J caused Scios to start a second trial on the outpatient use of Natrecor.  Unlike FUSION I, FUSION II was a blinded and controlled study.  It was also

specifically designed to determine the efficacy of serial outpatient Natrecor infusions and to measure whether these infusions lowered mortality and hospitalization rates.

148.    Meanwhile, as J&J aggressively expanded the population of patients exposed to Natrecor through its campaign to promote the drug off-label for serial outpatient infusions - concerns about Natrecor's safety increased.  In early 2004, the FDA requested that a panel of experts be convened to discuss, among other topics, the use of Natrecor in outpatient settings and dose/response relationships for the drug.  In response, in June 2004, Scios and J&J convened a panel of ten prominent cardiologists, led by Dr. Eugene Braunwald of Harvard Medical School, to review Natrecor's safety and efficacy, and to make recommendations concerning the use and further clinical studies of the drug (the "Special Advisory Panel").

149.    As reported by *The New York Times* on August 9, 2005:

Rather than the milquetoast findings often returned by such advisory panels, Dr. Braunwald's committee of 10 medical experts determined that use of Natrecor, an expensive intravenous therapy, should be strictly limited to acutely ill patients in hospitals.  The committee asked Scios to begin warning doctors against the drug's use in outpatients, a treatment that had not been approved by the Food and Drug Administration but that had helped turn Natrecor into a big money maker.

150.    On June 13, 2005, the Special Advisory Panel recommended that Scios and J&J proceed with their current clinical trial program, but also recommended an additional trial to assess the effect of Natrecor on survival, because the evidence was insufficient and inconclusive regarding the long-term safety of Natrecor.

151.    Consistent with the Company's overall policy to avoid, delay, or minimize taking patient safety actions that could adversely affect pharmaceutical sales, J&J initially resisted the Special Advisory Panel's recommendation that outpatient use of Natrecor be discontinued.  J&J orchestrated and controlled Scios' response to the Panel's criticism of

Natrecor's use in the outpatient setting and recommendation, *inter alia*, that the drug be used

strictly in the inpatient setting.

152.    As *The New York Times* article reported:

Some committee members said that their concerns about Scios's handling of their recommendations began soon after the panel reported its findings to the company on June 13.  The report's crucial finding was unambiguous.  Natrecor should not be used in outpatients.

But rather than simply disseminate the report, Scios created its own prefacing news release. The committee's conclusion that Natrecor should not be used in outpatient settings was not clearly stated until the final page of the five-page company document. Instead, the news release played up the panel's recommendation that Scios gather further data by continuing with a clinical trial, called Fusion II, to determine the drug's usefulness in outpatients.

"The press release emphasized a small aspect of our recommendations - that clinical trials should continue; it de-emphasized or made little mention of the more important take-home points of our recommendations," said Dr. Milton Packer, a cardiologist at the University of Texas Southwestern Medical Center in Dallas who served on the committee.

Dr. Packer also said that the committee members were shocked several weeks later when they received invitations as part of a mass mailing to enroll in a continuing medical education program, financed by Scios, that seemed to promote the outpatient use of Natrecor, whose chemical name is nesiritide.

"We were flabbergasted," Dr. Packer said. "Scios was sponsoring meetings to discuss nesiritide and its potential use in outpatients."

153.    On July 20, 2005, Dr. Braunwald of the Special Advisory Panel sent a letter to Dr.

Randall Kaye, Scios' Vice President of Medical Affairs, stating that "members of the Natrecor

Advisory Panel have been disturbed by what we consider to be significant omissions and lack of

clarity in Scios'[s] efforts to comply with the Panel's recommendations."

154.    On July 28, 2005, J&J Worldwide Chairman, Pharmaceuticals Group and

Executive Committee Member, defendant Scodari, instituted a communications team comprised

mostly of J&J employees to oversee the response to the Special Advisory Panel's

recommendations and all communications about Natrecor.  Scodari further ordered and

participated in the team's weekly conference calls, and instructed Scios' President and CEO to

"ensure a review on the return to promoting the on-label outpatient use (acute) is conducted" in

Scios' 2006 Strategic Plan (emphasis in Federal Natrecor Complaint, 104).

155.    In March 2006, the federal Centers for Medicare & Medicaid Services issued a

national coverage determination denying coverage for outpatient use of  Natrecor, stating:

> Much of the reported research on the use of nesiritide for the intermittent treatment of
> chronic heart failure appears in abstracts and has not yet been published as full peer-
> reviewed journal articles. In general, abstracts do not provide sufficient information for
> us to evaluate the strength of the reported findings critically. As such, these abstracts do
> not constitute strong evidence and are given less weight than other evidence. The
> published articles supporting the off-label use of nesiritide for chronic heart failure are
> hampered by methodological shortcomings, including small sample size and the lack of
> long term outcome data. . . . These weaknesses, along with the incidence of renal
> dysfunction, the increased incidence of mortality, and the findings and recommendations
> of the Nesiritide Advisory Panel create substantial concerns about the net health
> outcomes associated with the use of this drug for chronic heart failure. . . .CMS has
> determined that there is sufficient evidence to conclude that the use of nesiritide for the
> treatment of chronic heart failure is not reasonable and necessary for Medicare
> beneficiaries in any setting.

156.    Finally, in 2007, Scios released the results of its FUSION II clinical trial.  The

study did not show any significant benefits of serial outpatient Natrecor infusions in comparison

to standard care.  In other words, not only did Scios and J&J aggressively expand public

exposure to Natrecor through an illegal, off-label promotion campaign for outpatient use despite

significant health risks, but also despite the absence of any evidence that such use would benefit

patients.  The Natrecor Off-Label Promotion Scheme is thus a poignant example of the

Company's overall policy to elevate its commercial goals over significant legal and ethical issues

concerning patient health benefits and patient health risks.

157.    On November 29, 2007, J&J announced that it would record a $440 million write

down due to declining Natrecor sales.  The New York Times reported that the Company

explained that sales had declined significantly since outside medical researchers raised questions in 2005 about possible increased risk of kidney problems and death associated with the drug.

158.    The Natrecor Off-Label Promotion Scheme stands as an example of the willingness of the Board and J&J's most senior executive officers, including Officer Defendants Weldon, Poon and Scodari, to knowingly pursue unlawful and unethical strategies, and to ignore ethical issues concerning patient health benefits and patient health risks, in their pursuit of short term financial performance.  The $2.5 billion Scios acquisition was presented to the Board on February 9, 2003 after comprehensive due diligence had, necessarily, revealed five fundamental facts: (a) Natrecor was Scios' sole marketed drug and virtually its sole source of revenues; (b) Natrecor posed significant risks for patients and consequently had been approved by the FDA for a narrow and commercially limiting indication; (c) plans to grow Natrecor revenues depended on continuing and expanding Scios' promotion of Natrecor for off-label use in the outpatient serial infusion setting; (d) FUSION I had not yet been completed and thus the safety of Natrecor in the outpatient serial infusion setting had not yet been shown; and (e) no adequate and well-controlled clinical study had shown any patient benefit, over standard care, from outpatient serial infusion treatment with Natrecor.

159.    The Board was apprised of these fundamental facts and approved the acquisition that same day.  The ease and speed with which the Board approved this course of action is further evidence that the Director Defendants were fully aware, and in approval of, J&J's consistent strategy of off-label promotion of drugs and medical devices, which as of the February 2003 Scios acquisition, was already being applied across the Company in the Risperdal Off-Label Promotion Scheme (discussed *supra)*, the Topamax Off-Label Promotion Scheme (discussed *infra*) and the Biliary Stent Off-Label PromotionScheme (discussed *infra*).

160.    Now, as the result of the willingness of the Board and J&J's most senior executive officers to complete the Scios acquisition and pursue and expand the off-label promotion of Natrecor, and the willingness of senior management and the Board to continue this strategy at least through the summer of 2005, J&J faces liabilities to the federal government for the illegal Natrecor Off-Label Promotion Scheme potentially amounting to hundreds of millions of dollars.

161.    By knowingly pursuing the Natrecor Off-Label Promotion Scheme, the Officer Defendants, including Weldon, Poon and Scodari, breached their fiduciary duty of loyalty and good faith.  By knowingly permitting them to do so, the Director Defendants breached their fiduciary duty of loyalty and good faith. Such breaches of fiduciary duty have proximately caused the Company to suffer damages in an amount to be determined at trial, for which the Officer Defendants and the Director Defendants are fully accountable.

### 3.    Topamax

162.    As reported in the Annual Report on Form 10-K for the fiscal year ended December 31, 2003, filed on March 11, 2004 and signed by Defendants Weldon, Darretta, Coleman, Cullen, Jordan, Langbo, Linquist, Mullin, Reinemund, Satcher and Schacht, the Company has been under investigation for off-label promotion of Topamax since at least December 2003.  That filing disclosed that "[o]n December 8, 2003, the Company's Ortho-McNeil Pharmaceutical unit received a subpoena from the United States Attorney's office in Boston, Massachusetts seeking documents relating to the marketing, including alleged off-label marketing, of the drug TOPAMAX (topiramate) which is approved for anti-epilepsy therapy" (the "Topamax Off-Label Promotion Scheme").

163.    Further, on July 27, 2004, the Company received a letter request from the New York State Attorney General's Office for documents pertaining to marketing, off-label sales and clinical trials for Topamax (along with Risperdal, Procrit, Reminyl, Remicade and Aciphex). This additional investigation into off-label marketing and sales of Topomax was disclosed in the Company's Annual Report for the fiscal year ending January 2, 2005, filed March 15, 2005, and signed by Defendants Weldon, Darretta, Coleman, Cullen, Jordan, Langbo, Lindquist, Mullin, Reinemund, Satcher and Schacht.

164.    A full three years later, and despite the fact that Defendants were aware of the governmental investigations into the Company's sales and marketing practices across a wide spectrum of drugs, including, but not limited to Topamax, by at least early 2004, the Company received yet another subpoena in March of 2007.  This time, the subpoena was from the U.S. Attorney's Office in Boston, and requested information not only regarding the sales and marketing of Topamax, but also regarding the Company's corporate supervision and oversight of Ortho-McNeil, the subsidiary charged with selling Topamax.  The fact of this additional subpoena was disclosed in the annual report for the fiscal year ended December 30, 2007, filed February 26, 2008, and signed by Defendants Weldon, Poon, Coleman, Cullen, Johns, Langbo, Lindquist, Mullin, Perez, Prince, Reinemund and Satcher.

165.    As discussed above, the March 2007 subpoena was part of a coordinated investigation involving three separate U.S. Attorneys' Offices, spanning three J&J subsidiaries and involving three different drugs, focusing on J&J's lack of supervision and oversight of the three subsidiaries involved in the promotion, sales and marketing of Topamax, Risperdal and Natrecor.  According to the Company's most recent Annual Report on Form 10-K, the Topamax investigation has included testimony by current and former J&J employees before a federal

grand jury.   In April 2010, an agreement was reached whereby Ortho-McNeil agreed to pay approximately $75.4 million in civil and $6.1 million in criminal fines, and to plead guilty to a misdemeanor count of misbranding. At no time did the Board seek to hold any of the culpable individuals personally responsible for such fines or thereafter seek to recover them.

166.    Topamax was first approved by the FDA in December 1996 for the treatment of seizures in adults.  In August 2004, the FDA approved Topamax for the prevention of migraines. Despite these limited indications, pursuant to the Topamax Off-Label Promotion Scheme, J&J successfully generated substantial off-label demand for the drug.

167.    As a result of this scheme, Topamax has been prescribed extensively for numerous off-label indications, including treatment of bipolar disorder, to counteract weight gain associated with numerous antidepressants, treatment of alcoholism, treatment of  obesity, treatment of  binge eating, treatment of posttraumatic stress disorder, treatment in the prevention of periventricular leukomalacia in preterm infants after an hypoxic-ischemic injury, the treatment of essential tremor, bulimia nervosa, obsessive-compulsive disorder, smoking cessation, idiopathic intracranial hypertension, neuropathic pain, cluster headache, and cocaine dependence.  An analysis reported by Knight-Ridder in 2003 found that 79% of all prescriptions for Topamax were for off-label uses.

168.    Topamax sales grew explosively, from $687 million in 2002 to over $2.7 billion in 2008, the year before its patent expiration.

169.    In September 2004, J&J received a Warning Letter from the FDA concerning a serious violation of law by J&J in its marketing materials for Topamax.  This letter was copied to Weldon, Chairman of the Board and CEO of J&J. The Warning Letter stated that the Company's

Topamax promotional materials "fail to present any information about the risks of oligohidrosis, hyperthermia, and metabolic acidosis," which are "very serious risks."

170.     The September 2004 Warning Letter went on to emphasize that "it is also noteworthy that the majority of reports of these adverse reactions have been in children," and demanded that J&J withdraw these false and misleading promotional materials from circulation and respond with a plan of action to disseminate complete Topamax risk information to the audiences exposed to the misleading materials.

171.     The Company's failure to warn patients and prescribers about these "very serious risks" of treatment with Topamax is yet another example of the Company's policy to avoid, delay, or minimize taking patient safety actions that could adversely affect pharmaceutical sales, thus elevating commercial goals over issues of patient heath benefits and patient health risks.

172.     Despite the knowledge by J&J's Board of the federal investigation of the Company's illegal off-label promotion of Topamax, the Company continued with its aggressive efforts to generate off-label demand for the drug at least into late 2007.

173.     On October 9, 2007, the public interest group Public Citizen wrote a letter to the FDA, urging it to take action against "the illegal and dangerous promotional campaign by Ortho-McNeil Janssen-funded researchers for the unapproved use of Topamax (topiramate) for treating alcoholics." The Public Citizen letter reads, in part:

> In a study to be published in tomorrow's Journal of the American Medical Association, funded entirely by the company, researchers from the company and from the University of Virginia find only a modest improvement in the percentage of days of heavy drinking in people using Topamax compared with people using a placebo. Both groups also got a weekly 15 minute intervention by a trained nurse to promote compliance. But accompanying the study, in an embargoed press kit distributed by the University of Virginia on behalf of the researchers, is a question and answer sheet asking "Can my doctor prescribe me topiramate for alcohol dependence?" The answer is, essentially, yes: "Since topiramate is currently FDA-approved for seizures and migraines, it is available to your doctor to prescribe it to you off-label." This clearly violates the prohibition on off-

label promotion, as patients are being explicitly urged/promoted to ask their doctor for topiramate to treat their serious alcohol addiction.

174.    The Public Citizen letter went on to highlight serious, adverse side effects of Topamax use including metabolic acidosis, eye problems, increased body temperature, and kidney stones, and urged that "[s]uch reckless disregard for Federal law and regulations should not be tolerated."

175.    As noted above, in addition to the long-running federal investigation of J&J's off-label promotion of Topamax, the Company has also been charged with disseminating false and misleading promotional materials omitting required disclosures of serious health risks associated with the use of Topamax.

176.    In light of the multi-billion dollar sales of Topamax during the relevant period, the high percentage of Topamax prescriptions attributed to off-label uses, and the persistent nature of J&J's illegal activities even after its Board was on notice of the federal investigation, J&J faces substantial liability of more than $80 million in connection with the federal investigation of the Topamax Off-Label Promotion Scheme.

**D.      The DePuy Kickback Scheme**

177.    In March 2005, J&J's subsidiary, DePuy Orthopaedics, Inc. ("DePuy"), which J&J purchased in November 1998, was the target of an investigation by the United States Attorney's Office for the District of New Jersey (the "USAO").  Pursuant to the settlement between the government and the Company, in September 2007, J&J was forced to pay $84.7 million, and its DePuy subsidiary was charged with conspiracy to violate the federal Anti-Kickback Statute and forced to enter into a deferred prosecution agreement and a Corporate Integrity Agreement in a combined resolution of criminal and civil charges for paying and offering inducements to orthopedic surgeons to use DePuy hip and knee joint reconstruction and

replacement products (the "DePuy Kickback Scheme").  At no time did the Board seek to hold any of the culpable individuals personally responsible for such fine or thereafter seek to recover them.

178.    On September 27, 2007, the Department of Health and Human Services Office of the Inspector General filed a criminal complaint against DePuy in the United States District Court for the District of New Jersey (the "Criminal Complaint," incorporated by reference herein).  According to the Criminal Complaint, the Company operated this kickback scheme from January 2002 to December 2006.

179.    The Company disclosed in its May 10, 2005 Form 10-Q that "in March 2005, DePuy Orthopaedics, Inc. ("DePuy"), a Johnson & Johnson subsidiary, received a subpoena from the U.S. Attorney's Office, District of New Jersey, seeking records concerning contractual relationships between DePuy and surgeons or surgeons in training involved in hip and knee replacement and reconstructive surgery."

180.    This same disclosure was made in the Fiscal Year 2005 Annual Report on Form 10-K, signed by Defendants Weldon, Darretta, Poon, Coleman, Cullen, Johns, Jordan, Langbo, Lindquist, Mullin, Prince, Reinenumd and Satcher.

181.    Despite the knowledge of J&J Board's of the DePuy investigation, the illegal conduct was permitted to continue until December 2006.  It was not until 2007 that J&J made efforts to improve DePuy's weak compliance practices, which the J&J Board knew as far back as the acquisition of DePuy made J&J vulnerable to potential violations of the anti-kickback statute given DePuy's reliance on consultants and consulting agreements as conduits for the payment of kickbacks.

182.    As noted above, in addition to the liability J&J faces in connection with the DePuy Kickback Scheme, DePuy discontinued production of its ASR XL Acetabular Hip System and ASR Hip Surface Replacement Femoral Head Component in November 2009, and recalled these products in August 2010, offering to cover hundreds of millions of dollars of costs of follow-up monitoring and treatment associated with the recall.

### E.    The Biliary Stent Off-Label Promotion Scheme

183.    From in or about 1996 through at least 2007, J&J also pursued its unlawful off-label marketing strategy to drive sales of medical devices known as biliary stents (the "Biliary Stent Off-Label Promotion Scheme"), through its subsidiary, Cordis Corporation ("Cordis").  On September 26, 2006, a *qui tam* action was filed on behalf of, *inter alia*, the United States in the Northern District of Texas, under the False Claim Act (the "Biliary Stent Complaint") to recover damages, penalties and other remedies in connection with a biliary stent off-label promotional and marketing scheme pursued by multiple companies, including J&J, by and through Cordis and its Cordis Endovascular division.

184.    As is true with respect to all of its subsidiaries, J&J dominates and controls all policies, practices and activities of Cordis and its wholly-owned subsidiary, Cordis Endovascular.

185.    Biliary stents are medical devices implanted in the bile duct.  Several thousand patients are diagnosed annually with terminal biliary cancer resulting in poor flow of the bile duct.  Patients experience drainage issues in the bile duct resulting in painful, ancillary medical symptoms, and life expectancy is limited.  The biliary stent, a Class II medical device, is a temporary, palliative medical device implanted in the bile duct to keep it open.

186.    Vascular stents, on the other hand, are functionally and compositionally different than biliary stents.  Vascular stents (also known as intravascular or endovascular stents) are classified by the FDA as Class III medical devices that pose significant risks to patients.  They are implanted permanently into patients' vascular systems to treat peripheral vascular disease by enhancing vessel patency and reducing early restenosis over the life of the device.  Pursuant to the Biliary Stent Off-Label Promotion Scheme, J&J promoted biliary stents for off-label use in the human vascular system and caused and induced physicians to seek coverage and reimbursement for such use.

187.    In contrast to the few thousand patients diagnosed annually with cancer in the biliary tree, hundreds of thousands of patients are diagnosed annually with vascular disease. Most live decades.  Unlike biliary stents, vascular stents, as Class III medical devices that pose significant risks to patients, require premarket approval ("PMA") from the FDA before marketing the devices.  PMA is the most stringent regulatory review reserved for high-risk devices and requires device manufacturers to clinically establish the safety and efficacy of the devices in patients.  It is a lengthy, costly process which J&J sought to avoid pursuant to the Biliary Stent Off-Label Promotion Scheme.

188.    In conceiving the Biliary Stent Off-Label Promotion Scheme, J&J saw an opportunity to circumvent the expensive mandatory PMA process for Class III vascular stents by falsely claiming that stents it fully intended to promote and sell for vascular use were not vascular stents, but instead were biliary stents. The Biliary Stent Complaint alleges that, recognizing this opportunity, J&J, as well as competing companies, developed stents with the intent to promote and market the devices for the treatment of vascular disease.  They filed for patent protection with the United States Patent and Trademark Office certifying to claims that the

devices were intended for vascular disease and use in the human vascular system.  No claims were made for palliation of malignant strictures of the biliary tree.  J&J and its competitors then knowingly filed fraudulent section 510(k) premarket clearance notifications with the FDA, falsely certifying that the devices were only biliary stents for use in the palliation of malignant biliary strictures.

189.     The Biliary Stent Off-Label Promotion Scheme also provided a means to circumvent federal statutory requirements to conduct post-market surveillance of medical devices that are marketed and promoted for a Class III indication requiring PMA.  Pursuant to the Safe Medical Devices Act of 1990 and the Food and Drug Administration Modernization Act of 1997, Defendants' avoidance of statutorily required post-market surveillance further concealed Defendants' fraudulent scheme and the true extent of the safety and efficacy issues raised for beneficiaries by marketing the unapproved biliary stents as intended for use in the vascular system.  Thus, the Biliary Stent Off-Label Promotion Scheme is yet another example of J&J's deliberate policy of sidestepping laws and regulations designed to safeguard patient health in order to drive commercial profits.

190.     The FDA has not approved biliary stents for use in peripheral vasculature. Biliary stents are not vascular stents by intended use, by FDA classification, and by Medicare coverage.  In fact, the FDA concluded that biliary stents are not safe or effective for vascular use, and the FDA required these companies, including J&J, to clearly and prominently warn physicians of the safety and efficacy risks to patients when marketing the stents.

191.     To effectuate the Biliary Stent Off-Label Promotion Scheme, beginning in 1996, and continuing through at least 2006, J&J caused Cordis to file fraudulent pre-market clearance notifications with the FDA, certifying that the devices covered by each notice were only biliary

stents intended for use in the palliation of malignant strictures of the biliary tree when, in fact,

J&J intended to market the devices for use in peripheral vasculature.  Such false pre-market

clearance notifications are identified in the following chart in reverse chronological order:

| BILIARY STENT NAME | 510K | DATE |
|---|---|---|
| Palmaz Blue .014Transhepatic Biliary Stent System | K060877 | 4/27/06 |
| Smart Control Nitinol Stent Transhepatic Biliary System | K042969 | 11/8/04 |
| Precise Rx Nitinol Stent Transhepatic Biliary System | K041796 | 8/3/04 |
| Cordis Palmax Blue .018 Transhepatic Biliary Stent | K040413 | 6/21/04 |
| Cordis Palmaz Genesis Transhepatic Biliary Stent | K033394 | 12/22/03 |
| Precise Rx Nitinol Stent Transhepatic Biliary System | K032137 | 9/17/03 |
| Smart Control Nitinol Stent Transhepatic Biliary System | K032457 | 9/4/03 |
| Smart Control Nitinol Stent Transhepatic Biliary System | K031777 | 7/7/03 |
| Smart Control Nitinol Stent Transhepatic Biliary System | K031197 | 6/16/03 |
| Smart Control Nitinol Stent Transhepatic Biliary System | K023217 | 10/25/02 |
| Smart Control Nitinol Stent Transhepatic Biliary Stent | K021898 | 8/14/02 |
| Cordis Palmaz Genesis Transhepatic Biliary Stent | K021345 | 6/28/02 |
| Cordis Palmaz Genesis Transhepatic Biliary Stent | K020809 | 4/12/02 |
| Smart Nitinol Stent Transhepatic Biliary System | K020052 | 2/11/02 |

| | | |
|---|---|---|
| Precise Nitinol Stent Transhepatic Biliary System | K012993 | 10/5/01 |
| Cordis Palmaz Genesis Transhepatic Biliary Stent | K012590 | 9/7/01 |
| Palmaz Genesis Transhepatic Biliary Stent and Delivery System | K010411 | 8/27/01 |
| Cordis Palmaz Genesis Transhepatic Biliary Stent | K012056 | 8/1/01 |
| Cordis Palmaz Genesis Transhepatic Biliary Stent | K012087 | 8/1/01 |
| Cordis Palmaz Genesis Transhepatic Biliary Stent | K012090 | 8/1/01 |
| Precise Nitinol Stent Transhepatic Biliary System | K010445 | 3/16/01 |
| S.M.A.R.T. Nitinol Stent Transhepatic Biliary System | K03336 | 11/22/00 |
| S.M.A.R.T. Nitinol Stent Transhepatic Biliary System | K001843 | 7/18/00 |
| Rx Transhepatic Biliary Stent and Delivery System | K001258 | 6/27/00 |
| Cordis Medium Palmaz Transhepatic Biliary Stent and Delivery System | K000564 | 3/23/00 |
| Cordis Palmaz Corinthian Iq Transhepatic Biliary Stent | K994156 | 1/7/00 |
| S.M.A.R.T. Nitinol Stent Transhepatic Biliary System | K994068 | 12/23/99 |
| S.M.A.R.T. .018 Nitinol Stent Transhepatic Biliary System | K993646 | 11/18/99 |
| Palmaz X1 Transhepatic Biliary Stents | K993091 | 10/29/99 |
| Cordis Palmaz Corinthian Transhepatic Biliary Stent and Delivery System | K992755 | 9/15/99 |
| Cordis Palmaz Corinthian Transhepatic Biliary Stent and Delivery System | K991674 | 8/12/99 |

| Cordis Palmaz Corinthian Transhepatic Biliary Stent and Delivery System | K991028 | 8/4/99 |
|---|---|---|
| Cordis Palmaz Corinthian Transhepatic Biliary Stent and Delivery System | K990631 | 4/30/00 |
| Cordis Nitinol Stent and Delivery System | K980823 | 12/18/98 |
| Perflex Stainless Steel Stent and Delivery System | K980653 | 6/8/98 |
| Palmaz and Palmaz-Schatz Balloon-Expandable Stents | K964688 | 6/20/97 |
| Cordis Biliary Stent | K955728 | 5/8/96 |

192.    In each of these section 510(k) pre-market clearance notifications, J&J falsely certified to the FDA that the device "is intended for use in the palliation of malignant neoplasms in the biliary tree."  The section 510(k) pre-market clearance notifications concealed and failed to disclose that J&J intended for these devices to be used as vascular stents in the vascular system.

193.    Based on these false certifications and statements, the FDA issued a pre-market clearance letter for each of the above-listed devices, limited to the stated intended use and imposing restrictions on J&J prohibiting it from marketing or promoting the device as an FDA approved vascular stent.

194.    The FDA granted pre-market clearance for the biliary stents under section 510(k), limited to palliation of malignant strictures of the biliary tree.  None of the devices received PMA by the FDA as a Class III vascular stent intended for use in the peripheral vascular system.  Instead, the FDA required J&J to prominently disclose in labeling, marketing and promotional materials that "[t]he safety and effectiveness of this device for use in the vascular system have not been established."

- 67 -

195.     J&J's competitors in the vascular stent market, also named as defendants in the

Biliary Stent Complaint, followed an identical course of action, fraudulently obtaining pre-

market clearance letters

196.     Enabled with section 510(k) pre-market clearances for the biliary stents, J&J and

its competitors then actively promoted and marketed the devices off-label as vascular stents

intended to treat peripheral vascular disease, using the following measures:

(a)     instructing sales representatives to target physicians specializing in
peripheral vascular disease to induce the use of the Class II biliary stents as unapproved Class III
vascular stent intended for vascular disease;

(b)     directly or indirectly sponsoring or funding studies of the off-label use of
the biliary stents to treat peripheral vascular disease and providing the study information to sales
representatives for use in marketing and promoting the devices to vascular physicians;

(c)     extensively marketing and promoting the devices in print and electronic
advertisements targeting physicians with vascular specialization in an effort to solicit the use of
the devices for the vascular system, with simultaneously avoiding any print and electronic
marketing of the biliary stents targeted to gastroenterologists and hepatologists (physicians
specializing in biliary tree disorders);

(d)     providing unsolicited marketing and promotional literature to physicians
concerning the off-label use of the unapproved biliary stents to treat vascular disease, including
information advising physicians how to develop and expand a peripheral vascular practice,
thereby encouraging the unapproved use of the biliary stents;

(e)     preparing patient "advisory" letters and similar documents concerning the
health risks of undiagnosed and untreated peripheral vascular disease, provided to vascular
specialists, without solicitation, to send to patients to generate patient interest in peripheral
vascular disease and to induce the unapproved use of the biliary stents;

(f)     giving sales representatives mandatory quotas requiring them to sell the
biliary stents off-label simply to satisfy the quota;

(g)     establishing compensation schemes for sales representatives which
included bonuses for off-label sales; and

(h)     providing reimbursement guidelines and manuals to physicians that
instructed physicians to falsely code reimbursement claims using procedural codes for approved
vascular stents, even though an unapproved biliary stent was utilized.

197.    Further supporting the knowing and systemic nature of this off-label promotion at J&J, the Biliary Stent Complaint discloses that Cordis trained its sales representatives by placing them in a vascular laboratory where the physician would teach them how to read vascular angiograms and let the sales representatives watch live peripheral vascular cases.

198.    J&J and its competitors were highly successful in the off-label scheme.  In excess of 700 biliary stent product codes made by these companies have been promoted and marketed off-label for treating peripheral vascular disease, even though more than 500 of these biliary stent product codes cannot be used in the biliary tree due to the length and diameter of the device.  Indeed, virtually all of the approximate 150,000 stents implanted in patients each year to treat vascular disease are adulterated and misbranded biliary stents.

199.    In an article published on January 14, 2010, The New York Times reported that "[a] 2008 study in a medical journal, the American Journal of Therapeutics, estimated that one million biliary stents were used off-label from 2003 to 2006 to open clogged blood vessels in other parts of the body.  That report also found that deaths and injuries had occurred as a result of device malfunctions when the stents were used off-label."

200.    The adverse events reported as a result of the improper implanting of biliary stents have included death, fractures of the devices after implantation, migration and dislodgement of the devices after implantation, arterial dissection and occlusion, arterial and stent embolizations, aneurysms, acute renal insufficiency, amputations, air embolisms, fistulization, strokes, late restenosis, allergic reactions, infections, clots, internal bleeding, and persistent vessel spasms, among other serious medical conditions.

201.    In an article published on March 10, 2007, *The Wall Street Journal* reported that "[i]n 2004, the FDA forced J&J's Cordis unit to recall an instruction sheet, which wasn't approved by the FDA, for its Precise biliary stent after nine off-label patients were injured."

202.    That same March 2007 article reported that the FDA "has called a meeting with makers of bile-duct stents to discuss their heavy use for unapproved, or "off label" surgical applications."  In its January 14, 2010 article, The New York Times reported that "[i]n 2007, the F.D.A. warned biliary device manufacturers about promoting them for vascular use."

203.    J&J has disclosed in its Form 10-K for the fiscal year ended December 28, 2008, filed February 20, 2009 and signed by Defendants Weldon, Poon, Coleman, Cullen, Johns, Langbo, Lindquist, Mullin, Perez, Prince and Satcher that in June 2008, the Company received a subpoena from the United States Attorney's Office for the District of Massachusetts relating to the marketing of biliary stents by J&J's Cordis subsidiary.

204.    As a result of the knowing unlawful conduct represented by the Biliary Stent Off-Label Promotion Scheme, representing a breach of the fiduciary duty of loyalty by the Officer and Director Defendants herein, the Company has suffered damages in an amount to be determined at trial.

**F.     The 2010 Product Odor Recalls and Defendants' Inadequate Response to Prior Complaints**

205.    On January 15, 2010, the San Juan District Office of the FDA issued a Warning Letter to the Company's McNeil Consumer Healthcare business unit.  The subject of the Warning Letter was the Company's violation of cGMP regulations in connection with the failure to adequately investigate and report to the FDA consumer complaints relating to an "uncharacteristic odor" and related adverse patient health events due to contamination of over-the-counter ("OTC") products.

206.     This Warning Letter, a copy of which was provided to J&J Chairman of the

Board and CEO Weldon, charges, not only that McNeil Consumer Healthcare violated cGMP

regulations, but also that J&J's response at the parent company level was inadequate, specifically

finding that:

> The Agency is concerned about the response of Johnson & Johnson (J&J) to this matter.
> It appears that when J&J became aware of FDA's concerns about the thoroughness and
> timeliness of McNeil's investigation, whether all potentially affected products had been
> identified, and whether the recall was adequate in scope, J&J did not take appropriate
> actions to resolve these issues.  Corporate management has the responsibility to ensure
> the quality, safety, and integrity of its products.  Neither upper management at J&J nor at
> McNeil Consumer Healthcare assured timely investigation and resolution of the issues.

207.     The Warning Letter detailed several violations indicative of systemic compliance

management deficiencies.  These charges included:

(a)     The initial investigation into the root cause of the odor was unjustifiably
delayed and terminated prematurely.  Numerous complaints were received over a four-month
period in 2008 before they were considered a trend and before actions were initiated to determine
the root cause.  When microbiological testing in August 2008 did not support an initial
speculation that microbial contamination was the root cause of the odor, the investigation was
closed.  No other possible root causes were pursued.  The Company lacked adequate justification
for this decision.

(b)     Complaints of uncharacteristic odor were reported again in April 2009.
Approximately 112 similar complaints were received by August 3, 2009. Although J&J had test
results indicative of contamination with TBA as the source of the "off odor" on the complaint
samples since September 2009, these results were not shared with FDA until after the initiation
of the inspection and following several requests for this information made by the district office.

(c)     In October 2009, J&J concluded that the most probable root cause of the
odor in the Tylenol Arthritis Relief caplets was the exposure of drug product bottles to wood
pallets chemically treated with TBA.  The Company did not expand the scope of the
investigation to other lots and products potentially affected by this deviation.

(d)     The timing and depth of J&J's investigative efforts regarding
uncharacteristic odor complaints were insufficient to meet good manufacturing practice.  J&J's
management, including the Quality Control Unit, was not proactive in response to consumer
complaints.  In addition, during the 2008 examination of complaint samples, J&J's analysts
noted that the tablets, once removed from the bottle, did not have an unusual odor but the bottle
retained a strong odor.  Nonetheless, J&J did not pursue chemical testing at that time.

(e)     J&J's quality management should have ensured the start of chemical testing far earlier.  Failure to do so prolonged identification and resolution of the problem, resulting in continued consumer exposure.

(f)     J&J received numerous uncharacteristic odor consumer complaints during the period of April 2008 through September 2008 for Tylenol Arthritis Relief caplets.  Nevertheless, J&J failed to submit a FAR to the FDA within three working days to inform the agency of the nature of the problem and the steps being taken to address it.  J&J did not submit the FAR until September 18, 2009, after again noting an adverse, continuing trend of numerous complaints over the course of a several month period.

208.     The widespread quality and cGMP problems at J&J's McNeil manufacturing facilities was well known to J&J's senior management including, inter alia, Defendant Weldon, and was known or should have been known by the J&J Board as far back as 2005.  Despite identified risks, the manufacturing operations continued and known contaminated products were distributed.  When J&J acquired Pfizer Consumer Healthcare ("PCH") in December 2006, PCH OTC product lines were added to McNeil's Fort Washington and Las Piedras sites.  However, as the Board became increasingly aware of the foregoing risks, its members failed to institute and/or require management to institute proper quality control systems or exercise sufficient management oversight of McNeil.  Internal audits revealed critical cGMP issues that went uncorrected for long periods of time.  The Las Piedras site was rated overall as "unsatisfactory" in 2007 and "marginal" in 2009, facts known or which should have been known to the members of the Board.  J&J continued to refuse to address the systemic manufacturing problems.  As a result of the Company's inadequate cGMP compliance procedures, the Company was forced to conduct a broad recall of potentially affected products, in "consultation with the FDA," which it announced on the date of the FDA Warning Letter.  The TBA recall was expanded in June 2010, July 2010, October 2010 and March 2011.

209.     The Company had previously conducted a prior, limited recall due to TBA in November and December 2009 based on the cursory investigation criticized in the FDA Warning

Letter.  On November 23, 2010, Reuters reported that a new J&J recall was now being issued

with respect to Benadryl, Motrin, Rolaids:

> NEW YORK (Reuters) - Johnson & Johnson, which has been beset with recalls of Tylenol and other consumer products over the past year, has recalled almost 5 million additional packages of Benadryl, Motrin and Rolaids because of manufacturing "insufficiencies."
>
> J&J said the recalls, like many of the earlier ones, involved products made at its plant in Fort Washington, Pennsylvania. The facility was closed earlier this year to fix quality-control lapses, including unsanitary conditions.
>
> The latest actions involve 4 million packages of Children's Benadryl Allergy Fastmelt Tablets in cherry and grape flavors. The allergy drug was distributed in the United States and other markets, a company spokeswoman said.
>
> An estimated 800,000 bottles of Junior Strength Motrin Caplets, a painkiller, were recalled in the United States.  The Benadryl and Motrin recalls were initiated after a J&J review "revealed insufficiencies in the development of the manufacturing process, J&J said.
>
> The company spokeswoman declined to identify the specific manufacturing lapses. She said there was no indication that the products failed to meet quality standards.
>
> In addition, about 71,000 packages of Rolaids antacid, in a cherry flavored extra-strength Softchews formulation, were recalled in the United States.
>
> J&J said the Rolaids were made by a third party, and were recalled following consumer complaints about "an uncharacteristic consistency or texture, traced to crystallized sugar in the product."
>
> Unlike previous recalls, J&J did not issue press releases announcing the latest actions by its McNeil consumer healthcare division. It posted them on a company website. "This is not a consumer-level recall; consumers do not have to take any action," the spokeswoman said when asked why press releases were not issued. She said all three new actions instead were "wholesale and retail level" recalls, which called instead on wholesalers and retail outlets to take action.

210.    On March 10, 2011, McNeil entered into a Consent Decree of permanent

injunction with the federal government resolving charges of violations of the FDA's cGMP

regulations by causing the adulteration of drugs and their introduction into interstate commerce.

Operations at Fort Washington have been suspended until cGMP deviations are corrected, and

two other facilities are being closely monitored for cGMP compliance for the next 5 years. The Company's mishandling of the product contamination incident (the "Delayed OTC Contamination Recall Scheme"), the FDA Warning Letter, the series of product recalls, as well as its most recent recall on November 23, 2010, and the March 2011 consent decree have caused substantial financial harm to the Company as well as injury to its reputation and goodwill and its relations with its primary regulator, the FDA.

G.      **Bribery of Medical Professionals**

211.    The U.S. Securities and Exchange Commission (the "SEC") brought a civil action against J&J in the U.S. District Court for the District of Columbia on April 8, 2011 (the "SEC Bribery Complaint") alleging that J&J violated the Foreign Corrupt Practices Act (the "FCPA") by paying bribes to public medical professionals in Greece, Poland, and Romania to, *inter alia*, prescribe J&J drug products and utilize J&J medical devices in lieu of competing and less harmful alternatives, and by paying kickbacks to Iraq to obtain contracts (the "FCPA Bribery Scheme").

212.    According to the SEC Bribery Complaint, J&J, directly and through its DePuy subsidiary, from at least 1998 and continuing to early 2006, paid bribes to publicly-employed doctors in Greece, to encourage them to select J&J surgical implants for their patients. It is alleged that J&J reported $24,258,072 in profits on sales obtained through bribery.

213.    In September 1997, DePuy International, LTD ("DPI"), a wholly-owned subsidiary of DePuy, executed two contracts, which were shams for hiring a Greek agent to bribe public doctors in Greece to use DePuy's orthopedic implants. After J&J acquired DePuy in November 1998, J&J knowingly continued the bribery scheme.

214.    By April 1999, J&J executives learned that the Greek agent was paid through a private company in the Isle of Man.  These payments violated J&J's Policy on Business Conduct, which requires payments to third parties to be made in the country where the product is sold, and also raised a "red flag" of bribery.

215.    In January 2000, two DPI executives recommended to the DPI President that DPI terminate the Greek Agent because of bribery.  The DPI President raised the issue with his superior, DPI franchise Worldwide Chairman, during J&J's international sales conference in late January.  The franchise Worldwide Chairman instead decided to acquire Medec, S.A., the Greek agent's company (the "Greek Distributor") and to retain its owner, the Greek agent, as a consultant.  As alleged in the SEC Bribery Complaint, the superior explained in an e-mail, "[t]he only problem with the proposal was that we would lose half our business even by year 3."  He stated "[t]o lose approximately $4M in sales in end user terms to the competition is totally unacceptable."

216.    Throughout 2000, despite J&J's knowledge that the Isle of Man commission payments were really bribery payments to the Greek Distributor for the purchase of DePuy products, there were continued negotiations between DPI and the Greek distributorship.  In November 2000, a DPI lawyer and DPI accountant circulated a draft due diligence report which knowingly misrepresented that there was no evidence of bribery in the Greek Distributor's books when, in fact, they knew that the Greek Distributor's inventory was overvalued by 35% to cover the improper "cash incentives" the Greek Agent paid.  The SEC Bribery Complaint also alleges that a DPI vice president scolded the Greek Distributor's accountant for mentioning the illegal "cash incentives" in writing.

217.    In January 2001, J&J purchased the Greek Distributor and re-named it DePuy

Medec S.A ("DPM").  In mid-2003, J&J renamed the company DePuy Helles S.A. ("DPH").

DPM entered into a consultant agreement with the Greek agent to facilitate the bribe payments,

paying him 27% of all sales in Greece.  When an outside accountant questioned the amount of

the payments in the spring of 2001, the DPI executives split the payments between two new

agreements to conceal the true purpose and amount of the bribe payments.

218.    The SEC Bribery Complaint alleges that the Greek agent and DPI executives

referred to the bribe payments as "professional education" or "support" and that the Greek agent

wrote to DPI that "cash incentives to surgeons is common knowledge in Greece."  The SEC

Bribery Complaint further alleges that a DPI vice president emailed the head of DPH about an

increase in payments to the Greek agent for "increased direct payments to the surgeons."

219.    In October 2003, DPI dismissed the Greek agent, and hired another agent to fill

the same role in the bribery scheme.

220.    According to the SEC Bribery Complaint, whenever the Greek agent and his

replacement were late in paying the Greek doctors, DPM or DPH employees withdrew petty cash

to pay the doctors directly.  From 2002 to 2006, the Company records show $590,000 in

withdrawals booked as "miscellaneous" and re-deposited within days as "repayments."

221.    In 2005, the DPI President alerted J&J that DPH's use of a second consultant may

not be compliant with Company policies.  DPI's HCC Officer learned of this information but did

not require DPH to terminate its relationship despite the illegal payments being made by DPH to

its consultant.

222.    In February 2007, J&J, through counsel, disclosed to the DOJ and SEC that its

subsidiaries made improper payments regarding sales of medical devices in two foreign countries

in violation of the FCPA. Upon information and belief, J&J intentionally concealed the identities of the officers who were responsible for such violations and failed to disclose the full extent of the violations and the number of countries where such corrupt payments were made.

223.    The partial disclosures made in J&J's 10-K, although reflecting the ongoing nature of previously disclosed investigations, nevertheless concealed the facts referred to herein.

224.    On April 15, 2010, Robert Dougall, a former director of marketing of DPI, who turned whistleblower, was sentenced to 12 months in jail for helping the payment of $4.5 million of bribes to medical professionals in the Greek state healthcare system between 2002 and 2006. In sentencing Mr. Dougall, the judge found that the "corruption was systemic and long-term and involved several million pounds in corrupt payments."

225.    The SEC Bribery Complaint alleges that, from 2000 to 2006, J&J, through its Johnson & Johnson Poland Sp. z.o.o.subsidary ("J&J Poland"), paid bribes to publicly-employed doctors and hospital administrators in Poland, to obtain and retain J&J business.  It is alleged that J&J reported $4,348,000 in profits from its sales through the bribery scheme.  The bribery stopped when Polish prosecutors began to investigate the bribe payments.

226.    According to the SEC Bribery Complaint, J&J Poland employees created sham contracts with publicly-employed doctors and hospital administrators calling for services never provided or for fictitious activities as a ruse for paying them for using J&J's medical devices or for influencing hospitals to award medical device tenders to J&J.  Approximately $775,000 of payments were funneled in this way between January 1, 2000 and June 30, 2006.  At least one high-level business manager and another executive in J&J Poland had knowledge of and approved these illicit payments.  As each member of J&J's Board knew or should have known, J&J did not have adequate internal controls in place to detect and prevent the illicit payments.

227.     Another aspect of the FCPA Bribery Scheme in Poland was payment of bribes through sponsored travel.  J&J Poland spent approximately $7.6 million between 2000 and 2006 to sponsor trips for public doctors and hospital administrators in order to influence their decisions to purchase J&J medical products.  J&J's management approved the travel expenditures knowing that they were part of a bribery scheme.  Additionally, J&J Poland employees faked travel expenses in order to generate cash to funnel to doctors as bribe payments.

228.     The SEC Bribery Complaint alleges that J&J through its Johnson & Johnson d.o.o. ("Pharma Romania") subsidiary paid bribes in the form of cash and travel benefits to publicly-employed doctors and pharmacists in Romania in exchange for ordering and prescribing J&J pharmaceutical products.  J&J travel agents overcharged Pharma Romania for the trips in order to generate cash to pay for travel of the doctors' families or to provide "pocket money."  From 2000 to 2007, J&J reported $3,515,500 in profits from its sales through the bribery.

229.     The SEC Bribery Complaint alleges that from 2000 to 2003, J&J, through its Cilag AG International and Janssen Pharmaceutica N.V. ("Janssen") subsidiaries, paid kickbacks to Iraq to obtain contracts under the United Nations Oil for Food Program (the "Program").  The Program permitted the Iraqi government to sell its crude oil and use the proceeds to purchase food, medicine and other humanitarian supplies.

230.     Janssen sold pharmaceuticals to Kimadia, an arm of the Iraqi Ministry of Health, through a Lebanese agent, who they paid initially a 12% commission on the sales.  In 2001, when the Iraqi government surreptitiously instituted a policy requiring suppliers of humanitarian goods to pay a 10% kickback on each contract, Janssen increased the agent's commission to 22% to make these illegal payments.  When Kimadia's kickback demands stopped in March 2003, Janssen decreased the commissions by 10%.  The increase and decrease in commissions were

approved by a Janssen area director in Lebanon as well as a managing director for Janssen's Middle East West Asia group in Belgium.

231.     It is alleged that the kickback payments amounted to $857,387.  These payments were a bribe to the Iraqi regime, made through the Lebanese agent to Iraqi controlled accounts to avoid detection by the U.N.   To conceal these illegal payments, Janssen inflated the price of the contracts, and J&J management disguised them on the Company's books and records as legitimate commissions.  J&J's total reported profits on the contracts were $6,106,255.

232.     J&J, through its subsidiaries and agents, knowingly allowed its employees and third parties to bribe Greek and Polish public doctors and hospital administrators for the purpose of obtaining and retaining business, in violation of the FCPA, 15 U.S.C s 78dd-1, 78dd-2, 78dd-3.

233.     On May 24, 2007, *Ethisphere* published an article entitled, "What's Ailing Johnson & Johnson?"  The title incorporated a Band-aid (J&J's most publicly-recognizable product) with blood dripping behind it. The article was an "in-depth look [to] uncover astonishing evidence that all is not well at a long-revered icon."  Many problems that were plaguing J&J were cited including the fact that J&J admitted in February 2007 that it had bribed foreign officials in two countries in violation of the FCPA.

234.     J&J's accounting books and records did not accurately reflect the true nature of the illicit payments made to obtain contracts in Iraq, Romania, Greece and Poland, in violation of the FCPA, 15 U.S.C. s78m(b).  The bribe payments made to the Greek and Iraqi agents were falsely recorded.  The true terms of the contract payments to Polish doctors were not recorded. J&J created false contracts, invoices and other documents to conceal the true business arrangements made to facilitate the bribery schemes.

235.     As its Board members knew or should have known, J&J management failed to implement adequate internal control systems to detect and prevent the illicit payments, as described above, in violation of the FCPA.

236.     In April, 2011, J&J consented to a final judgment with respect to the SEC Bribery Complaint. The Company agreed to report periodically on its remediation and compliance measures to ensure compliance with the FCPA for the next three years.  J&J further agreed to pay $48.6 million in disgorged profits.  Also in April 2011, the Department of Justice and J&J entered into a Deferred Prosecution Agreement, pursuant to which J&J agreed to pay a fine of $21.4 million, to implement a FCPA compliance program and to report on its implementation, and to accept responsibility for the bribery conduct, as described above.  DPI also agreed with the U.K.'s Serious Fraud Office to pay a fine of 4.829 million pounds of sterling.  At no time did the Board seek to hold any of the culpable individuals personally responsible for such fine or disgorgement or thereafter seek to recover them.

237.     The J&J Board knew or should have known that J&J management was breaching the FCPA and subjecting the Company to investigations and substantial liability in connection with the aforementioned bribery schemes and possibly others which have not yet been uncovered.  The FCPA Bribery Scheme has caused financial and reputational harm to the Company, including, *inter alia*, the costs of responding to governmental investigations and defending related legal proceedings, fines, penalties, and settlement payments in connection with federal and related enforcement actions.

## V.      DERIVATIVE ALLEGATIONS

### A.      General Derivative Allegations

238.     Plaintiff brings this action derivatively in the right and for the benefit of J&J to

redress the serious and multi-year breaches of fiduciary duty and other wrongful conduct by the Individual Defendants as alleged herein.

239.    Plaintiff owns and has continuously owned common stock in J&J throughout substantial portions of the wrongdoings alleged herein.

240.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

241.    Plaintiff will adequately and fairly represent the interests of J&J and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting this type of action.

**B.    Plaintiff Has Made Pre-Suit Demands Pursuant to Rule 23.1**

242.    At the time this action was initially commenced, the Board was comprised of 11 Directors: Defendants Coleman, Cullen, Johns, Langbo, Lindquist, Mullen, Perez, Prince, Satcher, Weldon and Mulcahy.  Since April 2010, Defendant Langbo no longer serves on the Board.  As of July 2010, Ian E.L. Davis was appointed to the Board and is currently a member of the Audit Committee and the Public Policy Advisory Committee.  The Director Defendants as well as Mr. Davis currently serving on the Board are collectively referred to herein as the "Defendants/Current Board Members," or the "Current Board."

243.    On May 20, 2010, Plaintiff made a pre-suit demand on the Board that existed at the time as required by Fed. R. Civ. P. 23.1.  A copy of the letter from Plaintiff's counsel setting forth such demands and others (the "Demand Letter") is attached hereto as Exhibit "A."  Both before and after the Demand Letter, counsel for other J&J shareholders made pre-suit demands upon the Board referring to some of the same conduct as mentioned in the Demand Letter.  Cumulatively, all of these letters are referred to as the "Various Demand Letters." Plaintiff's

counsel was thereafter informed that the Board had appointed a so-called "Special Committee," with Douglas Eakeley, Esq. and his firm serving as its counsel.

244.    On April 22, 2010, in the wake of various pre-suit demands on the Current Board, a "Special Committee" consisting of defendants Prince, Mulcahy, Perez and Johns was chosen to deal with various demand letters, with Prince named as its Chairman.  The composition of the "Special Committee" and the appointment of Defendant Prince as its Chairman, reflects, and Plaintiff contends that there is an unwaivable conflict of interest between the Committee and J&J, particularly since three of the Committee's members (Defendants Prince, Johns and Perez) were Directors of J&J while substantial wrongdoing (as described above) was taking place, being concealed and not rectified.  Furthermore, because of the inherent bias of at least three of the Committee's members (Defendants Prince, Mulcahy and Johns) and the long, sordid history of the conduct of J&J's business by Defendant Weldon and the Company's senior management as detailed herein, each of the members of the Current Board (including Mr. Davis) familiarized him or herself with the details of the wrongdoing as alleged herein.  Notwithstanding the acquisition of such knowledge, not a single one of such Directors raised his or her voice in favor of taking action to remedy the Company's damages or against any of the culpable officers.  Each of the members of the Current Board, despite attending meetings of the Board and committees thereof to which they were appointed, devoted minimal amounts of time to the Company's business, relying instead on Defendant Weldon's assurances that, despite numerous regulatory actions against J&J and its subsidiaries, that "all was well."  Each member of the Current Board was over-burdened with multiple responsibilities, including multiple directorships over a long period of time. Similarly, as set forth below, Defendant Mulcahy, J&J's most recently appointed Director at the time of her appointment to the "Special Committee," took no affirmative action

with respect to such wrongdoing once she became a director and became fully informed of the wrongdoing.

245.    The "Special Committee" was purportedly directed by the Board to, *inter alia*, investigate the factual allegations underlying the Various Demand Letters and shareholder derivative lawsuits, along with other demand letters made subsequent to April 22, 2010 (including Plaintiff's Demand Letter), and subsequently-filed derivative complaints.  Despite this mandate, it was anticipated that none of the "Special Committee" members had any expectation that he or she would have the time or inclination to conduct any such investigation, let alone do so independently or without bias against the shareholders who had made the demands, or their lawyers.  Indeed, despite the importance of the pre-suit demands and derivative actions, the "Special Committee" members knew from the outset that they would delegate their own fact-gathering and analysis responsibilities to their legal counsel, Douglas Eakeley, Esquire of Lowenstein Sandler PC ("Lowenstein"), thus creating a fundamental conflict for such counsel.

246.    Consistent with such conflict of interest and, upon information and belief, in order to protect against a serious and useful record being made for the benefit of the Court, counsel to the "Special Committee" developed a plan to merely conduct "interviews" of selective individuals not under oath and without a recording or transcript of the "interview" being made, just "lawyer notes."  Such plan was developed so as to cloak all or as much of the fact-based investigation in a claim of attorney work product, as well as all communications between counsel and members of the Committee as privileged. Further, consistent with the orchestrated nature of the purported "investigation," no objective decision has been made as to the identity of the persons to be "interviewed."  As such, it is likely that many necessary "interviews" have never

been taken, particularly of those officers personally responsible for the wrongdoing alleged herein.

247.    Following the commencement of at least five shareholder derivative suits against the members of the J&J Board and other Defendants and the sending of the "Various Demand Letters," Mr. Eakeley called a meeting at his office on August 5, 2010 to which such lawyers were invited.  Because of a previous commitment and for other reasons, Plaintiff's then sole legal counsel could not attend.  After receiving from Mr. Eakeley's office on August 30, 2010, the Agenda for the August 5 meeting, a list of the lawyers who sent the Various Demand Letters, redacted Board resolutions and summary information as to the four members of the "Special Committee," Plaintiff's counsel e-mailed the following questions to Mr. Eakeley as follows:

> In reviewing the Board resolutions excerpted from the minutes of the April 22, 2010 meeting, several questions come to mind which one or more of the lawyers may have raised at the August 5 meeting that I could not attend. I certainly would have raised these questions, among others. I trust that you or one of your colleagues will be kind enough to provide me with answers to the following as soon as possible:
>
> 1.    Were you or a representative of your firm present at any portion of the April 22 meeting?
>
> 2.    What criteria were used by the Board to determine which of its members would be appointed to the so-called "Special Committee?"
>
> 3.    Who participated in the determination of such criteria?
>
> 4.    Were there any factors or facts that the Board considered that might serve to disqualify any individual Director from serving on the "Special Committee?"
>
> 5.    What process did the Board utilize to select the members of the "Special Committee?"
>
> 6.    Did anyone investigate each of the proposed members of the "Special Committee" to determine whether there were any facts or circumstances which would disqualify such members from serving on the "Special Committee?"  If so, who performed such investigation and when?

7.     Will the interviews referred to in the Agenda for the August 5, 2010 meeting be conducted under oath and/or with transcripts of the interviews?

8.     Will any such interviews be taken of each member of the J&J Board and those former members who were serving during the period of the wrongdoing alleged in the various "Demand Letters?"

9.     Will attempts be made to interview former employees of J&J and/or its subsidiaries whose conduct is implicated in the alleged wrongdoing?

10.    Will your firm and/or the members of the Special Committee attempt to calculate the extent of the economic and non-economic damages alleged by the shareholders who have sent the Board "Demand Letters" and as alleged in the derived Complaints that have been filed?

11.    Will the "Special Committee" be dealing with any of the issues raised by the "Demand Letters" beyond those raised by the demands that J&J commence litigation; *i.e.* will your firm or the "Special Committee" be taking any action as to any of the remedial measures proposed in the "Demand Letters?"

12.    Which persons played a role in the selection of you and/or your firm to represent the "Special Committee?"

13.    When did you and/or your firm first learn that you and/or your firm were being considered to represent the "Special Committee," the entire Board of Directors or any of the J&J Directors in connection with any of the "Demand Letters?"  From whom did you learn this fact?

14.    What steps were taken to ensure that there were no facts or circumstances that might justify disqualification of you and/or your firm from acting as counsel to the "Special Committee?"  By whom and when?

15.    Assuming your firm performed a conflict check before being considered for the assignment ultimately accepted by you, when was such conflict check performed?

248.    On September 2, 2010, Mr. Eakeley sent the following e-mail in purported

response:

My partners Gavin Rooney and Jason Halper also attended the meeting.  As for your remaining questions, I don't believe it is appropriate to open lines of communication with just one of the demand attorneys.  Nor do I think this is the appropriate time to initiate what is in effect discovery into the Special Committee formation and investigation.  We will have periodic meetings/calls with demand counsel; I also anticipate that some of your questions may be covered in the Committee's final report.

In reply, Plaintiff's Counsel communicated as follows:

I gather from your response that none of the shareholders' lawyers that attended the meeting at your office asked the questions I sent to you.

If you do not want to communicate with me alone, there is no valid reason why you cannot provide the requested information to all of the shareholders' lawyers that sent demands to the J&J Board. Moreover, the questions are not "discovery."

If the so-called "Special Committee" is to be given any credibility by a Court, you and it have a fundamental obligation to justify the legitimacy of the process by which the Committee was established, the appointment of the members of it, the selection of counsel, etc. Clearly, you and the Committee members have no legitimate reason to keep the requested information hidden.  I ask you again to answer these questions. I trust that you will reconsider your refusal to respond substantively and get back to me promptly."

249.    Mr. Eakeley never responded to the e-mail from Plaintiff's counsel and never provided the requested information to any of the lawyers who made pre-suit demands on behalf of J&J shareholders.  Such counsel's behavior is indicative of the Special Committee's utter disregard for the shareholders' concerns regarding its legitimacy.

250.    By not providing the fundamental information requested of counsel for the "Special Committee," such counsel demonstrates that the entire process by which the members of the "Special Committee" were chosen is fatally flawed and cannot survive even the most basic questions addressed to its legitimacy.  Indeed, the "Special Committee" members were chosen by the Board or counsel to the Board based, not on characteristics of independence and freedom from bias but, rather, upon creating an appearance of disinterestedness. However, even that creation is a chimera with no basis in reality.

251.    The formation of the "Special Committee" and the methodology pursuant to which its members were chosen was not a valid exercise of the Board's business judgment. Indeed, no serious steps were taken by any members of the Board to determine the disinterestedness and lack of conflicts of interest of the four chosen directors.

252.     On October 19, 2010, Mr. Eakeley reported by e-mail to Plaintiff's counsel as to what was purportedly being accomplished on the "Special Committee's behalf:

> "…we are still in the document gathering/analysis phase, along with interviews of in-house and outside counsel. We hope to begin interviewing witnesses next month…"

253.     In response, Plaintiff's Counsel stated that he assumed "that all the witnesses interviewed will be recorded or otherwise transcribed and will be taken under oath and that you will be interviewing each of the J&J Directors who served during the period relevant to the shareholder demands."

254.     Once again, Mr. Eakeley did not respond or indicate why it was appropriate for "in-house and outside counsel" to participate in such interviews which were (and are) purportedly being carried out independently and, presumably, in a way that the witnesses would not feel any pressure by or on behalf of J&J management or members of the Board.

255.     Thus, by Mr. Eakeley's own statements and failure to provide critical information regarding the selection of the "Special Committee" members and its functioning after their appointment demonstrates that the entire process has been revealed to be a sham, particularly given the identity of its members.

256.     Clearly, in appointing Defendant Prince to chair the "Special Committee," the Board and counsel to it, upon information and belief, chose Prince for this role due to his longstanding opposition to shareholders' rights and the concept of competent corporate governance.  As a present defendant in more than a dozen shareholder class actions and derivative suits, he cannot conceivably be unbiased in considering the Various Demand Letters and, in particular, the Demand Letters sent by Plaintiff's Counsel.  This is so because, *inter alia*, in *Lerner v. Prince, et al.*, Index #650417/09 (Supreme Court, New York County) and *In re Citigroup, Inc. Shareholder Derivative Litigation*, Civil Action 3338-cc (Del. Ch.), among at

least a dozen or more class actions and shareholder derivative cases, Defendant Prince has been accused by shareholders of Citigroup, of which he was Chairman and CEO, of securities fraud, breach of fiduciary duty and waste of corporate assets.  Defendant Prince was named a principal defendant in *Public Employees' Retirement Association of Colorado, et al. v. Citigroup, Inc. et al.*, Civil Action No. 2008 cv 135 (S.D.N.Y.) and numerous other securities fraud class actions and, by implication, in *SEC v. Citigroup, Inc.*, Civil Action No. 10-1277 (ESH), (D.D.C.).  In addition to being named personally as a defendant in scores of shareholder suits, Prince, before becoming Chairman of Citigroup, was personally responsible for the defense of what appear to be hundreds of shareholder suits against his employers, including Citigroup, Salomon Smith Barney and The Travelers, Inc.

257.    Defendant Prince was and is biased and not disinterested with respect to the claims alleged in the Demand Letter.  This is even more so evident in connection with the demands made by Plaintiff herein, particularly since the lawyer who sent the Demand Letter to J&J's Board, Richard D. Greenfield, Esq., on behalf of other clients, has caused Defendant Prince to be named as a defendant in shareholder litigation brought on behalf of Citigroup.  Further, Defendant Prince, despite his purported credentials as a former CEO of Citigroup, has virtually no credibility in the business community.  The *New York Times* (as reported on April 3, 2008) gave a critical verdict: "with little operating experience, Mr. Prince was ill equipped for the top job."  James J. Cramer, the television and print analyst of the financial markets, devoted an article in *New York* Magazine (appearing on November 19, 2007) to Defendant Prince and Citigroup.  As Cramer explained, "[t]he man simply wasn't smart enough to be a banker…From the day he took over, Prince ... was in over his head, just hopelessly inept when it came down to understanding what an investment bank does, or at least what it should do ... [H]e set out on a

series of acquisitions and buybacks that were too extensive and reckless ... Prince accumulated underperforming hedge funds."

258.    Defendant Prince, however, was unsuccessful in expanding Citigroup further through takeovers, having been "stung" by a series of "regulatory rebukes" to such efforts. Defendant Prince managed an incentive system that self-destructively gave outsized rewards to Citigroup management -- including himself -- for taking on the most excessive risks for relatively small short-term profits.  As Steven Pearlstein noted in the Washington Post (on November 2, 2007), "Prince never bothered to change the incentive structures that have always encouraged excessive risk taking…" In July 2007, Defendant Prince made the remarkable, and notorious, statement to the Financial Times that "[a]s long as the music is playing, you've got to get up and dance," and "[w]e're still dancing."  Of course, the music would be stopping in short order.

259.    Similarly, Defendant Mulcahy, who had been Chief of Staff to Xerox Corporation's CEO, Paul Allaire, and later its President and CEO herself, while blatant securities frauds were being committed by that company's senior management, faced more than 20 shareholder derivative and securities fraud suits, as well as an investigation and ultimate litigation in *SEC v. Xerox*, Civil Action No. 02-2789 (S.D.N.Y.).  The SEC litigation, settled on April 11, 2002, required Xerox to pay a $10 million penalty and restate its financials for the years 1997-2000.  Although she was not personally charged in the SEC litigation, she was closely allied with and a colleague of Mr. Allaire and "stonewalled" the SEC's investigation.  In the wake of her participation in the cover-up of the accounting manipulations at Xerox, Defendant Mulcahy was a defendant in a number of shareholder class actions and derivative suits charging her with breach of fiduciary duty and securities fraud. In the latter case, she was a

principal defendant in *Carlson v. Xerox Corporation, et al.*, Civil Action No. 09-civ 0544

(D.Conn.), where the defendants paid $750 million to settle the claims asserted against them.

260.    As Chairman of the Compensation Committee of the Board of Directors of Fannie

Mae, she is or was a defendant in a number of shareholder derivative suits including, *inter alia*,

*Agnes v. Raines, et al.*, Case No. 2008 cv 1093 (D.D.C.).  In each of these cases, Mulcahy is

alleged to have breached her fiduciary duties as a director and have committed corporate waste.

More significantly, during the period when Defendant Mulcahy was Chairman of the

Compensation Committee and a member of the Audit Committee, Fannie Mae's regulator, the

Office of Federal Housing Enterprise Oversight ("OFHEO"), in a May 2006 "Report of the

Special Examination of Fannie Mae" (the "Report") relating to accounting manipulation and

excess compensation on Defendant Mulcahy's "watch," said, *inter alia*:

> "By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders.  Earnings management made a significant contribution to the compensation of Fannie Mae Chairman and CEO Franklin Raines, which totaled over $90 million from 1998 through 2003.  Of that total, over $52 million was directly tied to achieving earnings per share targets.

> Fannie Mae consistently took a significant amount of interest rate risk and, when interest rates fell in 2002, incurred billions of dollars in economic losses.  The Enterprise also had large operational and reputational risk exposures.

> **Fannie Mae's Board of Directors contributed to those problems by failing to be sufficiently informed and to act independently of its chairman**, Franklin Raines, and other senior executives; by failing to exercise the requisite oversight over the Enterprise's operations; and by failing to discover or ensure the correction of a wide variety of unsafe and unsound practices.   (Emphasis added.)

261.    In the Report, OFHEO criticized Defendant Mulcahy individually and said in

much more specific detail the failings of the Compensation Committee (of which Mulcahy was

Chairman) and the Audit Committee (of which she was a member):

"… Fannie Mae senior management often scripted meetings of the Compensation Committee, which influenced how meetings were conducted. While the Compensation Committee report included in the annual proxy statement was signed by the independent, non-management Board Members who served on the Committee, in 2003 Mr. Raines, who was by far the largest beneficiary of Compensation Committee actions, edited the draft of that Committee's report to shareholders.  Nowhere in the minutes of Committee meetings is there any suggestion that the Committee seriously vetted management's recommendations.

In addition to the failures of the Audit and Compensation Committees, Fannie Mae's full Board of Directors failed in numerous ways that put the safety and soundness of the Enterprise at risk. The Board of Directors failed to stay informed about Fannie Mae corporate strategy, major plans of action, and risk policy.  Having approved an executive compensation program that created incentives to manipulate earnings, members of the Board of Directors failed to monitor against such manipulations…..

In 2003, Freddie Mac admitted manipulating its accounting to report artificially lower earnings volatility.  Yet, the Board failed at the time to initiate an independent inquiry even as OFHEO began its own examination." Report, Id. (Emphasis added.)

262.    A noted business commentator, Ross M. Miller, of Miller Risk Advisors, on

October 4, 2004, pointed out Defendant Mulcahy's propensity to serve on boards of directors at

times when corporate governance was collapsing, as it has been over the years with J&J. Mr.

Miller wrote:

"The first echo of Enron is the mysterious departure of Anne Mulcahy, CEO of Xerox, from Fannie's board of directors. Two days after writing a letter that rearranged the terms of employment for Fannie's top management (but still left them with giant loopholes to crawl through), Anne found it no longer convenient to make the trip to Washington, D.C. to attend board meetings and swapped her seat on Fannie's board for one on Citigroup's, which is closer to her Stamford, Connecticut office. …

Anne Mulcahy gives us two Enron coincidences for the price of one. At least if one is rather elastic on the notion of a coincidence. Her departure with lame excuse recalls CEO Jeff Skilling's sudden resignation from Enron. Her presence at Xerox during its major accounting scandal reminds us that Andy Fastow was at Continental Illinois when it collapsed. (Both Mulcahy and Fastow went on to greater glory despite being at the scene of a train wreck.)"

263.    Defendant Mulcahy, during her tenure as a member of Citigroup's Board of

Directors from 2004 to 2010, is accused personally in *Lerner v. Prince* and in numerous other

shareholder derivative suits in New York and Delaware, of failing to perform her duties as a director, breaching her fiduciary duties to Citigroup and its shareholders, and committing waste of Citigroup's assets. As a member of the Citigroup Board, she was one of its directors who oversaw a "Demand Committee" and the waste of millions of dollars of Citigroup's assets which whitewashed the conduct of herself, defendant Prince and other officers and directors.

264.    Although Defendant Mulcahy was not a J&J Director during most of the wrongdoing alleged herein, it is clear from her background that, whatever her skills may be as a corporate executive, given her history as an "outside" director who has been sued repeatedly by shareholders and had to fend off regulators, as she did at Xerox and Fannie Mae, Defendant Mulcahy is certain to be biased and not disinterested with respect to the claims alleged in the Demand Letter.  This is even more so in connection with the demands made by Plaintiff herein, particularly since the lawyer who sent the Demand Letter to J&J's Board, Richard D. Greenfield, Esq., on behalf of other clients, has caused her to be named as a defendant in shareholder litigation brought on behalf of Citigroup, Xerox and Fannie Mae.  Since joining the Board, she has "fallen into place" and, *inter alia*, is already participating in the waste of the Company's assets by participating in the activities of the so-called "Special Committee," of which she is a member despite (and perhaps, because of) her long-time hostility to shareholder claims and litigation.

265.    Defendant Perez, fired as President and CEO of Nike, Inc. in 2006, was described in a January 12, 2007 article in *The New York Times* as having "been at three companies in the last three years…," is so overburdened with directorships in the private and public sector that he cannot realistically devote nor did he devote any substantial amount of time to investigating the wrongdoing as alleged in the Demand Letter.

266.    Defendant Johns, who is similarly burdened with his full-time occupation and a member of the boards of directors of two additional public companies, also has numerous other professional and educational responsibilities that, in practice, prevented him from devoting any significant amount of time to investigating the wrongdoing alleged in the Demand Letter. Further, Defendant Johns can hardly be considered disinterested with respect to the allegations in the Demand Letter with respect to the improper payments by J&J and/or its subsidiaries to educational organizations, as well as healthcare professionals and others, all of which was part of the Company's off-label promotional strategies and other questionable activities. The Demand Letter specifically raises such issues as follows:

> "Over a period of many years, J&J directly and through its subsidiaries, has used a variety of methods to effectively bribe medical professionals to, inter alia, prescribe J&J drug products and to utilize J&J devices and products such as the ASR in lieu of competing and less harmful alternatives.  Such bribes included the payment of honoraria, the funding of "research" and "studies," payments for the writing of articles directly or through ghostwriters and by other means."   Demand Letter at 4.

267.    Defendant Johns is a known apologist for, as well as a beneficiary of, industrial support for research.  He puts the disclosure burden on the recipients of such largesse and ignores the responsibilities of companies such as J&J, as he has done during his five years on the J&J Board.  In the guise of arguing in favor of "restoring balance to industry-academia relationships in an era of institutional financial conflicts of interest promoting research while maintaining trust," Defendant Johns and two lawyer colleagues make the point that the recipients "should fully disclose industry-related financial interests and relationships." Yet, nowhere in Defendant Johns' writings does he argue for the reciprocal obligation that the corporate funders have with respect to such disclosure.  One critic of Defendant Johns' views expressed above, David S. Egilman, MD, commented:

"The authors, however, never discussed the central issue-how to manage this imbalanced relationship in which industry has considerably more resources and markedly different priorities than medical schools…Finally, we doubt that academicians and medical leaders can effectively make policy decisions in the public interest once they have developed interlocking directorates, personal friendships, financial interests, etc. Such conflicts of interest may make it impossible for them to manage such conflicts themselves."

Defendant Johns and his lawyer colleagues, responded as follows:

"We agree with Dr. Egilman…that many trustees, presidents, chancellors, provosts, deans, and department chairpersons - all examples of persons whom we have termed 'institutional decision makers' - have developed extensive ties with industry…The burden of proof is on institutional decision makers to demonstrate that their personal financial interests in research directly and materially further scientific advancement, and that such benefit, if any, outweighs the risks that are created from conflicts of interest."

268.    In light of the foregoing views and his acquiescence in the practices of J&J and its subsidiaries over the past five years, he is disabled from investigating, let alone analyzing objectively, the conduct criticized in the Demand Letter.

269.    In addition to the pre-disposition of the members of the "Special Committee" toward rejection of the Demand Letter and the other shareholders' pre-suit demands, none of its four members had any expectation that they would personally devote any significant amount of time to the investigation that the "Special Committee" purportedly conducted.

270.    Indeed, each of its four members is already burdened by multiple Board responsibilities, as well as through their principal activities. For example, Defendant Prince, the disgraced former Chairman and CEO of Citigroup, the Chairman of the "Special Committee," is now Chairman of Sconset Group, LLC and a Senior Counselor for Albright Capital Management, LLC, is also a director of Xerox Corporation (serving until 2010 with defendant Mulcahy) and serves on its Corporate Governance and Finance Committees, as well as the J&J Compensation & Benefits and Nominating & Corporate Governance Committees.  He is also spending a substantial amount of his available time dealing with the numerous factual and legal

issues that have arisen in the multiple suits in which he is a named defendant, as well as in connection with SEC, Congressional and other investigations.

271.     Defendant Mulcahy also serves on the Board of the Washington Post Company ("WPCo"), as well as Citigroup, Catalyst and Target Corporation and is the Chair of the Board of Trustees for a national charity.  Like Defendant Prince, she is also spending a substantial amount of her available time dealing with the numerous factual and legal issues that have arisen in the multiple suits in which she is a named defendant, as well as in related proceedings including ongoing investigations of WPCo.  Defendant Mulcahy also is a member of J&J's Compensation & Benefits Committee and the Nominating & Corporate Governance Committee.

272.     Defendant Perez, in addition to his contemporaneous service in a senior role at Greenhill & Company investment bankers, also serves on the boards of directors of Campbell Soup Company and Whirlpool Corporation, as well as a director of a Chicago-based charity and a university in New York State.  He also is the Chairman of J&J's Nominating & Corporate Governance Committee and a member of the Compensation & Benefits Committee.

273.     Defendant Johns, who serves as the full-time Chancellor of Emory University, serves as well on multiple boards of directors, including those of AMN Healthcare Services, Inc. and Genuine Parts Company. He serves on the Compensation and Stock Plan and Corporate Governance Committees of AMN and the Audit, Compensation, Nominating and Governance Committees of Genuine Parts; concurrently, he serves on the Compensation & Benefits and the Science & Technology Committees of the J&J Board.

274.     Although Plaintiff made a pre-suit demand upon the members of the J&J Board, even before the Board had formally rejected such demand, it had *de facto* done so with its appointment of the "Special Committee" and its mostly biased members. After the "Special

Committee" had wasted many millions of dollars of J&J's (and its shareholders') money in purported investigations of the claims made in the Various Demand Letters, its members did what they were expected to do; namely, formally reject Plaintiff's and other pre-suit demands. Such rejection was "rubber-stamped" by the Board as a whole.

275.    None of J&J's Directors are disinterested and or independent with respect to the wrongdoing alleged herein.  In the case of Defendant Mulcahy, who has been on the J&J Board since October 2009, she has nevertheless acquiesced in the wrongful conduct of management since that time as described herein and, as well, participated in its cover-up, having been informed of much of the wrongdoing prior to her joining the J&J Board and certainly thereafter.

276.    The "Special Committee" was expected not to recommend, and, in fact, did not recommend to the full Board, that any of its members or their subordinates be sued by the Company because a majority of the members of the then-Current Board are personally implicated in and/or acquiesced in the wrongful conduct set forth in the Demand Letter, the Various Demand Letters and herein.

**C.    Defendants' Roles in and Responsibilities to J&J**

277.    Directors of a New Jersey corporation have a fiduciary duty to act loyally and in good faith to oversee its business and affairs and to assure that effective policies, procedures and systems are in place to prevent, and to detect and promptly terminate, unlawful business practices.   A New Jersey corporate director breaches the duty of loyalty and good faith by failing to attempt to do so, and by knowingly permitting management to pursue unlawful business practices and strategies.  As a fiduciary, each director must in good faith bring to bear all of his or her knowledge, skill, experience and expertise in the fulfillment of the duties of attention and fidelity to the lawful best interests of the corporation.

278.    Pursuant to J&J's Principles of Corporate Governance, all of the Company's Directors were "well supported by accurate and timely information" and were provided with "sufficient time and resources" to fully attend to all of their crucial oversight responsibilities. Directors have "unrestricted . . . full and free access to officers and employees of the Company." Furthermore, the "Board and each Committee has the authority to engage independent legal, financial or other advisors as it may deem necessary, without consulting or obtaining the approval of any officer of the Company in advance."  The Company maintains a "comprehensive orientation program for all new non-employee directors," which includes "extensive written materials and...one on one sessions with members of senior management" regarding key oversight topics, including "legal issues, compliance programs and business conduct" matters. Therefore, upon joining the Board, all of the non-employee members of the Current Board were comprehensively briefed on the Company's history of unlawful business practices and the ineffectiveness of the Company's compliance programs to prevent such practices, and during their service on the Board, all of the non-employee members of the Current Board received accurate and timely reports of all compliance issues, unlawful business practices, and investigations and inquiries, and had at their disposal all of the resources necessary to exercise effective oversight and to require that management root out and terminate unlawful business practices occurring at the Company.

279.    Through their service on key board committees, the non-employee members of the Current Board also were directly responsible for crucial front-line oversight responsibilities in the areas of internal controls, legal and regulatory compliance, corporate citizenship, medical risk management affecting patient safety, and corporate governance/board effectiveness.  Service on these key committees, as well as service as a J&J Director, necessarily exposed these

Directors to knowledge of the individual instances, and overall pattern of unlawful business practices reflected in this Complaint, as well as to knowledge of the Board's consistent ineffectiveness in assuring management's prevention of such unlawful business practices.

280.    The Company's Audit Committee was responsible at all relevant times for being the Board's front line in the oversight of "Policies and Procedures Addressing Legal and Ethical Concerns," including the "monitoring" of all compliance programs, and reports from the Company's internal audit function concerning "management improprieties."  The Audit Committee was required to report regularly to the full Board concerning its meetings and discussions and to review with the full Board all "significant issues and concerns" arising at its meetings.  Therefore, the members of the Audit Committee received regular reports of compliance program activities, findings by regulatory authorities and agencies, and unlawful and unethical business practices, with respect to the Company and all of its operating subsidiaries, and reported these matters to the full Board.  From 1997 to 2009, the Audit Committee met over 80 times.  Of the Defendants/Current Board members, three have served on the Audit Committee: Coleman since 2004, Cullen since at least 1997, and Mullin since 2000.  Defendant Langbo served on the Audit Committee from at least 1997 to 2003, and Mr. Davis has been a member since 2010.

281.    The Company's Nominating & Corporate Governance Committee was created in April 1998 and was responsible at all relevant times for "overseeing matters of corporate governance," including the evaluation of the performance and practices of the Board, its committees, and the Chief Executive.  Its responsibilities include the assessment of the effectiveness of each committee, recommending to the full Board any required changes in committee charters and membership, recommending the annual process for Board and committee

evaluation, overseeing that process, and regularly reporting to the full Board concerning issues and concerns arising during its meetings. Therefore, the members of the Nominating & Corporate Governance Committee were regularly confronted with considering the consistent ineffectiveness of the Audit Committee and the other Board committees, as well as the Board as a whole, in providing effective oversight of management, particularly with respect to assuring management's prevention of unethical and unlawful business practices. And, the Nominating & Corporate Governance Committee regularly reported these matters to the full Board.  From 1998 through 2010, the Nominating & Corporate Governance Committee met 53 times.  Of the Defendants/Current Board members, five have served on the Nominating & Corporate Governance Committee: Cullen since 2004, Mulcahy since 2010, Perez since 2010, Mullin from 2000 to 2005, and Prince since 2007. Defendant Langbo was on the Committee from 2004 to 2010.

282.    The Company's Public Policy Advisory Committee has at all relevant times consisted both of Directors and senior executive officers of the Company, including the General Counsel and senior executives in charge of government and regulatory affairs.  The Committee's purpose includes reviewing and advising the Board on governmental and regulatory affairs involving public health issues.  Therefore, the Director members of the Public Policy Advisory Committee were regularly apprised by the General Counsel and other senior executives of the Company of all regulatory affairs and compliance matters affecting the Company and  its operating subsidiaries' relationships with their principal regulators, including the FDA and federal and state healthcare law enforcement authorities, and regularly reported to the full Board concerning significant issues and concerns arising at the committee's meetings.  The Public Policy Advisory Committee has existed at least since 1997.  Of the Defendants/Current Board

members, four have served on the Public Policy Advisory Committee: Lindquist since 2004, Mullin since 2006, Perez from 2008 to 2010, and Satcher since 2003.  Mr. Davis has been on the Committee since 2010.

283.   The Company's Science and Technology Advisory Committee has at all relevant times consisted of both directors and one or more senior scientific or medical officers of the Company.  Historically, all directors serving on this committee have had a background of expertise in medical and biological science issues and, due to their background, have expertise in matters of science, medicine, clinical trial development and conduct, and scientific and medical ethics.

284.   Defendants Coleman, Johns and Satcher, members of the Science & Technology Advisory Committee, had special expertise and experience relevant to the various schemes detailed herein.  Since August 2002, Defendant Coleman has served as the President of the University of Michigan with technical expertise in the area of the biochemistry of cancer. Directly relevant to Coleman's knowledge of the facts alleged herein is the fact that one of the members of the 2005 Special Advisory Panel (described above) related to J&J's blockbuster drug, Natrecor, was Dr. Bertram Pitt, a professor at the University of Michigan working under Coleman at the time.  As detailed herein, the purpose of the 2005 Special Advisory Board was, inter alia, to examine the safe and effective use of Natrecor in out-patient settings, and to determine whether J&J should conduct more expansive clinical testing on the drug.  Both in her capacity as a director of J&J and as the President of the University of Michigan where Dr. Pitt worked, Defendant Coleman was aware of the determination of the Panel, inter alia, that Natrecor should not be used out-patient, and that J&J should undertake more expansive clinical trials regarding the drug.

285.    Defendant Johns has been a member of the Science & Technology Advisory Committee since 2006.  He served as Executive Vice President for Health Sciences at Emory University from 1996 through October 2007.  His background is as an ear, nose and throat surgeon, with expertise in head and neck cancer surgery.  In his capacity as Executive Vice President for Health Sciences at Emory University, Defendant Johns was heavily engaged in the issue of off-label promotion and marketing because of his responsibility for directing the school's policies in these critical areas.  In addition, Emory University Medical School was a major player in the field of vascular stents.  Defendant Johns likewise played a critical role in determining whether to allow off-label use of stents and drugs by Emory physicians.

286.    Defendant Satcher was the Director of Primary Care at the Morehouse School of Medicine from 2002 to 2004.  He served as interim President of the Morehouse School of Medicine from 2004 until 2006.  He established the Satcher Health Leadership Institute at Morehouse in 2006 and is a former Surgeon General of the United States.  In these capacities, Defendant Satcher was knowledgeable about and actively involved in healthcare policy outside of J&J and was fully aware of the regulations governing and risks inherent in off-label promotion and marketing of drugs by pharmaceutical companies.

287.    Members of the Science and Technology Advisory Committee have served concurrently on the Public Policy Advisory Committee, thus leveraging their scientific expertise to enhance the Board's understanding of the medical science and scientific/medical ethics aspect of the Public Policy Advisory Committee's governmental and regulatory affairs oversight function.  The purpose of the Science and Technology Advisory Committee is to review and advise the full Board regarding matters of science, medicine and technology relevant to the operation of the Company's business, including matters of product development, clinical

research, pharmacovigilance, and the interface between the Company's scientific activities and the scientific and prescriber community.

288.    Therefore, the Director members of the Science and Technology Advisory Committee received regular reports from scientific officers of the Company concerning such matters, including the unlawful and unethical business practices and strategies set forth in this Complaint, and regularly reported to the full Board regarding significant issues and concerns that arise at the committee's meetings.  The Science & Technology Advisory Committee has existed at least since 1997.  Of the Defendants/Current Board members, four have served on the Science and Technology Advisory Committee: Coleman since 2004, Johns since 2006, Lindquist since 2004 and Satcher since 2003.

289.    Each of the Director Defendants, including each of the members of the Current Board, knew that, as Directors of J&J, it was their fiduciary duty and responsibility to oversee management to assure that it acted effectively to prevent unlawful and unethical business practices, and to promptly cause the termination of any existing unlawful and unethical business practices.  They also knew that it was a violation of their fiduciary duty of loyalty and good faith to permit the continuation of any such unlawful and unethical business practices, once they became aware of them.  As  alleged with particularity below, however, they were aware at all relevant times of the unlawful and unethical business practices alleged herein, yet permitted them to be continued, year after year, thus committing knowing breaches of their fiduciary duty of loyalty and good faith.

290.    As alleged in detail below, at all relevant times during each of their tenures on the Board, as a result of their service on the Board and on the committees described above, their knowledge and expertise as alleged herein, the receipt by the Board and those committees of

regular, complete and accurate reports, the sustained and systematic nature of the wrongdoing

over multiple years and across multiple product lines, and as reflected in the Company's

disclosures signed by the Director Defendants as specified above, the Defendants/Current Board

members, were aware of the unlawful business practices comprising the Topamax Off-Label

Promotion Scheme, the Omnicare Kickback Scheme, the Risperdal Off-Label Promotion

Scheme, the Natrecor Off-Label Promotion Scheme, the DePuy Kickback Scheme, the Biliary

Stent Off-Label Promotion Scheme, the improperly delayed recall of contaminated OTC

products, and the FCPA Bribery Scheme.  These schemes were not the result of a rogue

employee or division, but instead reflect a Company-wide business strategy, employed with

consistent methods across multiple subsidiaries over extended multi-year periods of time, to

maximize sales through off-label promotion and the payment to healthcare providers and

pharmacy benefit managers of kickbacks and inducements, and to avoid or delay any action that

could hurt sales and profits regardless of risks to patients and consumers.  Thus, the Company, as

a de facto matter of policy, manifested over and over again in the various schemes alleged

herein, consistently elevated revenues and profits over compliance with laws and regulations

designed  to protect patient health, including FDA pre-marketing approval requirements for

drugs and medical devices, FDA labeling requirements requiring full and adequate warnings of

risks posed by specific drugs and devices, and federal statutory law designed to keep the

professional decisions of healthcare providers free of commercial influences, despite the expert

knowledge of Company Senior Management and members of the Board that, as a result, patients

would inevitably be harmed.  This strategy was well known to J&J's senior management and its

Board, and was knowingly pursued despite their knowledge of its illegality and the inevitable

harm to patients. As demonstrated herein, this unlawful and unethical strategy continued even

after multiple enforcement investigations were commenced by federal and state regulators and law enforcement authorities, with the knowledge of the Director Defendants that it exposed the Company to criminal prosecution, significant civil and criminal penalties, and the potentially devastating exclusion of Company products from reimbursement under federal health care programs.  The Board and J&J management knowingly made a calculated bet that any legal consequences would be insignificant when compared to the increased sales, profits, and cash flows that were expected to result from their unlawful strategy and practices.  By knowingly permitting this strategy to continue, the Director Defendants, including the Defendants/Current Board Members, adopted it as Company policy, and committed a sustained and systematic failure of compliance oversight in breach of their fiduciary duty of loyalty and good faith.

291.    The following subparagraphs set forth, year by year beginning in 2002, the pattern of pervasive unlawful business practices occurring at the Company and the Defendants/Current Board Members knowledge thereof.

    **a.  2002.**

**Unlawful Business Practices**

292.    (i) The Risperdal Off-Label Promotion Scheme, including promotion of Risperdal for use in elderly patients suffering from dementia or exhibiting hostility, with the Risperdal Off-Label Promotion Scheme occurring despite the FDA's January 5, 1999 notice of violation letter to J&J's Janssen Research Foundation, which specifically notified J&J that such promotion was outside the approved indications for Risperdal and that J&J's Risperdal promotional materials were false and misleading due to unsubstantiated safety, efficacy, comparative, and quality of life claims and lack of fair balance; (ii) the Topamax Off-Label Promotion Scheme; (iii) the

Biliary Stent Off-Label Promotion Scheme; (iv) the Omnicare Kickback Scheme; and (v)
initiation of the DePuy Kickback Scheme.

### Defendants'/Current Board Members' Knowledge of Wrongdoing

293.    During 2002, Defendants/Current Board member Cullen was a member of
the Board and the Audit Committee, and Defendant/Current Board member Mullin was a
member of the Board and of both the Audit Committee and the Nominating and Corporate
Governance Committee.  As such, Cullen and Mullin were each aware of all of the schemes
identified immediately above occurring in 2002 as a result of regular reporting on compliance.

294.    Additionally, Mullin, as a result of his specific duty and responsibility, as a
member of the Nominating and Corporate Governance Committee, to consider and evaluate on a
regular basis the effectiveness of the Board and its committees in providing compliance
oversight, was aware that the Board was failing to take action to exercise appropriate compliance
oversight, despite its knowledge of all of the unlawful schemes identified above.

295.    Further, as a result of the Nominating and Corporate Governance Committee's
reports to the Full Board, all as alleged above in paragraph 281, Defendants/Current Board
members Cullen was also aware that the Board was failing to take action to exercise appropriate
compliance oversight despite its knowledge of all of the unlawful schemes identified above.

296.    Thus, Defendants/Current Board members Cullen and Mullin were each aware
that they were breaching their fiduciary duties as directors during 2002.

b.   2003.

**Unlawful Business Practices**

297.    (i) the Risperdal Off-Label Promotion Scheme, as described above, continued; (ii) the Topamax Off-Label Promotion Scheme continued; (iii) the Biliary Stent Off-Label Promotion Scheme continued; (iv) the Omnicare Kickback Scheme continued; (v) the DePuy Kickback Scheme continued; and (vi) J&J's adoption and expansion of the off-label promotion of Natrecor following its April 2003 acquisition of Scios continued.  Company Form 10-K disclosures, signed by all persons then serving as J&J Directors, show that federal authorities had begun to investigate the Company and its subsidiaries for drug marketing violations.

298.    Specifically, in July 2003, J&J subsidiary Centocor received a request that it voluntarily provide documents and information to the criminal division of the U.S. Attorney's Office, District of New Jersey, in connection with its investigation into various Centocor marketing practices.  In December 2003, J&J subsidiary, Ortho-McNeil, received a subpoena from the U.S. Attorney in Boston seeking documents related to the marketing of Topamax for unapproved uses.

**Defendants'/Current Board Members' Knowledge of Wrongdoing**

299.    During 2003, Defendants/Current Board member Cullen was a member of the Board and the Audit Committee. Defendant/Current Board member Mullin was a member of the Board and of both the Audit Committee and the Nominating and Corporate Governance Committee.  Defendant/Current Board member Satcher was a member of the Board and of both the Public Policy Advisory Committee and the Science and Technology Advisory Committee.

300.    Each of these Defendants/Current Board members was aware of all of the schemes identified immediately above occurring in 2003 as a result of regular reporting on

compliance matters and unlawful business practices to the Audit Committee, and the Audit Committee's reporting of such matters to the full Board, as alleged above in paragraph 280.

301. Additionally, as a member of the Public Policy Advisory Committee, Defendant/Current Board member Satcher was aware of such matters to the extent they implicated government and regulatory affairs and, to the extent they implicated matters of scientific and medical ethics, Satcher was aware of them as a member of the Science and Technology Advisory Committee.

302. Each of the schemes identified above, was reported to these Board Committees, as alleged above in paragraphs 280 and 281. Moreover, as alleged in detail above, the Company's adoption and expansion of Scios' off-label promotion of Natrecor was known to and approved by the Board, including by Defendants/Current Board members Cullen, Mullin, and Satcher, as a result of the Board's in-depth consideration and approval of the Company's acquisition of Scios following comprehensive due diligence.

303. Additionally, with respect to the governmental investigations disclosed in the Company's 10-K filings, which are identified above, the signatures of the Defendants/Current Board members then serving on the Board evidence their knowledge of such matters.

304. Finally, Defendant Mullin, as a result of his duty and responsibility as a member of the Nominating and Corporate Governance Committee, to specifically consider and evaluate the effectiveness of the Board and its Committees in providing compliance oversight, was aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of all of the schemes and wrongdoing identified above.

305. As a result of the Nominating and Corporate Governance Committee's reports to the full Board, all as alleged above in paragraph 281, Defendants/Current Board members Cullen

and Satcher were also aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of all of these matters.  Thus, Defendants/Current Board members Cullen, Mullin, and Satcher were each aware that they were breaching their fiduciary duties as directors during 2003.

### c.      2004.

**Unlawful Business Practices**

306.    (i) the Risperdal Off-Label Promotion Scheme, as described above continued; (ii) the Topamax Off-Label Promotion Scheme continued, despite the Company's receipt, in December 2003, of a federal subpoena specifically concerning off-label promotion of Topamax, and an FDA Warning Letter dated September 15, 2004, copied to Board Chairman Weldon, concerning false and misleading Topamax promotional materials that failed to warn of serious health risks; (iii) the Biliary Stent Off-Label Promotion Scheme continued; (iv) the Omnicare Kickback Scheme continued; and (v) the DePuy Kickback Scheme continued; and (vi) the Natrecor Off-Label Promotion Scheme continued.

**Defendants'/Current Board Members' Knowledge of Wrongdoing**

307.    Company 10-K disclosures, signed by all persons then serving as J&J Directors, show that all Board members knew that federal authorities were continuing their investigation of the Company and its subsidiaries for drug marketing violations, and state law enforcement authorities were also beginning to investigate such violations.

308.    Specifically, in January, 2004, the Office of Inspector General for the U.S. Office of Personnel Management asked J&J for documents related to payments made to doctors in connection with the sales, marketing and clinical trials for Risperdal.

309.     On July 27, 2004, the Company received a letter request from the New York State Attorney General's Office for documents pertaining to marketing, off-label sales and clinical trials for Topamax, Risperdal, Procrit, Reminyl, Remicade and Aciphex.

310.     In September 2004, J&J subsidiary, Ortho Biotech Inc., received a subpoena from the U.S. Office of Inspector General's Denver, Colorado field office, seeking documents directed to the sales and marketing of Procrit from 1997 forward, as well as to dealings with U.S. Oncology Inc., a healthcare services network for oncologists.  The Company's 10-K disclosures also reflected the ongoing nature of previously disclosed investigations.  Additionally, all Directors were aware of  increased enforcement trends with respect to Pharmaceutical marketing laws, as evidenced by the following statement in J&J's fiscal year 2004 Form 10-K (signed by each member of the Board at that time): "[S]ales and marketing practices in the health care industry have come under increased scrutiny by government agencies and state attorney generals and resulting investigations and prosecutions carry the risk of significant civil and criminal penalties."

311.     During 2004, Defendants/Current Board members Coleman, Cullen and Mullin were members of the Board and the Audit Committee, Mullin and Cullen were also members of the Nominating and Corporate Governance Committee, Coleman was also a member of the Science and Technology Advisory Committee, and Satcher and Lindquist were members of the Board and of both the Public Policy Advisory Committee and the Science and Technology Advisory Committee.

312.     Each of these Defendants/Current Board members was aware of each of the unlawful schemes and wrongdoing identified above as a result of regular reporting on compliance matters and unlawful business practices to the Audit Committee, and the Audit

Committee's reporting of such matters to the full Board, as alleged above in paragraph 280. Additionally, as members of the Public Policy Advisory Committee, Defendants/Current Board members Satcher and Lindquist were aware of such matters to the extent they implicated government and regulatory affairs, and Satcher, Lindquist, and Coleman were aware of such matters to the extent they implicated matters of scientific and medical ethics as members of the Science and Technology Advisory Committee.

313.    Each of the schemes and wrongdoing identified above were reported to these Committees, as alleged above in paragraphs 280 and 281.  Additionally, with respect to the governmental investigations disclosed in the Company's 10-K filings identified above, the signatures of the Defendants/Current Board members then serving on the Board evidence their knowledge of such matters.

314.    Defendants/Current Board members Mullin and Cullen, as members of the Nominating and Corporate Governance Committee, were specifically charged with reviewing and evaluating the effectiveness of the Board and its Committees in providing compliance oversight, were thus aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of all of the matters identified above.

315.    Further, as a result of the Nominating and Corporate Governance Committee's regular reports to the Full Board, all as alleged above in paragraph 210, Defendants/Current Board members Coleman, Lindquist and Satcher were also aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of all of the schemes and wrongdoing identified above.

316.    Thus, each of Defendants/Current Board members Cullen, Mullin, Lindquist, Coleman and Satcher were aware that they were breaching their fiduciary duties as directors during 2004.

   **d.    2005**.

**Unlawful Business Practices**

317.    (i) the Risperdal Off-Label Promotion Scheme, as described above (2002) continued; (ii) the Topamax Off-Label Promotion Scheme, as described above, continued; (iii) the Biliary Stent Off-Label Promotion Scheme continued; (iv) the DePuy Kickback Scheme continued, despite receipt of a federal subpoena in March 2005 concerning the relationships between DePuy and surgeons or surgeons-in-training involved in hip and knee replacement and reconstructive surgery; and (v) the Natrecor Off-Label Promotion Scheme continued.

**Defendants'/Current Board Members' Knowledge of Wrongdoing**

318.    Company Form 10-K disclosures, signed by all persons then serving as J&J Directors, show that federal authorities were continuing their investigation of the Company and its subsidiaries for drug and medical device marketing violations.  In March 2005, J&J's Depuy subsidiary received a subpoena from the United Sates Attorney for the District of New Jersey seeking documents relating to contractual relationships between DePuy and surgeons or surgeons-in-training involved in hip and knee replacement and reconstructive surgery.  In July 2005, the Company's Scio's subsidiary received a subpoena from the United States Attorney's Office for the District of Massachusetts seeking documents relating to the sales and marketing of Natrecor.

319.    In September 2005, the Company received a subpoena from the U.S. Attorney's Office, District of Massachusetts, seeking documents related to sales and marketing of eight drugs to Omnicare, Inc.

320.    Finally, in November 2005 J&J's Janssen unit received a subpoena from the U.S. Attorney's Office in Philadelphia in seeking information about the marketing and adverse side effects of Risperdal.

321.    The Form 10-K disclosures also reflected the ongoing nature of previously disclosed investigations.  Additionally, J&J's fiscal year 2005 Form 10-K (signed by each member of the Board at that time) indicated the Directors' awareness that the increased scrutiny by federal and state law enforcement authorities was expanding beyond sales and marketing practices, as evidenced by the following statement: "[S]ales, marketing and other business practices in the health care industry have come under increased scrutiny by government agencies and state attorney generals and resulting investigations and prosecutions carry the risk of significant civil and criminal penalties."

322.    During 2005, Defendant/Current Board member Johns was a member of the Board; Coleman, Cullen and Mullin were members of the Board and the Audit Committee; Mullin and Cullen were also members of the Nominating and Corporate Governance Committee; Coleman was also a member of the Science and Technology Advisory Committee; and Satcher and Lindquist were members of the Board and of both the Public Policy Advisory Committee and the Science and Technology Advisory Committee.

323.    As such, each of these Defendant/Current Board members were aware of each of the schemes and unlawful business practices identified above as a result of regular reporting on

compliance matters and unlawful business practices to the Audit Committee, and the Audit Committee's reporting of such matters to the full Board, as alleged above in paragraph 209.

324.    Additionally, as members of the Public Policy Advisory Committee, Satcher and Lindquist were aware of such matters to the extent they implicated government and regulatory affairs, and Satcher, Lindquist, and Coleman were aware of such matters to the extent they implicated matters of scientific and medical ethics as members of the Science and Technology Advisory Committee.

325.    The schemes and unlawful business practices identified above were reported to these Committees, as alleged above in paragraphs 211 and 216.  Additionally, with respect to the governmental investigations disclosed in the Company's 10-K filings as noted above, the signatures of the Defendants/Current Board members then serving on the Board evidence their knowledge of such matters.

326.    Defendants/Current Board members Mullin and Cullen, as members of the Nominating and Corporate Governance Committee, were specifically charged with reviewing and evaluating the effectiveness of the Board and its Committees in providing compliance oversight, and were aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of each of the schemes and unlawful business practices identified above.

327.    Further, as a result of the Nominating and Corporate Governance Committee's reports to the Full Board, all as alleged above in paragraph 210, Johns, Coleman, Lindquist and Satcher were also aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of all of these matters.  Thus, each of

Defendants/Current Board members Johns, Cullen, Mullin, Lindquist, Coleman and Satcher were aware that they were breaching their fiduciary duties as directors during 2005.

        e.      **2006**.

**Unlawful Business Practices**

328.    (i) the Risperdal Off-Label Promotion Scheme as described above continued and, in addition, in January 2006, the Company received a request for information from the Attorney General of the State of Texas regarding the sales and marketing of Risperdal while, in September, 2006, J&J's Janssen unit received a subpoena from the California Attorney General's office seeking documents on sales and marketing and side effects of Risperdal and the Attorneys General of five states and the Office of General Counsel of Pennsylvania filed actions seeking reimbursement of Medicaid or other public funds for Risperdal prescriptions written for off-label use, compensation for treating their citizens for alleged adverse reactions to Risperdal, civil fines or penalties, punitive damages, or other relief.

329.    The Attorney General of Texas joined a *qui tam* action in that state seeking similar relief (while the Form 10-K disclosures also reflected the ongoing nature of previously disclosed investigations); (ii) the Topamax Off-Label Promotion Scheme, as described above, continued and, in addition, in June 2006, the Company received an additional subpoena from the United States Attorney's Office in Boston for documents relating to the off-label marketing of Topamax; (iii) the Biliary Stent Off-Label Promotion Scheme continued; and (iv) the DePuy Kickback Scheme, as described above, continued.

330.    In February 2006, J&J received a subpoena from the SEC requesting documents regarding J&J's participation in the UN Iraq Oil for Food Program.

331.    Form 10-K disclosures, signed by all persons then serving as J&J Directors, show that federal authorities were continuing their investigation of the Company and its subsidiaries for drug and medical device marketing violations, and state law enforcement officials escalated their investigations and enforcement activities directed at the Company's unlawful and unethical business activities.  Such disclosures revealed a level of knowledge by each of the then-sitting directors who, by such time, also should have investigated the underlying facts and determined the extent of the wrongdoing.

**Defendants'/Current Board Members' Knowledge of Wrongdoing**

332.    During 2006, Defendants/Current Board members Coleman, Cullen, Johns, Lindquist, Mullin, Prince, and Satcher were members of the Board; Coleman, Cullen, and Mullin were members of the Audit Committee; Lindquist, Mullin, and Satcher were members of the Public Policy Advisory Committee; Coleman, Johns, Lindquist, and Satcher were members of the Science and Technology Advisory Committee; and Cullen was amember of the Nominating and Corporate Governance Committee.

333.    All of them were aware of each of the schemes and unlawful business practices identified above as a result of regular reporting on compliance matters and unlawful business practices to the Audit Committee, and the Audit Committee's reporting of such matters to the full Board, as alleged above in paragraph280.

334.    Additionally, as members of the Public Policy Advisory Committee, Lindquist, Mullin, and Satcher were aware of such matters to the extent they implicated government and regulatory affairs and Coleman, Johns, Lindquist, and Satcher were aware of such matters to the extent they implicated matters of scientific and medical ethics as members of the Science and Technology Advisory Committee.

335.    Each of the schemes and unlawful business practices identified above were reported to such Committees, and all of the other Defendants/Current Board members on the Board at this time were aware of them because such Committees reported such matters to the full Board, as alleged above in paragraphs 280 and 281.

336.    Additionally, with respect to the governmental investigations and enforcement actions, disclosed in the Company's Form 10-K filings as noted above, the signatures of the Defendants/Current Board members then serving on the Board evidence their knowledge of such matters.

337.    Defendants/Current Board member Cullen, as member of the Nominating and Corporate Governance Committee specifically was  responsible for reviewing and evaluating the effectiveness of the Board and its Committees in providing compliance oversight, were aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of all of these matters, and as a result of the Nominating and Corporate Governance Committee's reports to the Full Board, all as alleged above in paragraph 210, all of the other Defendants/Current Board members on the Board at this time also knew this fact.

338.    Thus, Defendants/Current Board members Coleman, Cullen, Johns, Lindquist, Mullin, Prince, and Satcher were each aware that they were breaching their fiduciary duties as directors during 2006.

        **f.    2007**.

**Unlawful Business Practices**

339.    (i) the Risperdal Off-Label Promotion Scheme, as described above, continued and, in addition, in March, 2007, the Company received a subpoena from the U.S. Attorney's Office in Philadelphia concerning sales and marketing of Risperdal and the Company's

supervision of the subsidiary selling Risperdal; (ii) the Topamax Off-Label Promotion Scheme, as described above, continued and, in addition, in March 2007, the Company received a subpoena from the U.S. Attorney's Office in Boston concerning sales and marketing of Topamax and the Company's supervision of the subsidiary selling Topamax; (iii) the Biliary Stent Off-Label Promotion Scheme continued; and (iv) false and misleading promotion of Natrecor, as described above, continued.

340.    In addition, in March 2007, the Company received a subpoena from the U.S. Attorney's Office in San Francisco concerning the sale and marketing of Natrecor and the Company's supervision of the subsidiary selling Natrecor, while the Company failed to disclose appropriate indication and patient risk information, in violation of FDA reminder advertisement regulations (FDA letter dated November 6, 2007 to J&J's Scios).  The Company's Form 10-K disclosures, signed by all persons then serving as J&J Directors, show that federal authorities were escalating their investigation of the Company and its subsidiaries for drug and medical device marketing violations, and state enforcement activity against the Company had expanded substantially and, in May 2007, the New York State Attorney General issued a subpoena seeking information relating to the marketing and safety of Procrit.  In September 2007, the Company was forced to pay $84.7 million to settle charges by the United States Attorney's Office for the District of New Jersey that its DePuy subsidiary paid kickbacks to orthopedic surgeons to induce them to use DePuy products, and DePuy was forced to plead guilty to criminal violation of the federal anti-kickback statute and to enter into a deferred prosecution agreement and a corporate integrity agreement.

341.    In November 2007, the Attorney General of the Commonwealth of Massachusetts issued a civil investigative demand seeking information regarding financial relationships between a number of Massachusetts-based orthopedic surgeons and providers and DePuy.

342.    By year end, the attorney generals of several states indicated a potential interest in pursuing litigation similar to that commenced by Pennsylvania and five other states with respect to false claims and damages caused by the off-label promotion of Risperdal.

**Defendants'/Current Board Members' Knowledge of Wrongdoing**

343.    During 2007, Defendants/Current Board members Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, and Satcher were members of the Board; Coleman, Cullen, and Mullin were members of the Audit Committee; Lindquist, Mullin, Perez and Satcher were members of the Public Policy Advisory Committee; Coleman, Johns, Lindquist, and Satcher were members of the Science and Technology Advisory Committee; and Cullen and Prince were members of the Nominating and Corporate Governance Committee.

344.    As such, all of them were aware of each of the schemes and unlawful business practice identified above as a result of regular reporting on compliance matters and unlawful business practices to the Audit Committee, and the Audit Committee's reporting of such matters to the full Board, as alleged above in paragraph 280.

345.    Additionally, Lindquist, Mullin, Perez and Satcher, as members of the Public Policy Advisory Committee, were each aware of such matters to the extent they implicated government and regulatory affairs, and Coleman, Johns, Lindquist, and Satcher were aware of such matters to the extent they implicated matters of scientific and medical ethics as members of the Science and Technology Advisory Committee.

346.    The schemes and unlawful business practices identified above were reported to these Committees, and all of the other Defendants/Current Board members on the Board at this time were aware of the schemes and unlawful business practices identified above because these Committees reported such matters to the full Board, all as alleged above in paragraphs 280 and 281.

347.    Additionally, with respect to the governmental investigations and enforcement actions disclosed in the Company's 10-K filings as noted above, the signatures of the Defendants/Current Board members then serving on the Board evidences their knowledge of such matters.

348.    Defendants/Current Board members Prince and Cullen, as members of the Nominating and Corporate Governance Committee charged with specifically reviewing and evaluating, the effectiveness of the Board and its Committees in providing compliance oversight, were aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of each of the schemes and unlawful business practices identified above.

349.    Further, as a result of the Nominating and Corporate Governance Committee's reports to the Full Board, all of the other Defendants/Current Board members on the Board at this time also knew of the schemes and unlawful business practices identified above, all as alleged above in paragraph 281.

350.    Thus, each of Defendants/Current Board members -- Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, and Satcher -- were aware that they were breaching their fiduciary duties as directors during 2007.

g.      **2008**.

**Unlawful Business Practices**

351.     (i) the Risperdal Off-Label Promotion Scheme, as described above, continued and, in addition, Company 10-K disclosures, signed by all persons then serving as J&J directors, show that the Company was facing the threat of nationwide liability to more than 40 states in connection with the unlawful off-label promotion of Risperdal with, by year end, the Attorneys General of more than 40 states indicated a potential interest in pursuing litigation similar to that commenced by Pennsylvania and eight other states with respect to false claims and damages caused by the off-label promotion of Risperdal; (ii) the Topamax Off-Label Promotion Scheme, as described above, continued; (iii) the Biliary Stent Off-Label Promotion Scheme as described above continued.

352.     In addition, in June 2008, J&J received a subpoena from the United States Attorney's Office for the District of Massachusetts relating to the marketing of biliary stents by the Company's Cordis subsidiary with the Company 10-K disclosures, signed by all persons then serving as J&J directors, show that J&J's pursuit of off-label promotion as a deliberate business strategy, this time in connection with the Biliary Stent Off-Label Promotion Scheme, would again expose the Company to adverse investigative and enforcement action; and, (iv) the Company violated cGMP regulations in connection with product odor complaints, as detailed in the Warning Letter dated January 15, 2010, and discussed above.

**Defendants'/Current Board Members' Knowledge of Wrongdoing**

353.     During 2008, Defendants/Current Board members Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, and Satcher were members of the Board; Coleman, Cullen, and Mullin were members of the Audit Committee; Lindquist, Mullin, Perez and Satcher were

members of the Public Policy Advisory Committee; Coleman, Johns, Lindquist, and Satcher were members of the Science and Technology Advisory Committee; and Cullen and Prince were members of the Nominating and Corporate Governance Committee.

354.    Each of these Defendants/Current Board members was aware of all of the schemes and unlawful business practices identified above as a result of regular reporting on compliance matters and unlawful business practices to the Audit Committee, and the Audit Committee's reporting of such matters to the full Board, as alleged above in paragraph 209. Additionally, Defendants/Current Board members Lindquist, Mullin, Perez and Satcher, as members of the Public Policy Advisory Committee, were aware of such matters to the extent they implicated government and regulatory affairs and Defendants/Current Board members Coleman, Johns, Lindquist, and Satcher were aware of such matters to the extent they implicated matters of scientific and medical ethics as members of the Science and Technology Advisory Committee.

355.    Each of the schemes and unlawful business practices identified above was reported to these committees, and all of the other Defendants/Current Board members on the Board at this time were aware of them because these Committees reported such matters to the full Board, as alleged above in paragraphs 280 and 281.

356.    Additionally, with respect to the governmental investigation and state enforcement actions disclosed in the Company's 10-K filings as noted above, the signatures of the Defendants/Current Board members then serving on the Board evidence their knowledge of such matters.

357.    Defendants/Current Board members Prince and Cullen, as members of the Nominating and Corporate Governance Committee, specifically charged with reviewing and

evaluating the effectiveness of the Board and its Committees in providing compliance oversight, were aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of each of the schemes and unlawful business practices identified above and, as a result of the Nominating and Corporate Governance Committee's reports to the Full Board, all of the other Defendants/Current Board members on the Board at this time also knew this fact, as alleged above in paragraph 281.

358.    Thus, Defendants/Current Board members Coleman, Cullen, Johns,  Lindquist, Mullin, Perez, Prince, and Satcher were each aware that they were breaching their fiduciary duties as directors during 2008.

### h.    2009.

### Unlawful Business Practices

359.    During 2009, J&J continued to be extensively involved in unlawful activity, including violation of cGMP regulations in connection with product odor complaints, as detailed in the Warning Letter dated January 15, 2010, and discussed above.

360.    Company 10-K disclosures, signed by all persons then serving as J&J Directors, show that the Company's unlawful business practices relating to drug and medical device marketing and promotion, as well as clinical development, continued to provoke law enforcement investigations and enforcement actions as follows: (i) in April 2009, the Company received a HIPPA subpoena from the U.S. Attorney's Office for the District of Massachusetts (Boston) seeking information regarding the Company's financial relationship with several psychiatrists; (ii) in May 2009, the New Jersey Attorney General issued a subpoena to DePuy Orthopaedics, Inc., seeking information regarding the financial interest of clinical investigators who performed clinical studies for DePuy Orthopaedics, Inc. and DePuy Spine, Inc.; and (iii) the

10-K disclosures also reflected the ongoing nature of previously disclosed multiple nvestigations and enforcement activities at the federal and state level.

**Defendants'/Current Board Members' Knowledge of Wrongdoing**

361.   During 2009, Defendants/Current Board members Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, and Satcher were members of the Board; Coleman, Cullen, and Mullin were members of the Audit Committee; Lindquist, Mullin, Perez and Satcher were members of the Public Policy Advisory Committee; Coleman, Johns, Lindquist, and Satcher were members of the Science and Technology Advisory Committee; and Cullen and Prince were members of the Nominating and Corporate Governance Committee.

362.   Each of these Defendants/Current Board members was aware of all of the schemes and unlawful business practices identified above as a result of regular reporting on compliance matters and unlawful business practices to the Audit Committee, and the Audit Committee's reporting of such matters to the full Board, as alleged above in paragraph 209.

363.   Additionally, Defendants/Current Board members Lindquist, Mullin, Perez and Satcher, as members of the Public Policy Advisory Committee, were aware of such matters to the extent they implicated government and regulatory affairs and Coleman, Johns, Lindquist, and Satcher were aware of such matters to the extent they implicated matters of scientific and medical ethics as members of the Science and Technology Advisory Committee.

364.   The schemes and unlawful business practices identified above were reported to these Committees, and all of the other Defendants/Current Board Members on the Board at this time were aware of them because these Committees reported such matters to the full Board, as alleged in paragraphs 280 and 281.

365.   Furthermore, Defendants/Current Board members Prince and Cullen, as members of the Nominating and Corporate Governance Committee specifically charged with reviewing and evaluating the effectiveness of the Board and its Committees in providing compliance oversight, were aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of all of the schemes and unlawful business practices identified above and as a result of the Nominating and Corporate Governance Committee's reports to the Full Board, all of the other Defendants/Current Board members on the Board at this time also knew this fact, as alleged in above in paragraph 281.

366.   Thus, Defendants/Current Board members Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, and Satcher were each aware that they were breaching their fiduciary duties as directors during 2009.

### i.   2010.

**Unlawful Business Practices**

367.   During 2010,  while the Board knew or should have known of the various illegal conduct described herein, J&J management continued to be extensively involved in unlawful activity, including violation of cGMP regulations in connection with product odor complaints, as discussed above.

368.   Company 10-K disclosures, signed by all persons then serving as J&J Directors, show that the Company's unlawful business practices relating to drug and medical device marketing and promotion, as well as clinical development, continued to provoke law enforcement investigations and enforcement actions as follows: (i) Attorneys General of multiple states and Office of General Counsel of Pennsylvania filed actions regarding the Risperdal Off-Label Scheme and the Attorney Generals of 40 states may also pursue such litigation; (ii) in

February 2010, the government served a Civil Investigative Demand seeking additional
information regarding the sale and marketing of Risperdal; (iii) in May 2010, the US House of
Representatives' Committee on Oversight and Government Reform sent a letter to J&J
requesting information and documents pertaining to the April 2010 recall of various McNeil
liquid products and a public hearing was conducted in May 2010, and another public hearing was
held in September 2010 after further information requests regarding the Motrin recall; (iv)
McNeil and certain J&J affiliates received grand jury subpoenas from the US Attorney's Office
for the Eastern District of Pennsylvania requesting documents relating to recent recalls of various
McNeil products and the FDA inspections of manufacturing facilities; (v) the government has
served McNeil with a Civil Investigative Demand seeking records regarding violations of the
False Claims Act; (vi) J&J also received Civil Investigative Demands from multiple state
Attorneys General Offices relating to McNeil recall issues and on January 12, 2011, the Oregon
Attorney General filed a civil complaint in state court alleging civil violations of the Oregon
unlawful trade practices act relating to McNeil OTC products; (vii) in September 2010, a
shareholder filed a class action in the U.S. District Court for the District of New Jersey based
upon anti-fraud provisions relating to the McNeil manufacturing facilities, and  (viii) the 10-K
disclosures also reflected the ongoing nature of previously disclosed multiple investigations and
enforcement activities at the federal and state level. For all intents and purposes, the Board sat
idly by in derogation of the stewardship responsibilities of its members that were and are owed to
J&J asnd its shareholders.

### Defendants'/Current Board Members' Knowledge of Wrongdoing

369.    During 2010, Defendants/Current Board members Coleman, Cullen, Johns,

Lindquist, Mullin, Perez, Prince, Satcher and Davis were members of the Board; Coleman, Cullen, Mullin and Davis were members of the Audit Committee; Lindquist, Mullin, Perez, Satcher and Davis were members of the Public Policy Advisory Committee; Coleman, Johns, Lindquist, and Satcher were members of the Science and Technology Advisory Committee; and Cullen and Prince were members of the Nominating and Corporate Governance Committee.

370.    Each of these Defendants/Current Board members was aware of all of the schemes and unlawful business practices identified above as a result of regular reporting on compliance matters and unlawful business practices to the Audit Committee, and the Audit Committee's reporting of such matters to the full Board, as alleged above in paragraph 280.

371.    Additionally, Defendants/Current Board members Lindquist, Mullin, Perez, Satcher, and Davis as members of the Public Policy Advisory Committee, were aware of such matters to the extent they implicated government and regulatory affairs and Coleman, Johns, Lindquist, and Satcher were aware of such matters to the extent they implicated matters of scientific and medical ethics as members of the Science and Technology Advisory Committee.

372.    The schemes and unlawful business practices identified above were reported to these Committees, and all of the other Defendants/Current Board Members on the Board at this time were aware of them because these Committees reported such matters to the full Board, as alleged in paragraphs 280 and 281.

373.    Furthermore, Defendants/Current Board members Prince and Cullen, as members of the Nominating and Corporate Governance Committee specifically charged with reviewing and evaluating the effectiveness of the Board and its Committees in providing compliance oversight, were aware that the Board was failing to take action to exercise appropriate compliance oversight despite its knowledge of all of the schemes and unlawful business practices

identified above and as a result of the Nominating and Corporate Governance Committee's reports to the Full Board, all of the other Defendants/Current Board members on the Board at this time also knew this fact, as alleged in above in paragraph 281.

374.    Thus, Defendants/Current Board members Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, Satcher and Davis were each aware that they were breaching their fiduciary duties as directors during 2010.

375.    As demonstrated in the immediately preceding paragraph, the Board (including the Defendants/Current Board members) has knowingly permitted J&J's management to pursue a long-term strategy of unlawful and unethical business practices, characterized by the simultaneous pursuit of multiple off-label promotion and kickback schemes utilizing similar methods and tactics across multiple subsidiaries and business units and involving multiple drugs and medical devices.

376.    As Chairman and CEO from 2002 forward, and as Worldwide Chairman of J&J's Pharmaceuticals Group from 1998 to 2002, defendant/Current Board member Weldon is responsible for the pervasive pattern of deliberate unlawful conduct reflected in the Topamax Off-Label Promotion Scheme, the Omnicare Kickback Scheme, the Risperdal Off-Label Promotion Scheme, the Natrecor Off-Label Promotion Scheme, the DePuy Kickback Scheme, the Biliary Stent Off-Label Promotion Scheme, the improperly delayed recall of contaminated OTC products, and the FCPA Bribery Scheme.   Defendant Weldon testified before Congress that it was a "mistake" when J&J did not advise the FDA that the Motrin products removed from the market in 2009 had been purchased by third parties conducting assessments; Defendant Weldon refused to label the product retrieval, which was due to Motrin's failure to meet dissolution specifications, as a recall.

377.     These multiple illegal schemes cannot be attributed to an anomalous incident of misconduct within the Company or from the acts of a rogue employee or division within the Company. Rather, as alleged herein, serious violations of the drug marketing laws and FDA regulations occurred systematically and pervasively across multiple business units.  This pattern of unlawful business practices reflects a decision to embrace a policy of calculated legal violations as the Company's deliberate business strategy, of which Weldon, as CEO and as Worldwide Chairman of J&J's Pharmaceuticals Group, necessarily had knowledge.  As Worldwide Chairman of J&J's Pharmaceuticals Group beginning in 1998, Weldon embraced, directed, encouraged, and pursued the Topamax Off-Label Promotion Scheme, the Omnicare Kickback Scheme, and the Risperdal Off-Label Promotion Scheme -- with the knowledge of the Board -- to drive pharmaceutical sales and catapult himself to the position of Chairman of the Board and CEO in 2002.  As Chairman and CEO, he continued these schemes, presided over the initiation of the DePuy Kickback Scheme and the Company's acquisition of Scios, which depended substantially on continuation and expansion of Scios' off-label promotion of Natrecor, and continued the Biliary Stent Off-Label Promotion Scheme -- by which the Company applied its off-label promotion strategy to its medical devices business segment -- through the Company's Cordis subsidiary  There is no legitimate "business judgment" involved in Weldon's knowing pursuit of such unlawful business strategies and tactics.  His actions constitute a breach of the fiduciary duty of loyalty and good faith, as to which Weldon faces a substantial risk of liability, rendering him personally interested and incapable of impartially considering a pre-suit demand.

378.     Defendant/Current Board member Coleman has served on the Board, the Audit Committee and the Science and Technology Advisory Committee since September 2003, and

accordingly, had all of the knowledge attributed to her in ¶193(b)-(h) above, and with such knowledge, knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in ¶193(b)-(h), thereby breaching her fiduciary duty of loyalty and good faith, with knowledge that she was doing so.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which she faces a substantial threat of personal liability.

379.    Defendant/Current Board member Cullen has served on the Board since 1995, on the Audit Committee since 1997, and on the Nominating and Corporate Governance Committee since 2004 and, accordingly, had all of the knowledge attributed to him in ¶193(a)-(h) above, and with such knowledge, knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in such ¶193(a)-(h), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which he faces a substantial threat of personal liability.

380.    Defendant/Current Board member Johns has served on the Board since 2005, and on the Science and Technology Advisory Committee since 2006 and, accordingly, had all of the knowledge attributed to him in ¶193(d)-(h) above, and with such knowledge, knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in such ¶193(d)-(h), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which he faces a substantial threat of personal liability.

381.     Defendant/Current Board member Lindquist has served on the Board the Public

Policy Advisory Committee, and the Science and Technology Advisory Committee since

February 2004 and, accordingly, had all of the knowledge attributed to her in ¶193(c)-(h) above,

and with such knowledge, knowingly permitted the Company to continue to pursue its unlawful

and unethical business practices and strategies as alleged in such ¶193(c)-(h), thereby breaching

her fiduciary duty of loyalty and good faith, with knowledge that she was doing so.  Such

conduct is not the product of a valid exercise of business judgment, and constitutes a non-

exculpable breach of fiduciary duty for which she faces a substantial threat of personal liability.

382.     Defendant/Current Board member Mullin has served on the Board since 1999, on

the Audit Committee since 2000, on the Public Policy Advisory Committee since 2006, and on

the Nominating and Corporate Governance Committee from 2000 to 2005 and, accordingly, had

all of the knowledge attributed to him in ¶193(a)-(h) above, and with such knowledge,

knowingly permitted the Company to continue to pursue its unlawful and unethical business

practices and strategies as alleged in ¶193(a)-(h), thereby breaching his fiduciary duty of loyalty

and good faith, with knowledge that he was doing so. Such conduct is not the product of a valid

exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for

which he faces a substantial threat of personal liability.

383.     Defendant/Current Board member Perez has served on the Board since June 2007

and on the Public Policy Advisory Committee since 2008 and, accordingly, had all of the

knowledge attributed to him in ¶193(f)-(h) above, and with such knowledge, knowingly

permitted the Company to continue to pursue its unlawful and unethical business practices and

strategies as alleged in ¶193(f)-(h), thereby breaching his fiduciary duty of loyalty and good

faith, with knowledge that he was doing so.  Such conduct is not the product of a valid exercise

of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which he faces a substantial threat of personal liability.

384.    Defendant/Current Board member Prince has served on the Board since 2006 and on the Nominating and Corporate Governance Committee since 2007 and, accordingly, had all of the knowledge attributed to him in ¶193(e)-(h) above, and with such knowledge, knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in 193(e)-(h), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which he faces a substantial threat of personal liability.

385.    Defendant/Current Board member Satcher has served on the Board since 2002 and on the Public Policy Advisory Committee and the Science and Technology Advisory Committee since 2003 and, accordingly, had all of the knowledge attributed to him in ¶193(a)-(h) above, and with such knowledge, knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in ¶193(a)-(h), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so. Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which he faces a substantial threat of personal liability.

386.    In conclusion, as specifically alleged above: (a) 9 out of a total of 11 current Directors of the Company - Weldon, Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, and Satcher - face a substantial threat of personal liability with respect to claims in this Action, and the challenged conduct of each of them was not the product of a valid exercise of business judgment; and (b) six out of a total of 11 current Directors of the Company - Weldon, Coleman,

Cullen, Lindquist, Mullin and Satcher - face a substantial threat of personal liability with respect to each of the Risperdal Off-Label Promotion Scheme, the Topamax Off-Label Promotion Scheme, the Biliary Stent Off-Label Promotion Scheme, the Natrecor Off-Label Promotion Scheme, the Omnicare Kickback Scheme, the Depuy Kickback Scheme, the improperly delayed recall of contaminated OTC products, and the FCPA Bribery Scheme.

387.    Therefore, a majority of the members of the Current Board are not disinterested for the purposes of a pre-suit demand with respect to the claims set forth in this Complaint. Accordingly, demand is futile and therefore legally excused under New Jersey law.

## VI.  BREACHES OF FIDUCIARY DUTY BY THE FORMER DIRECTOR DEFENDANTS

388.    Director Defendant Jordan served on the Board from 1981 until April 2007.  From at least 1997 to 1999, Jordan served on the Audit Committee; from 1999 to 2003, and from 2006 until April 2007, she served on the Nominating and Corporate Governance Committee; and from at least 1997 to 2005, she served on the Public Policy Advisory Committee. Pursuant to the Company's Principles of Corporate Governance, as a Director and Board committee member, Jordan was "well supported by accurate and timely information" and was provided with "sufficient time and resources" to fully attend to all of her crucial oversight responsibilities. Therefore, for each of the years from 2002 through 2006, Jordan possessed all of the knowledge attributed to directors and members of the committees on which she served, as alleged in ¶193(a)-(e). With such knowledge, Jordan knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in ¶193(a)-(e), thereby breaching her fiduciary duty of loyalty and good faith, with knowledge that she was doing so.

389.    Director Defendant Langbo served on the Board from 1991 until April 2010.  He served on the Audit Committee from at least 1997 to 2003, and on the Nominating and Corporate Governance Committee from 2004 to 2010 and, accordingly, had all of the knowledge attributed to him in ¶193(a)-(h) above, and with such knowledge, knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in such ¶193(a)-(h), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which he faces a substantial threat of personal liability.

390.    Director Defendant Schacht served on the Board from 1997 to April 28, 2005. He served on the Audit Committee from 1998 to 2005 and on the Nominating and Corporate Governance Committee from 1999 to 2004.  Pursuant to the Company's Principles of Corporate Governance, as a Director and Board committee member, Schacht was "well supported by accurate and timely information" and was provided with "sufficient time and resources" to fully attend to all of his crucial oversight responsibilities. Therefore, for each of the years from 1997 through 2005, Schacht possessed all of the knowledge attributed to directors and members of the committees on which he served as alleged in ¶193(a)-(c). With such knowledge, Schacht knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in ¶193(a)-(c), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.

391.    Director Defendant Reinemund served on the Board from 2003 until April 24, 2008, and served on the Nominating and Corporate Governance Committee from 2004 to 2008. Pursuant to the Company's Principles of Corporate Governance, as a director and Board

committee member, Reinemund was "well supported by accurate and timely information" and was provided with "sufficient time and resources" to fully attend to all of his crucial oversight responsibilities.  Therefore, for each of the years from 2003 through 2007, Reinemund possessed all of the knowledge attributed to Directors and members of the committees on which he served, as alleged in ¶193(b)-(f).  With such knowledge, Reinemund knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in ¶193(b)-(f), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.

392.      Director Defendant Darretta served on the Board from 2002 until 2006.  Darretta was a management insider, named Chief Financial Officer and appointed to the Executive Committee in 1997.  He was appointed Executive Vice President in 2002 and Vice Chairman of the Board in January 2004.  As a member of the Company's senior executive management and Executive Committee, Darretta had intimate knowledge of the Company's business strategies and tactics, including the unlawful and unethical business practices alleged herein. Pursuant to the Company's Principles of Corporate Governance, as a Director, Darretta was "well supported by accurate and timely information" and was provided with "sufficient time and resources" to fully attend to all of his crucial Board oversight responsibilities.  For each of the years from 2002 through 2006, comprising his service on the Board, Darretta possessed all of the knowledge attributed to Directors in ¶193(a)-(e).  With such knowledge, Darretta knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in ¶193(a)-(e), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.

393.    Director Defendant Lenehan served on the Board from 2001 until February 1, 2004.  Lenehan was a management insider, named in 1993 as Company Group Chairman and worldwide Franchise Chairman for Consumer Pharmaceuticals and a member of the Consumer Group Operating Committee.  In 1994, he was promoted to Executive Committee member and Worldwide Chairman, Consumer Pharmaceuticals & Medical Devices Group.  He was Worldwide Chairman of J&J's Medical Devices and Diagnostics Group from 1999 to 2001, when he became Vice Chairman of the Board, a position in which he also had responsibility for the consumer business.  He was named to the additional position of President of J&J in 2002.  As a member of the Company's senior executive management and Executive Committee, Lenehan had intimate knowledge of the Company's business strategies and tactics, including the unlawful and unethical business practices alleged herein. Pursuant to the Company's Principles of Corporate Governance, as a Director Lenehan was "well supported by accurate and timely information" and was provided with "sufficient time and resources" to fully attend to all of his crucial Board oversight responsibilities.  For each of the years from 2001 through 2003, comprising his service on the Board, Lenehan possessed all of the knowledge attributed to Directors in ¶193(a)-(b).  With such knowledge, Lenehan knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in ¶193(a)-(b), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.

394.    Director Defendant Wilson served on the Board from 1986 until April, 2003.  He served as Vice Chairman of the Board from 1989 until 2002.  Wilson was a management insider, appointed Company Group Chairman in 1981, to the Executive Committee in 1983, as Chairman of a Sector Operating Committee in 1985, and as Vice Chairman of the Board in 1989.  He was

named Senior Vice Chairman of the Board in 2001 and assumed expanded responsibilities as Vice Chairman of the Executive Committee in 1994. Wilson also served on the Science and Technology Advisory Committee. As a member of the Company's senior executive management and Executive Committee, Wilson had intimate knowledge of the Company's business strategies and tactics, including the unlawful and unethical business practices alleged herein. Pursuant to the Company's Principles of Corporate Governance, as a director Wilson was "well supported by accurate and timely information" and was provided with "sufficient time and resources" to fully attend to all of his crucial Board oversight responsibilities. For each of the years from 1997 through 2002, during his service on the Board, Wilson possessed all of the knowledge attributed to directors in ¶193(a)-(b). With such knowledge, Wilson knowingly permitted the Company to continue to pursue its unlawful and unethical business practices and strategies as alleged in ¶193(a)-(b), thereby breaching his fiduciary duty of loyalty and good faith, with knowledge that he was doing so.

## VII.   BREACHES OF FIDUCIARY DUTY BY THE OFFICER DEFENDANTS

395.   As officers of a New Jersey corporation, each of the Officer Defendants, Weldon, Poon, Valeriani, Scodari, Torphy, Gorsky and Deyo, owed the Company and its shareholders a fiduciary duty of utmost fidelity and absolute good faith, as well as the duty to exercise that degree of care that an ordinarily prudent officer would use under the circumstances. Each officer is duty-bound to bring to bear all of his or her knowledge, skill, experience and expertise in the fulfillment of his or her appointed official duties. Moreover, corporate officers are required to faithfully pursue the lawful best interests and advantage of the corporation. Officers breach their fiduciary duty of loyalty and good faith when they directly, or knowingly cause or permit the

corporation and those acting under their authority and supervision to violate the laws applicable to the corporation's business activities.

396.    Defendant Weldon has served as CEO of J&J and Chairman of the Executive Committee from April 2002 until the present.  As Worldwide Chairman of the Company's Pharmaceuticals Group and as a member of the Executive Committee from 1998 to April 2002, and later as CEO and Chairman of the Executive Committee, Weldon had knowledge of, and responsibility for, and approved and directed, the promotional and marketing strategies for each of the Company's pharmaceutical products, including, without limitation, Risperdal, Topamax, and Natrecor, including the Risperdal Off-Label Promotion Scheme, the Topamax Off-Label Promotion Scheme, and the Natrecor Off-Label Promotion Scheme, as well as the Omnicare Kickback Scheme, all as alleged herein.  Furthermore, as a member of the Executive Committee and as CEO and Chairman of the Executive Committee, Weldon had knowledge of, and responsibility for, and approved, and ultimately, as CEO, directed the use of the Company's off-label promotion strategy in the Biliary Stent Off-Label Promotion Scheme, as well as the kickback strategy employed in the DePuy Kickback Scheme.  Finally, as CEO and Chairman of the Executive Committee, Weldon had knowledge of the Company's receipt of OTC product odor complaints and approved and directed the Company's improper failure to complete a timely and adequate investigation of the matters addressed in the January 2010 Warning Letter, as discussed herein. Throughout the period from 1998 to the present, Weldon was fully aware of the unlawful and unethical nature of all of these activities, as well as the FCPA Bribery Scheme, and nevertheless knowingly approved and directed their execution as consistent with the Company's ongoing and long-standing policy of promoting the broadest possible use and sales of the its

pharmaceutical and medical device products, regardless of the applicable law, thus knowingly breaching his fiduciary duty of loyalty and good faith to the Company.

397. Defendant Poon joined the Company in 2000 as a Company Group Chairman in the Pharmaceuticals Group, was named a member of the Executive Committee and Worldwide Chairman, Pharmaceuticals Group in 2001, and was named Worldwide Chairman, Medicines & Nutritionals in 2003. In 2007, Poon assumed responsibility for the J&J Development Corporation, the Corporate Office of Science and Technology, the Corporate Office of Information Management, Worldwide Procurement and Worldwide Operations, and was again named Worldwide Chairman, Pharmaceuticals Group, in January 2008. Throughout her executive tenure at J&J, Poon had knowledge of, and responsibility for, and approved and directed, the promotional and marketing strategies for each of the Company's pharmaceutical products, including, without limitation, Risperdal, Topamax, and Natrecor, including the Risperdal Off-Label Promotion Scheme, the Topamax Off-Label Promotion Scheme, and the Natrecor Off-Label Promotion Scheme, as well as the Omnicare Kickback Scheme, all as alleged herein. Furthermore, as a member of the Executive Committee, Poon had knowledge of, and responsibility for, and approved and directed the use of the Company's off-label promotion strategy in the Biliary Stent Off-Label Promotion Scheme, as well as the kickback strategy employed in the DePuy Kickback Scheme. Throughout the period from 2000 to the present, Poon was fully aware of the unlawful and unethical nature of all of these activities, as well as the FCPA Bribery Scheme, and nevertheless knowingly approved and directed their execution as consistent with the Company's ongoing and long-standing policy of promoting the broadest possible use and sales of the its pharmaceutical and medical device products, regardless of the

applicable law, thus knowingly breaching her fiduciary duty of loyalty and good faith to the Company.

398.    Defendant Valeriani served as Worldwide Franchise Chairman for the DePuy franchise beginning in 2002, became a member of the Executive Committee in September 2003, assumed responsibility for the Company's diagnostics businesses and was named Worldwide Chairman, Diagnostics, in the first quarter of 2004 and, later in 2004, was named Worldwide Chairman, Cardiovascular Devices and Diagnostics.  In 2006, he assumed responsibility for a newly-created Cardiovascular Devices & Diagnostics Group Operating Committee, which included LifeScan, Inc., Cordis Corporation and Ortho-Clinical Diagnostics, Inc.  As reported by The Wall Street Journal on November 16, 2007, Valeriani "split oversight of [J&J's] $20 billion [Medical Devices] division with" Michael Dormer. Throughout the period from 2002 forward, as a result of his senior executive responsibilities and activities relating to J&J's medical devices segment, and from 2003 forward as a result of his membership of the Executive Committee, Valeriani had knowledge of, and responsibility for, and approved and directed, the promotional and marketing strategies for the Company's medical device products, including, without limitation, DePuy products and the Company's biliary stent products, including the DePuy Kickback Scheme and the Biliary Stent Off-Label Promotion Scheme, all as alleged herein. Valeriani was fully aware of the unlawful and unethical nature of all of these activities, as well as the FCPA Bribery Scheme, and nevertheless knowingly approved and directed their execution, consistent with the Company's ongoing and long-standing policy of promoting the broadest possible use and sales of the its pharmaceutical and medical device products, regardless of the applicable law, thus knowingly breaching his fiduciary duty of loyalty and good faith to the Company.

399.    Defendant Scodari joined J&J in 1999 and in 2001 he was named Company Group Chairman for the J&J North American Pharmaceuticals business, and became a member of the Pharmaceuticals Group Operating Committee.  From 2003 to 2005, Scodari was Company Group Chairman of J&J's Biopharmaceutical Business, and was Worldwide Chairman, Pharmaceuticals Group, and a member of the Executive Committee from March 2005 until March, 2008.  Throughout the period from 2000 to his retirement in 2008, Scodari acted as leading deputy to defendant Poon in the Company's pharmaceutical segment. Throughout his executive tenure at J&J, Scodari had knowledge of, and responsibility for, and approved and directed, the promotional and marketing strategies for each of the Company's pharmaceutical products, including, without limitation, Risperdal, Topamax, and Natrecor, including the Risperdal Off-Label Promotion Scheme, the Topamax Off-Label Promotion Scheme, and the Natrecor Off-Label Promotion Scheme, as well as the Omnicare Kickback Scheme, all as alleged herein.  Furthermore, as a member of the Executive Committee, Scodari had knowledge of, and approved the use of, the Company's off-label promotion strategy in the Biliary Stent Off-Label Promotion Scheme, as well as the kickback strategy employed in the DePuy Kickback Scheme. Throughout the period from 2000 to his retirement in 2008, Scodari was fully aware of the unlawful and unethical nature of all of these activities, as well as the FCPA Bribery Scheme, and nevertheless knowingly approved and/or directed their execution, consistent with the Company's ongoing and long-standing policy of promoting the broadest possible use and sales of the its pharmaceutical and medical device products, regardless of the applicable law, thus knowingly breaching his fiduciary duty of loyalty and good faith to the Company.

400.    Defendant Torphy was the Corporate Vice President of Science & Technology, and sat on the Science & Technology Advisory Committee of the Board from 2003 through

2006.  Torphy was actively engaged with the members of the Science & Technology Advisory Committee, including helping to set the agenda for Science & Technology Advisory Committee meetings.  In that capacity, Torphy actively interfaced with Research and Development components of the Company.  Throughout the period from 2003 through 2006, Torphy had knowledge of the promotional and marketing strategies for each of the Company's pharmaceutical products, including, without limitation, Risperdal, Topamax, and Natrecor, including the Risperdal Off-Label Promotion Scheme, the Topamax Off-Label Promotion Scheme, the Natrecor Off-Label Promotion Scheme, and the Biliary Stent Off-Label Promotion Scheme, as well as the Omnicare Kickback Scheme and the DePuy Kickback Scheme, all as alleged herein.  Throughout the period from 2003 through 2006, Torphy was fully aware of the unlawful and unethical nature of all of these activities, as well as the FCPA Bribery Scheme, and nevertheless knowingly approved and/or acquiesced in their execution, consistent with the Company's ongoing and long-standing policy of promoting the broadest possible use and sales of the its pharmaceutical and medical device products, regardless of the applicable law, thus knowingly breaching his fiduciary duty of loyalty and good faith to the Company.

401.    Defendant Gorsky has been J&J's Worldwide Chairman, Medical Devices and Diagnostics Group, since September 2009, and a member of J&J's Executive Committee since January 2009.  He came to J&J in 2008 after serving as head of Novartis Pharmaceuticals Corporation's North American pharmaceuticals business. Prior to joining Novartis in 2004, Gorsky had served in various management positions at J&J, beginning as a sales representative with Janssen Pharmaceutical Inc. in 1988.  Over the next 15 years, he advanced through positions of increasing responsibility in sales, marketing and management, and was ultimately named President of Janssen Pharmaceutical Inc. in the U.S.  As leader of Janssen's management

board, Gorsky had responsibility for all of its functional areas, including, inter alia, marketing, sales and medical affairs.  While at J&J's Janssen subsidiary, Gorsky had principal responsibility for the commercialization of Risperdal, including the conceptualization and execution of the Risperdal Off-Label Promotion Scheme.  Gorsky thus had knowledge of, and responsibility for, and approved and directed, the Risperdal Off-Label Promotion Scheme.  Gorsky was fully aware of the unlawful and unethical nature of the Risperdal Off-Label Promotion Scheme, but nevertheless knowingly approved and directed its execution, consistent with the Company's ongoing and long-standing policy of promoting the broadest possible use and sales of the its pharmaceutical and medical device products, regardless of the applicable law, thus knowingly breaching his fiduciary duty of loyalty and good faith to the Company.

402.    Defendant Deyo became a member of the Executive Committee and Vice President, Administration in 1996 and Vice President, General Counsel and Chief Compliance Officer in April, 2004.  From at least 2002 to 2009, Deyo was a management member of the Board's Public Policy Advisory Committee, thus serving as a key advisor to the Board on matters of governmental and regulatory affairs and compliance.  As a member of the Executive Committee since 1996 and as General Counsel and Chief Compliance Officer from 2004 forward, Deyo had knowledge of, and responsibility for, and approved, the promotional and marketing strategies for each of the Company's pharmaceutical products, including, without limitation, Risperdal, Topamax, and Natrecor, including the Risperdal Off-Label Promotion Scheme, the Topamax Off-Label Promotion Scheme, and the Natrecor Off-Label Promotion Scheme, and also had knowledge and approved of  the use of the Company's off-label promotion strategy in the Biliary Stent Off-Label Promotion Scheme, as well as the kickback strategy employed in the DePuy Kickback Scheme.  Finally, as Executive Committee member, General

Counsel, and Chief Compliance Officer, Deyo had knowledge of the Company's receipt of OTC product odor complaints and approved and directed the Company's improper failure to complete a timely and adequate investigation of the matters addressed in the January 2010 Warning Letter, as discussed herein. Throughout the period from 1998 to the present, Deyo was fully aware of the unlawful and unethical nature of all of these activities, as well as the FCPA Bribery Scheme, and nevertheless knowingly approved their execution as consistent with the Company's ongoing and long-standing policy of promoting the broadest possible use and sales of the its pharmaceutical and medical device products, regardless of the applicable law, thus knowingly breaching his fiduciary duty of loyalty and good faith to the Company.

## VIII.   DAMAGES SUFFERED BY J&J

403.    As a result of the Defendants' deliberate breaches of their fiduciary duties in connection with the Omnicare Kickback Scheme, the Risperdal Off-Label Promotion Scheme, the Natrecor Off-Label Promotion Scheme, the Topamax Off-Label Promotion Scheme, the DePuy Kickback Scheme, the Biliary Stent Off-Label Promotion Scheme,  the Delayed OTC Scheme and/or the FCPA Bribery Scheme (as detailed above), J&J has suffered and will continue to suffer substantial harm, particular since the Board has never sought to hold responsible Defendant Weldon and the other culpable members of management for their wrongful conduct.

404.    J&J was forced to pay almost $85 million in September 2007 to resolve criminal and civil charges related to the unlawful paying and offering of inducements to orthopedic surgeons to use DePuy hip and knee joint reconstruction and replacement products. In April 2010, an agreement was reached whereby J&J's Ortho-McNeil Pharmaceutical subsidiary agreed to pay approximately $75.4 million in civil and $6.1 million in criminal fines to settle the

Topomax Off-Label Promotion Scheme.  Two jury verdicts regarding the Risperdal Off-Label Promotion Scheme were adverse to J&J and resulted in one award of $257.7 million and the other award of $327.1 million. With respect to the FCPA Bribery Scheme, in April, 2011, J&J agreed to pay $48.6 million to the SEC in disgorged profits, a fine of $21.4 million to the DOJ, and a fine of 4.829 million sterlings to the U.K.'s Serious Fraud Office. At no time did the Board seek to hold any of the culpable individuals personally responsible for such fines and liabilities or thereafter seek to recover them.

405.     Moreover, J&J has incurred substantial costs and expense in responding to multiple federal and state regulatory subpoenas, requests for documents, investigations, and complaints, as well as to qui tam complaints, in connection with the Omnicare Kickback Scheme, the Risperdal Off-Label Promotion Scheme, the Natrecor Off-Label Promotion Scheme, the Topamax Off-Label Promotion Scheme, the DePuy Kickback Scheme, the Biliary Stent Off-Label Promotion Scheme, the Delayed OTC Scheme, and/or the FCPA Bribery Scheme.

406.     In addition, the Individual Defendants' breaches of their fiduciary duties to the Company have also exposed the Company to substantial injury to its reputation and corporate goodwill, as well as to potential criminal and civil liability.

## COUNT I
### (For Violations of Section 14(a) of the Exchange Act)

407.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted by Plaintiff individually and derivatively on behalf of J&J against the Individual Defendants who were members of the Company's Board when the 2010 and 2011 Proxy Statements were issued and disseminated to the Company's shareholders.

408.     This claim is asserted by Plaintiff against those members of the Company's Board for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 as controlling persons

of J&J in connection with the Company's 2010 and 2011 Proxy Statements disseminated on behalf of the Board in connection with the Company's 2010 and 2011 Annual Meetings of Shareholders scheduled and ultimately held. The Proxy Statements solicited the votes of Plaintiff and the other J&J shareholders in connection with, *inter alia*, the election/re-election of the members of the Current Board.

409.    The Proxy Statements issued and disseminated to J&J's shareholders purported to describe the activities of the Company's Board and the committees thereof in the preceding year, setting forth, inter alia, the number of meetings held and what certain of such committees purportedly accomplished. The Board, through the Proxy Statements, went on to recommend that J&J shareholders vote in favor of the Board's proposals and, in particular, to vote in favor of the election of each of them as members of the Board.

410.    The Proxy Statements contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as more fully set forth above.  In particular, the Proxy Statements failed to disclose the extent to which the Company's entire Board (and, in particular, the nominees for election to the Board) were responsible for the wrongdoings that caused the Company to be exposed to massive amounts in fines, restitution, verdicts in litigation and other damages. J&J's 2011 Proxy Statement, in the context of the narrative appearing therein as to those directors sitting for election at the 2011 Annual Meeting, as well as the descriptions of the purported functioning of the Board committees upon which such directors sat, failed to disclose: (a) the fact that the Demand Letter and the Various Demand Letters had been sent to the Board;  and (b) all such Board members had been sued by a number of the Company's shareholders alleging, *inter alia,* breach of fiduciary duty and waste of corporate assets.  The Board could have disclosed such

material facts in the 2011 Proxy Statement in neutral, non-perjorative language; the Board did

not do so. Each of the foregoing material facts should have been disclosed to J&J shareholders so

that they, in voting upon the nominees to the Board as well as the Board's proposals, would do

so with the benefit of being informed of any facts material and relevant thereto.

411.    As a result of the use by the Board of the 2010 and 2011 Proxy Statements to

solicit the votes of J&J shareholders, which Proxy Statements failed to disclose the material facts

set forth herein, the Board's proposals and nominees were approved.  By utilizing such Proxy

Statements, the suffrage rights of Plaintiff and each other shareholder of the Company have been

violated, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-

9 and, by having the other Director-supported nominees re-elected, J&J has been and continues

to be damaged.

## COUNT II
**(Against the Enumerated Directors and Officers for Breach of Fiduciary Duty
in connection with the Omnicare Kickback Scheme, the Risperdal Off-Label
Promotion Scheme, the Natrecor Off-Label Promotion Scheme, the Topamax Off-Label
Promotion Scheme, the DePuy Kickback Scheme, the Biliary Stent Off-Label Promotion
Scheme,  the Delayed OTC Contamination Recall Scheme and the FCPA Bribery Scheme)**

412.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully

set forth herein.

413.    The Director Defendants all owed and owe fiduciary duties to J&J and its

shareholders. By reason of their fiduciary relationships, Defendants specifically owed and owe

J&J the highest obligation of good faith and loyalty in the administration of the affairs of the

Company, including the oversight of J&J's compliance with federal laws governing the

marketing of pharmaceuticals. Moreover, the Board had specific fiduciary duties as defined by

the Company's key corporate governance documents and principles that, had they been

discharged in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company alleged herein.

414. The Director Defendants consciously violated their corporate responsibilities in at least the following ways:

(a)     Affirmatively and repeatedly declining to stop and prevent J&J's illegal marketing and promotion of off-label uses of Risperdal, Topamax, Natrecor and the Company's biliary stents after receiving reports of such illegal activity and numerous red flags indicating such widespread illegality, and/or consciously disregarding such reports and activity;

(b)     Deciding not to act to stop and prevent J&J's illegal kickbacks to healthcare professionals and organizations for prescribing, recommending or using multiple J&J drugs and medical devices, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and/or consciously disregarding such reports and activity; and

(c)     Approving and/or consciously disregarding J&J's business plan of marketing its drugs through the widespread illegal promotion of off-label uses and dosages, through illegal payments, and through illegal kickbacks to healthcare professionals in order to maximize J&J's short-term profit but at the expense of shareholder's long-term interests and J&J's reputation and goodwill.

415. As a direct and proximate result of the Director Defendants' conscious failure to perform their fiduciary obligations, the Company has sustained and will sustain significant damages, not only monetarily, but also to its corporate image and goodwill.

416. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT III
**(Against the Officer Defendants
for Breach of Fiduciary Duty in connection with
the Omnicare Kickback Scheme, the Risperdal Off-Label
Promotion Scheme, the Natrecor Off-Label Promotion
Scheme, the Topamax Off-Label Promotion Scheme,
the DePuy Kickback Scheme, the Biliary Stent
Off-Label Promotion Scheme, the Delayed OTC
Contamination Recall Scheme, and the FCPA Bribery Scheme)**

417.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

418.    By reason of their positions as fiduciaries of the Company, the Officer Defendants owed duties of good faith, loyalty, and truthful disclosure.  The Officer Defendants were all aware of and educated concerning the relevant laws and regulations concerning pharmaceutical and medical device marketing and were duty-bound to abide by the laws and regulations and to enforce compliance therewith.

419.    The Officer Defendants consciously violated and breached these duties by causing J&J to employ a deliberate and systematic business plan of artificially increasing sales by engaging in unlawful sales and promotion practices by numerous J&J employees for a prolonged period of time in violation of FDA requirements, federal healthcare program requirements and/or the Federal anti-kickback statute.

420.    The Officer Defendants authorized and implemented J&J policies and practices of encouraging the widespread illegal marketing and promotion of off-label uses of J&J drugs and medical devices, as well as the payment of illegal payments and illegal kickbacks to healthcare professionals and organizations to induce the prescription, recommendation and use of J&J drugs and devices.

421.     As a direct and proximate result of the Officer Defendants' breaches of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

422.     The Officer Defendants are liable to the Company as a result of the acts alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring the 2010 and 2011 J&J Proxy Statements null and void and ordering a new Annual Meeting of Shareholders or special meeting of shareholders under the supervision of a Trustee or Special Master after the preparation and distribution of a replacement proxy statement prepared in compliance with all federal disclosure laws and rules;

B.     Declaring that the current and former Directors and officers named as Defendants herein have breached their fiduciary duties as alleged herein causing substantial damages to J&J;

C.     Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged and/or will be damaged by reason of the conduct complained of herein;

D.     Awarding Plaintiff and her counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

Dated: August 29, 2011              /s/ James C. Shah                            .
                                    James C. Shah
                                    Shepherd, Finkelman, Miller & Shah, LLP
                                    475 White Horse Pike
                                    Collingswood, NJ 08107
                                    (Tel) (856) 858-1770
                                    (Fax) (856) 858-7012
                                    (Email) jshah@sfmslaw.com

Counsel for Plaintiff

Of Counsel

Richard D. Greenfield
Ilene F. Brookler
Greenfield & Goodman LLC
250 Hudson Street, 8th Floor
New York, NY 10013
(Tel) (917) 495-4446
(Fax) (212) 355-9592
Email: whitehatrdg@earthlink.net


Scott R. Shepherd
Shepherd, Finkelman, Miller & Shah, LLP
35 E. State Street
Media, PA 19063
(Tel)  (610) 891-9880
(Fax) (610) 891-9883
Email: sshepherd@sfmslaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

M.J.Copeland, Individually and
Derivatively on behalf of
**Johnson & Johnson**

Plaintiff,

v.

**Charles O. Prince, III, Anne M. Mulcahy,**
**Mary Sue Coleman, James G. Cullen,**
**Michael M.E. Johns, Arnold G. Langbo,**
**Susan L. Lindquist, Leo F. Mullin,**
**William D. Perez, Ted Torphy,**
**David Satcher, William C. Weldon,**
**Christine A. Poon, Steven S. Reinemund,**
**Robert J. Darretta, Ann Dibble Jordan,**
**Henry B. Schacht, James T. Lenehan,**
**Robert N. Wilson, Joseph C. Scodari,**
**Alex Gorsky, Nicholas Valeriani and**
**Russell C. Deyo,**

Defendants
        and

**Johnson & Johnson**

Nominal Defendant.

Civil Action No.

# VERIFICATION

I, M.J. Copeland, hereby declare and verify as follows: I am the plaintiff in
the above-captioned case. I have read the contents of the foregoing
Complaint. I am informed and believe that the facts related therein are true,
based upon facts as related to me by my counsel, and on that ground, I verify
that the facts stated therein are true.

M.J. Copeland _____ August 25, 2011